Sheila Gropper Nelson, SBN 85031
Resolution Law Firm P. C.
50 Osgood Place, 5th Fl.
San Francisco CA 94133
Email: Shedoesbklaw@aol.com
415-362-2221
Attorneys for Arcon Construction Corporation
Debtor-in-possession

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
[San Francisco Division]

| | |
|---|---|
| In re: | Case No. 24-30679 |
| Arcon Construction Corporation | Request for Judicial Notice in Support of Arcon Construction Corporation's Objection to 653 28th Street LLC Motion Regarding the Automatic Stay & To Pursue a Derivative Action |
| Debtor & Debtor-in-possession | Date: TBD |
| _____/ | Time: TBD |
| | Court: Honorable D. Montali |

    Pursuant to Federal Rule of Evidence 201, debtor Arcon Construction Corporation, debtor and debtor-in-possession, ("Arcon") hereby requests that the Court take judicial notice of the following in support of its (1) Objection to 653 28th Street LLC's, (653), motion to confirm that the automatic stay is not applicable or alternatively for authority to pursue a derivative action for Debtor's Bankruptcy Estate:

[a]    653's Third Amended Cross-Complaint Filed in CGC 19-574888;
[b]    The Statement of Decision entered in that action;
[c]    The Judgment entered in that Action;
[d]    This Court's order of December 9, 2024 (Dkt No. 74); and
[e]    Email to Ms. Alves.

Dated: Jan 15, 2026                    Respectfully submitted,
                                        /s/Sheila Gropper Nelson
                                       Resolution Law Firm P. C.
                                       Sheila Gropper Nelson
                                       Attorney for Arcon Construction Corporation

REQUEST FOR JUDICIAL NOTICE 24-30679 - 1

1

2

3

4

5

6

7

8

9                               Exhibit A

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE 24-30679 - 2

Brian E. Soriano, SBN 183865
Vladie P. Viltman, SBN 203140
LAW OFFICE OF BRIAN E. SORIANO
1801 Bush Street, Suite 304
San Francisco, CA 94109
TEL: 415/593-7333
FAX:415/480-6073
EMAIL: brian@bsoriano.com
EMAIL: vladie@bsoriano.com

Attorneys for Defendant/Cross-Complainant
653 28th Street, LLC

ELECTRONICALLY
**F I L E D**
Superior Court of California,
County of San Francisco

**05/20/2022**
Clerk of the Court
BY: BOWMAN LIU
Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| ARCON CONSTRUCTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>653 28TH STREET LLC; JOHN LUM ARCHITECTURE INC.; JOHN GIT HOONG LUM, AN INDIVIDUAL; ADEPT CONSTRUCTION SOLUTIONS, INC.; IGOR M. KLEYNER, AN INDIVIDUAL; MICHAEL YAN CHAN DBA MICHAEL CHAN COMPANY; AND Does 1-200, inclusive,<br><br>Defendants. | Case No. CGC-19-574888<br><br>**653 28TH STREET, LLC'S THIRD AMENDED CROSS-COMPLAINT FOR:**<br><br>**(1) BREACH OF WRITTEN CONTRACT;**<br>**(2) NEGLIGENCE;**<br>**(3) NEGLIGENT MISREPRESENTATION;**<br>**(4) INTENTIONAL MISREPRESENTATION;**<br>**(5) PROFESSIONAL NEGLIGENCE;**<br>**(6) BREACH OF CONTRACT;**<br>**(7) BREACH OF ORAL CONTRACT;**<br>**(8) EQUITABLE INDEMNITY;**<br>**(9) CONTRIBUTION; and**<br>**(10) DECLARATORY RELIEF** |
| 653 28TH STREET LLC,<br><br>Cross-Complainant,<br><br>v.<br><br>ARCON CONSTRUCTION CORPORATION; JOHN LUM ARCHITECTURE INC.; MICHAEL CHAN COMPANY; ADEPT CONSTRUCTION SOLUTIONS, INC., MODERN TECHNOLOGY RESOURCES, INC., AND Roes 1-100, inclusive,<br><br>Cross-Defendants. | **(11) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>**(12) VIOLATION OF BUSINESS AND PROFESSIONS CODE 7160**<br><br>Complaint Filed: March 28, 2019<br>Trial Date: December 15, 2021 |

Defendant and Cross-Complainant 653 28th Street, LLC ("Cross-Complainant") hereby alleges as follows:

1.

## GENERAL ALLEGATIONS

1. This matter arises out of the remodeling/construction of a residential home located at 653 28th Street, San Francisco, California (the "Subject Property"). Cross-Complainant is the owner of the Subject Property, as successor-in-interest to Farallon Real Estate Fund 4, LLC. Cross-Complainant is not a general contractor, an architect, a structural, civil or geotechnical engineer or a design professional, and at all relevant times hereto relied upon its retained contractor, design professionals and consultants to perform their scopes of work in a competent manner and in conformance with applicable laws, statutes, building codes, regulations and standards of care.

2. At all times relevant hereto, Cross-Complainant was a limited liability company, duly organized and existing under the laws of the State of California and was doing business in the City and County of San Francisco, State of California.

3. At all times relevant hereto, Cross-Defendant Arcon Construction Corporation ("Arcon") was and is a corporation, duly organized and existing under the laws of the State of California, and a licensed general building contractor doing business as a general contractor in the City and County of San Francisco, State of California. Pursuant to its own website, Arcon boasts safety, quality and the on-time performance of work, including general contracting, design-build projects and guaranteed maximum price services with single-source accountability, guaranteed outcomes and turnkey solutions. Against this backdrop, Cross-Complainant entered into a guaranteed lump sum fixed price contract with Arcon to act as general contractor, construct the Subject Property and perform all required work in accord with the terms of the written contract entered into between it and Cross-Complainant, which contract was at no time amended subsequent to execution. Prior to bidding the project and entering into the guaranteed lump sum contract, Arcon was provided with all approved architectural plans, structural plans, shoring plans, a detailed geotechnical soils and investigation report and all other project plans and specifications, reports and documents necessary to bid the project and perform the services it was requested to provide. Cross-Complainant hired and relied upon the proposed services and expertise of Arcon, expected that Arcon was competent to properly and timely perform said services in accord with the terms of its contract, applicable laws, statutes, regulations, building codes and standards of care, and had no reason to believe that Arcon could not or would not

2

perform its services in accord with the applicable contract, laws, statutes, regulations, building codes and standards of care in the industry.

4.     At all times relevant hereto, Cross-Defendant John Lum Architecture, Inc. ("Lum") was and is a corporation, duly organized and existing under the laws of the State of California, and a licensed architectural firm doing business as an architect in the City and County of San Francisco, State of California. Lum entered into a contract with Cross-Complainant to provide, and did provide, among other things, design and architectural services as well as construction administration/observation services for the Subject Property. Lum entered into its contract with Cross-Complainant to provide, and did provide, among other things, architectural services in connection with the Subject Property, including services required to ensure that the applicable plans and specifications to be used for the project were accurate, integrated and cohesive so as to allow the Subject Property to be permitted and built in accord therewith. Cross-Complainant hired and relied upon the proposed services and expertise of Lum, expected that Lum was competent to properly and timely perform said services in accord with the terms of its contract, applicable laws, statutes, regulations, building codes and standards of care, and had no reason to believe that Lum could not or would not perform its services in accord with the applicable contract, laws, statutes, regulations, building codes and standards of care in the industry.

5.     At all times relevant hereto, Cross-Defendant Michael Chan Company ("Chan") was an entity of unknown form, duly organized and existing under the laws of the State of California and a licensed civil/structural engineer doing business as a civil/structural engineer in the City and County of San Francisco, State of California. Chan entered into a contract with Cross-Complainant to provide, and did provide, among other things, civil engineering and structural engineering services in connection with the Subject Property, including those services required, as a civil engineer, to ensure that the applicable plans and specifications to be used for the project were accurate, integrated and cohesive and to incorporate comments and changes from other design professionals and from the San Francisco Building Department so as to cause the Subject Property to be permitted and built in accord therewith. Cross-Complainant hired and relied upon the proposed services and expertise of Chan, expected that Chan was competent to properly and timely perform said services in accord with the

3

terms of its contract, applicable laws, statutes, regulations, building codes and standards of care, and
had no reason to believe that Chan could not or would not perform its services in accord with the
applicable contract, laws, statutes, regulations, building codes and standards of care in the industry.

   6. At all times relevant hereto, Cross-Defendants Adept Construction Solutions, Inc.
("Adept") and Modern Technology Resources, Inc. ("Modern") were corporations, duly organized and
existing under the laws of the State of California and licensed to do and doing business as a civil and
geotechnical engineering firm in the City and County of San Francisco, State of California. At all
times relevant hereto, Adept and Modern were alter egos of each other and were, among other things,
located at the same address and using the same geotechnical and civil engineering license numbers,
and there exists a unity of interests and ownership among and between them such that any
separateness among and between them has ceased to exist and never existed (collectively
"Adept/Modern"). Adept/Modern entered into contracts with Cross-Complainant to provide, and did
provide, among other things, civil engineering services, geotechnical engineering services, shoring
engineering services, temporary shoring and drainage services, soils testing, drainage and
waterproofing plans and specifications, shoring plans and calculations, permit services, a geotechnical
report and construction observations services and acted as Engineer of Record for the Subject
Property. Specifically, Adept/Modern entered into its contracts with Cross-Complainant to provide,
and did provide, among other things, all services specific to its scopes of work in connection with the
Subject Property, including those services required to ensure that the applicable plans and
specifications to be used for the project were accurate, integrated and cohesive so as to allow the
Subject Property to be permitted and built in accord therewith. Cross-Complainant hired and relied
upon the proposed services and expertise of Adept/Modern, expected that Adept/Modern was
competent to properly and timely perform said services in accord with the terms of its contracts,
applicable laws, statutes, regulations, building codes and standards of care, and had no reason to
believe that Adept/Modern could not or would not perform its services in accord with the applicable
contracts, laws, statutes, regulations, building codes and standards of care in the industry..

   7. Arcon, Lum, Chan, Adept and Modern are collectively be referred to herein as "Cross-
Defendants."

4

8.      Cross-Complainant is unaware of the true names and capacities of Cross-Defendants sued herein as Roes 1 through 100, inclusive, whether individual, corporate, association or otherwise, and therefore sues these Cross-Defendants by such fictitious names.  Cross-Complainant will amend this Cross-Complaint to allege their true names and capacities when ascertained.

9.      Cross-Complainant alleges on information and belief that Cross-Defendants and Roes 1 through 100, and each of them, inclusive, are and were contractors, subcontractors, design professionals, engineering professionals, architectural professionals, materialmen, suppliers, manufacturers, property management entities or other individuals and/or entities of as yet unidentified forms and/or description, which in whole or in part participated in some fashion in the creation, construction, design, development, manufacture or had other participation in the Subject Property as alleged herein and in Arcon's First Amended Complaint.

10.     Cross-Complainant is informed and believes and thereon alleges that at all relevant times herein, Cross-Defendants and Roes 1 through 100, and each of them, were acting as the agents, servants, employees, successors, predecessors, associates, employees, partners, joint ventures, alter egos, conspirators, representatives and/or in some other capacity, however termed and/or described, of each other and were acting within the course and scope of each of the other Cross-Defendants and Roes 1 through 100 and with full knowledge and consent, such that Cross-Defendants and Roes 1 through 100 are jointly and severally liable to Cross-Complainant.

11.     On or about June 13, 2018, Cross-Complainant entered into a written contract with Arcon to act as general contractor and construct the Subject Property for a guaranteed lump sum fixed price bid in the amount of $1,984,141.46, which contract was Arcon's standard contract. A Rider to the contract was also signed by the parties and incorporated into Arcon's standard contract without exception on June 13, 2018; these documents are collectively referred to herein as the "Arcon Contract." A copy of the Arcon Contract is attached hereto as Exhibit "A" and made a part hereof.  At all times relevant hereto, Arcon was represented by its own, independent counsel in the negotiation of all aspects of the Arcon Contract, including the Rider. Since execution, the Arcon Contract has not been amended.

5

12.     On or about August 27, 2015, Cross-Complainant's predecessor-in-interest, Farallon Real Estate 4, LLC, entered into a written contract with Lum to provide, among other things, design, architectural and construction administration/observations services for the Subject Property (the "Lum Contract"). Thereafter, Cross-Complainant underwent a name change and the contract which is referred to herein as the "Lum Contract" continued in full force and effect.  Lum was required to perform its work in a competent manner in compliance with applicable laws, statutes, regulations, building codes and standards of care and was required to integrate its plans, specifications and calculations with all other plans, specifications and calculations prepared for use at the Subject Property by other design professionals to ensure that the plans could and would be permitted and that the Subject Property was buildable in accord with said plans. A copy of the Lum Contract is attached hereto as Exhibit "B" and made a part hereof.

13.     On or about November 14, 2016, Cross-Complainant entered into a written contract with Chan to provide, among other things, civil engineering and structural engineering services for the Subject Property (the "Chan Contract"). Chan was required to perform its work in a competent manner in compliance with applicable laws, statutes, regulations, building codes and standards of care and was required to integrate its plans, specifications and calculations with all other plans, specifications and calculations prepared for use at the Subject Property by other design professionals and to incorporate comments and changes from other design professionals and from the San Francisco Building Department to ensure that the plans could and would be permitted and that the Subject Property was buildable in accord with said plans.  A copy of the Chan Contract is attached hereto as Exhibit "C" and made a part hereof.

14.     On or about October 30, 2017, November 14, 2017, and December 11, 2017, Cross-Complainant entered into contracts with Adept/Modern to provide, among other things, civil engineering services, geotechnical engineering services, shoring engineering services, temporary shoring and drainage services, soils testing, drainage and waterproofing plans and specifications, shoring plans and calculations, permit services, a comprehensive geotechnical report, construction observation services and to act as Engineer of Record for the Subject Property (the "Adept/Modern Contracts"). Adept/Modern was required to perform work in a competent manner in compliance with

6

applicable laws, statutes, regulations, building codes and standards of care and was required to integrate its plans, specifications and calculations with all other plans, specifications and calculations prepared for use at the Subject Property by other design professionals to ensure that the plans could and would be permitted and that the Subject Property was buildable in accord with said plans. The Adept/Modern Contracts also expressly require that Cross-Complainant be named as an additional insured on the Adept/Modern commercial general liability and professional liability/errors omissions policies of insurance. Copies of the Adept/Modern Contracts are attached hereto as Exhibit "D" and made a part hereof.

15.     Prior to bidding the project and well in advance of entering into the guaranteed lump sum Arcon Contract, Arcon was provided with all approved architectural plans, structural plans, shoring plans, a detailed geotechnical soils and investigation report and all other project plans and specifications, reports and documents necessary to bid the project so that it could accurately bid the project and satisfy itself that the project was buildable in accord with the plans for the amount set forth in the Arcon Contract without the need for revision or change orders.

16.     The documents provided to Arcon well in advance of the bidding and/or commencement of the work clearly put Arcon on notice of, among other things, the scope of the project, any difficulties associated with the site and site conditions, and informed Arcon that it should expect various site difficulties during excavation work and that bedrock was located near the surface of the soil at the Subject Property.

17.     Prior to entering into the Arcon Contract, Arcon specifically acknowledged, represented and declared in advance of entering into the Arcon Contract for a guaranteed lump sum fixed price amount, that it had carefully reviewed the contract documents, as defined in Article I and to include all of the plans listed under Scope of Work in Article 2.2 of the Arcon Contract (the "Contract Documents") and that the Contract Documents were full and complete and were sufficient to enable Arcon to determine the cost of the work outlined therein in order to bid the job and enter into the Arcon Contract for the guaranteed lump sum fixed price amount. Arcon also specifically acknowledged, represented and declared that the Contract Documents, including the plans and specifications, were sufficient to enable Arcon to construct the Subject Property in accordance with

7

said plans and with all applicable laws, statutes, building codes and regulations and to fulfill all of its obligations under the Arcon Contract. Arcon further specifically acknowledged, represented and declared that it had visited the site and made appropriate field measurements, that it had examined all of the conditions affecting the work to be performed at the Subject Property, that it was fully familiar with all of the Contract Documents, including the plans and specifications, and that there were no discrepancies, inconsistencies, errors, or omissions in the Contract Documents, including the plans and specifications, of any kind.

18. Arcon acted as general contractor and performed construction work at the Subject Property pursuant to the applicable Arcon Contract from approximately June of 2018 to the date it walked off the job in late December of 2018. Prior to walking off the job without justification, Arcon repeatedly breached its agreement to, among other things, perform its work, pay its subcontractors, build the Subject Property for a guaranteed lump sum fixed price of $1,984,141.46, undertake the work without change except if approved in advance in writing by Cross-Complainant, and to diligently prosecute the work without delay and in accord with the Contract Documents and all other provisions of the Arcon Contract.

19. Notwithstanding the terms of the Arcon Contract and the express representations, declarations and warranties made by Arcon therein, as more particularly set forth below, Arcon, among other things, failed and refused to do the work for the guaranteed lump sum fixed price, failed to pay its subcontractors, undertook work that was not approved and thereafter sought compensation therefore, failed to get preapproved change orders from Cross-Complainant before doing work, prepared false and fraudulent invoices and change orders, failed to give equitable credits for excavation, shoring and other geotechnical work not performed, to Arcon's benefit, walked off the job without any basis therefore allowing the Subject Property to sit idle for weeks on end so as to cause dangerous conditions to develop and unnecessary project delays, failed to review the Contract Documents, including plans, specifications and reports, in advance of bidding the job (or even unroll them) and before commencing the work, failed to return mobilization fees for work never mobilized, refused to perform the work, thereby bringing the project to a halt which made completion by the date agreed upon by Arcon impossible, forced Cross-Complainant to hire a new general contractor, and

8

1  caused Cross-Complainant to carry the costs of the project unnecessarily and sustain additional

2  damages and losses as more particularly set forth below and according to proof.

3      20.    On January 24, 2019, Cross-Complainant issued a Notice of Breach due to Arcon's

4  continued refusal to perform under the terms of the Arcon Contract. A copy of the Notice of Breach is

5  attached hereto as Exhibit "E". Despite receiving this notice, and the opportunity to return to the

6  project, Arcon still refused to return to the job. Accordingly, left with no choice but to terminate Arcon

7  for cause, on February 1, 2019, Cross-Complainant issued a Notice of Termination, which email is

8  attached hereto as Exhibit "F", rather than be held hostage to what was a clearly emerging pattern of

9  Arcon avoiding the guaranteed lump sum fixed price terms of the Arcon Contract and, instead,

10  demanding to be paid more without a legitimate basis therefore.

11      21.    On or about February 5, 2019, Cross-Complainant filed a Demand for Arbitration

12  alleging losses for Arcon's failure to pay its subcontractors, disputes related to unapproved change

13  orders, false invoices, work not performed or partially performed despite full payment of same,

14  unearned mobilization fees retained by Arcon after it walked off the job, the failure to provide credits

15  and equitable adjustments to Cross-Complainant as required under the Arcon Contract, delay damages,

16  carrying costs, attorney's fees and costs and various other losses.

17      22.    On or about March 6, 2019, Arcon filed a meritless Answering Statement/Counterclaim

18  in the arbitration proceedings claiming losses after being fired for cause.

19      23.    On or about March 28, 2019, Arcon filed the Complaint against Cross-Complainant

20  herein asserting causes of action for Breach of Contract, Common Count in Quantum Meruit and

21  Foreclose Mechanic's Lien.

22      24.    On or about May 29, 2019, Arcon filed its First Amended Complaint against Cross-

23  Complainant, Lum, Chan, Adept and others asserting causes of action for damages arising out of

24  alleged deficiencies in the plans that Arcon had never bothered to unroll before bidding the job,

25  entering into the Arcon Contract or commencing the work. Arcon asserts claims for Breach of

26  Contract, Common Count in Quantum Meruit, Foreclosure of Mechanic's Lien, Intentional

27  Misrepresentation, Negligence, Negligent Misrepresentation, Tort of Another, Equitable Indemnity

28  and Contribution, Implied Indemnity and Declaratory Relief (the "FAC"). On or about December 3,

9

2019, Arcon filed an Amendment to Complaint to Substitute True Name for Doe or Fictitious Name, adding Modern as a defendant. All of Arcon's claims are disputed by Cross-Complainant.

25.     Notwithstanding anything alleged in the pleadings on file herein or in this Cross-Complaint, in addition to known losses sustained to date, Cross-Complainant reserves the right to amend this Cross-Complaint to seek additional sums against any Cross-Defendant to the extent there are newly discovered or more fully developed facts, circumstances, defects or deficiencies related to the Subject Property.

## FIRST CAUSE OF ACTION

### (Breach of Written Contract as to Arcon and Roes 1 - 100, inclusive)

26.     Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

27.     Pursuant to the Arcon Contract, Arcon agreed, among other things, to act as general contractor and construct the Subject Property for a fixed guaranteed lump sum of $1,984,141.46 and further agreed to fully comply with all terms of the Arcon Contract. Arcon agreed to complete the work and the Subject Property by June 26, 2019.

28.     At all relevant times and during all phases of the work commenced by Arcon, Arcon had all of the equipment, subcontractors and information, including plans, specifications, site reports and Contract Documents needed to proceed to completion, and there was no reason whatsoever for Arcon to breach its contract, stop all work as of late December, 2018, or cause the significant delays and damages of which Cross-Complainant now complains.

29.     Cross-Complainant performed all material obligations required of it pursuant to the Arcon Contract.

30.     Arcon breached the Arcon Contract, by, among other things, failing and refusing to perform the scope of work set forth in the Arcon Contract for the guaranteed lump sum fixed price of $1,984,141.46, failing to review the Contract Documents, including the plans, specifications, before bidding the work and/or commencing it, failing to pay its subcontractors, failing to perform work and/or only partially performing work required under the Arcon Contract, while nonetheless invoicing the work as complete, undertaking work that was not approved (and, in fact, expressly disapproved)

10

and then seeking compensation therefore, failing to obtain preapproved change orders from Cross-Complainant before doing work and ignoring express directives from Cross-Complainant, preparing false and fraudulent invoices and change orders, failing to give required equitable credits and adjust the contract price downwards for excavation, shoring and other geotechnical work not performed by Arcon despite the cost saving benefits enjoyed by Arcon, walking off the job without any basis therefore, forcing the project to sit idle for weeks on end so as to create dangerous conditions to Cross-Complainant and adjoining homeowners and causing delays to the project, failing to construct the Subject Property in accordance with applicable Contract Documents, laws, statutes, building codes and regulations and appropriate standards of care and failing to ascertain same prior to bidding the project, failing to review and rule out any errors, deficiencies or discrepancies in the Contract Documents, including the plans, specifications, and confirm that the work could and would be performed for the amount of the guaranteed lump sum fixed price bid amount and without delay, failing to visit the site and be familiar with the site and all relevant site conditions, failing to return mobilization fees for work never mobilized, refusing to perform the work it had agreed to perform, bringing the project to a halt which made completion by the date agreed upon by Arcon impossible, forcing Cross-Complainant to hire a new general contractor, and causing Cross-Complainant to sustain delay damage, excess carrying costs in connection with the project and other losses and damages, failing to name Cross-Complainant as an additional insured under Arcon policies of insurance, and numerous other breaches and negligent conduct.

31.     In entering into the Arcon Contract, Cross-Complainant reasonably relied upon Arcon to perform the work agreed upon in the Arcon Contract in accord with terms of the Arcon Contract and reasonably relied on the express, affirmative written promises, guarantees, representations and warranties Arcon made as set forth therein.

32.     As a result of Arcon's and Roes 1 through 100's conduct complained of herein, Cross-Complainant has suffered damages and losses including, but not limited to, the overpayment for work performed, partially performed or not performed, in not receiving equitable adjustments to which it is entitled, in paying mobilization fees for work not mobilized, for additional professional fees, increased construction costs, extreme project delays, in not receiving a per diem credit of $500 for each day after

the agreed-upon deadline for project completion, increased carrying costs in connection with the
project, damages associated with the clouding of title and the adverse impact on the ability to market
and sell the Subject Property, lost profits, attorney's fees and costs according to contract, expert fees
and costs, mediation fees and costs, and other damages and losses all in an amount in excess of
$800,000, or in an amount according to proof.

33. Arcon's and Roes 1 through 100's breaches of contract are a substantial factor in
causing Cross-Complainant's harm.

WHEREFORE, Cross-Complainant prays for judgment against Arcon and Roes 1 through 100
as set forth below.

## SECOND CAUSE OF ACTION

### (Negligence as to Arcon and Roes 1 - 100, inclusive)

34. Cross-Complainant realleges and incorporates by reference each and every allegation
contained in the preceding paragraphs as if fully set forth in this cause of action.

35. Arcon and Roes 1 through 100, and each of them, owed a duty to Cross-Complainant as
a licensed contractor, among other things, to construct the Subject Property in accordance with the
Arcon Contract, the applicable plans, specifications, reports and other Contract Documents and in
compliance with all applicable laws, statutes, building codes and regulations and standards of care
which they knew or should have known were applicable and would be used to construct the Subject
Property.

36. Arcon and Roes 1–100, and each of them, were negligent, their conduct fell below all
applicable standards of care for a general contractor, and they breached their duties to Cross-
Complainant by, among other things, engaging in the conduct identified in Paragraphs 19 and 30
above, which Paragraphs are incorporated herein by reference.

37. Arcon's and Roes 1 through 100's negligence was a substantial factor in causing Cross-
Complainant's harm and damages.

38. As a result of Arcon's and Roes 1 through 100's conduct complained of herein, Cross-
Complainant has suffered damages and losses including, but not limited to, the overpayment for work
performed, partially performed or not performed, in not receiving equitable adjustments to which it is

entitled, in paying mobilization fees for work not mobilized, for additional professional fees, increased construction costs, extreme project delays, in not receiving a per diem credit of $500 for each day after the agreed-upon deadline for project completion, increased carrying costs in connection with the project, damages associated with the clouding of title and the adverse impact on the ability to market and sell the Subject Property, lost profits, attorney's fees and costs according to contract, expert fees and costs, mediation fees and costs, and other damages and losses all in an amount in excess of $800,000, or in an amount according to proof.

WHEREFORE, Cross-Complainant prays for judgment against Arcon and Roes 1 through 100 as set forth below.

### THIRD CAUSE OF ACTION

### (Negligent Misrepresentation as to Arcon and Roes 1 - 100, inclusive)

39.     Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

40.     Arcon and Roes 1 through 100, and each of them, expressly and impliedly represented to Cross-Complainant that they would do the work in accord with each and every express term of the Arcon Contract and would be bound thereby.

41.     Arcon and Roes 1 through 100, and each of them, further expressly and impliedly represented to Cross-Complainant that, among other things (as well as the allegations set forth in Paragraphs 19 and 30 above), they had carefully reviewed and were fully familiar with all Contract Documents, including the plans and specifications, and the site before bidding the project and before commencing the work, that the Contract Documents, including the plans and specifications, were full, complete, and sufficient to enable Arcon to determine the cost of the construction work and accurately bid the project for the guaranteed lump sum fixed price bid, that the work could and would be completed for a guaranteed lump sum fixed price amount of $1,984,141.46, that the Contract Documents, including the plans and specifications, contained no discrepancies, inconsistencies, errors or omissions, and that they were sufficient without revision to enable Arcon to construct the Subject Property in accordance with all Contract Documents and applicable laws, statutes, building codes and regulations and otherwise to fulfill all its obligations under the Arcon Contract.

13

42.     Arcon and Roes 1 through 100, and each of them, further expressly and impliedly represented to Cross-Complainant that before entering into the Arcon Contract, they had visited the site and made appropriate field measurements, examined all conditions affecting the work to be performed at the Subject Property, were fully familiar with all of the conditions at the site and affecting the construction of the Subject Property, and had carefully examined all Contract Documents, including all plans and specifications, and found that there were no discrepancies, inconsistencies, errors or omissions in the Contract Documents, including the plans and specifications, that would impact on the bid amount set forth in the Arcon Contract or their ability to build the Subject Property.

43.     These representations were false when made or said.

44.     By illustration, notwithstanding the foregoing representations, which were relied upon by Cross-Complainant with no reason to believe them to be false, in fact, Arcon and Roes 1-100, and each of them, instead engaged in the conduct more particularly described herein and in Paragraphs 19 and 30 above, among other things, and numerous other breaches, negligent conduct and misrepresentations.

45.     Although Arcon and Roes 1 through 100, and each of them, may have believed that their representations were true, however, given their subsequent conduct and the facts and circumstances alleged herein, they had no reasonable grounds for believing the representations to be true. Arcon and Roes 1 through 100, and each of them, intended that Cross-Complainant rely on the representations described herein when hiring Arcon to construct the Subject Property and in entering into the guaranteed lump sum fixed price Arcon Contract.

46.     Cross-Complainant reasonably relied on the above representations of Arcon and Roes 1 through 100, and each of them, in entering into the Arcon Contract with Arcon for construction of the project in the guaranteed lump sum fixed price amount of $1,984,141.46.

47.     Cross-Complainant's reasonable reliance on those representations was a substantial factor in causing losses, damages and the harm sustained by Cross-Complainant, and Cross-Complainant has suffered damages in excess of $800,000, or in an amount according to proof.

14

48.     As a result of Arcon's and Roes 1 through 100's conduct complained of herein, Cross-Complainant has suffered damages and losses including, but not limited to, the overpayment for work performed, partially performed or not performed, in not receiving equitable adjustments to which it is entitled, in paying mobilization fees for work not mobilized, for additional professional fees, increased construction costs, extreme project delays, in not receiving a per diem credit of $500 for each day after the deadline for project completion, in suffering increased carrying costs in connection with the project, damages associated with the clouding of title and the adverse impact on the ability to market and sell the Subject Property, lost profits, attorney's fees and costs according to contract, expert fees and costs, mediation fees and costs, and other damages and losses all in an amount in excess of $800,000, or in an amount according to proof.

WHEREFORE, Cross-Complainant prays for judgment against Arcon and Roes 1 through 100 as set forth below.

## FOURTH CAUSE OF ACTION

### (Intentional Misrepresentation as to Arcon and Roes 1 - 100, inclusive)

49.     Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

50.     Arcon and Roes 1 through 100, and each of them, falsely and fraudulently represented to Cross-Complainant that they would do the work in accord with each and every express term of the Arcon Contract and would be bound thereby.

51.     Arcon and Roes 1 through 100, and each of them, further falsely and fraudulently represented to Cross-Complainant that, among other things (as well as the allegations set forth in Paragraphs 19 and 30 above), they had carefully reviewed and were fully familiar with all Contract Documents, including the plans and specifications, and the site before bidding the project and before commencing the work, that the Contract Documents, including the plans and specifications, were full, complete, and sufficient to enable Arcon to determine the cost of the construction work and accurately bid the project for the guaranteed lump sum fixed price, that the work could and would be completed for a guaranteed lump sum fixed price amount of $1,984,141.46, that the Contract Documents, including the plans and specifications, contained no discrepancies, inconsistencies, errors or

15

omissions, and that they were sufficient without revision to enable Arcon to construct the Subject Property in accordance with all Contract Documents, applicable laws, statutes, building codes and regulations and otherwise to fulfill all its obligations under the Arcon Contract.

52. Arcon and Roes 1 through 100, and each of them, further falsely and fraudulently represented to Cross-Complainant that before entering into the Arcon Contract, Arcon had visited the site and made appropriate field measurements, examined all conditions affecting the work to be performed at the Subject Property, were fully familiar with all of the conditions at the site and affecting the construction of the Subject Property, and had carefully examined the Contract Documents, including the plans and specifications, and found that there were no discrepancies, inconsistencies, errors or omissions in the Contract Documents, including the plans and specifications, that would impact on the bid amount set forth in the Arcon Contract or their ability to build the Subject Property.

53. The above referenced representations made by Arcon were false when made or said.

54. Notwithstanding having made the above affirmative, express acknowledgements, declarations and representations to Cross-Complainant, Arcon has since admitted that it did not review Contract Documents, including the plans and specifications, before bidding the job or commencing the work and allegedly only discovered issues with same after commencing work including, among other things: (1) that the Contract Documents, including the architectural, shoring and structural plans, were not full and complete; (2) that the Contract Documents, including the architectural, shoring and structural plans, contained inconsistencies, errors and omissions; (3) that the Contract Documents, including the architectural, shoring and structural plans, were not in compliance with applicable building codes laws, statutes and regulations, including San Francisco Planning Department roof height requirements; and (4) that the Contract Documents contained inconsistencies, errors and omissions that caused increased construction costs above the guaranteed lump sum fixed price amount of $1,984,141.46 set forth in the Arcon Contract.

55. Arcon and Roes 1 through 100 knew that the representations they made to Cross-Complainant as set forth in the Arcon Contract and otherwise, were, when made, false or made the representations recklessly and without regard for their truth.

16

56.     Arcon and Roes 1 through 100 intended that Cross-Complainant rely on these representations when inducing Cross-Complainant to enter into the Arcon Contract for the guaranteed lump sum fixed price amount set forth therein.

57.     Cross-Complainant reasonably relied on Arcon's and Roes 1 through 100's representations when it entered into the guaranteed lump sum fixed price Arcon Contract in the amount of $1,984,141.46.

58.     Cross-Complainant has been harmed and has sustained significant damages as a result of Arcon's and Roes 1 through 100's misrepresentations. As a result of Arcon's and Roes 1 through 100's conduct complained of herein, Cross-Complainant has suffered damages and losses including, but not limited to, the overpayment for work performed, partially performed or not performed, in not receiving equitable adjustments to which it is entitled, in paying mobilization fees for work not mobilized, for additional professional fees, increased construction costs, extreme project delays, a per diem credit of $500 for each day after the deadline for project completion, increased carrying costs in connection with the project, damages associated with the clouding of title and the adverse impact on the ability to market and sell the Subject Property, lost profits, attorney's fees and costs according to contract, expert fees and costs, mediation fees and costs, and other damages and losses all in an amount in excess of $800,000, or in an amount according to proof.

59.     Cross-Complainant's reliance on these misrepresentations was reasonable and said representations were a substantial factor in causing the harm, damages and losses suffered by Cross-Complainant, which damages are in excess of $800,000, or in an amount according to proof.

WHEREFORE, Cross-Complainant prays for judgment against Arcon and Roes 1 through 100 as set forth below.

## FIFTH CAUSE OF ACTION

**(Professional Negligence as to Lum, Chan, Adept, Modern and Roes 1 - 100, inclusive)**

60.     Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

61.     Cross-Defendants Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, owed a duty to Cross-Complainant as licensed engineers and/or architects to prepare, review,

17

and furnish accurate, integrated, cohesive, and consistent plans, drawings, specifications, calculations and/or reports devoid of discrepancies, conflicts, errors or omissions and that were usable when delivered and that complied with all applicable laws, statutes, building codes and regulations and standards of care which they knew or should have known were applicable and would be used to bid and construct the Subject Property. Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, knew or should have known that their plans, drawings, specifications, calculations and/or reports would be used and relied upon in bidding the job and constructing the Subject Property and that Cross-Complainant did not have the knowledge or expertise to review or correct the Contract Documents, including the plans and specifications, or identify inconsistencies, inaccuracies, discrepancies, errors or omissions contained therein.

62.  Without peril to Cross-Complainant's ability to deny same and the allegations in Arcon's FAC, and notwithstanding Arcon's negligent or purposeful failure to perform under the terms of the Arcon Contract to the extreme detriment of Cross-Complainant, to the extent proven, Cross-Complainant alleges that Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, were negligent and breached their respective duties to Cross-Complainant in that they prepared and furnished plans, drawings, specifications, calculations and/or reports which were inconsistent, were not reviewed for consistency, were not integrated and/or contained inaccuracies, erroneous information, errors and/or omissions and/or were not in compliance with or undertook other actions not in conformance with applicable laws, statutes, building codes and regulations and/or applicable standards of care.

63.  Without peril to Cross-Complainant's ability to deny same and the allegations in Arcon's FAC, and notwithstanding Arcon's negligent or purposeful failure to perform under the terms of the Arcon Contract to the extreme detriment of Cross-Complainant, Cross-Complainant alleges that, to the extent it is proven that the conduct of Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, fell below the standard of care for licensed engineers and architects and was a substantial factor in causing damage to Cross-Complainant, in whole or in part, such negligence on the part of Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, makes them liable to Cross-Complainant in an amount according to proof.

18

64.     Cross-Complainant has been damaged and sustained harm and losses as a result of Arcon's conduct complained of herein, and to the extent such damage is caused in whole or in part by Lum, Chan, Adept and/or Modern, the damage includes, but is not limited to, the overpayment for work performed, partially performed or not performed, in not receiving equitable adjustments to which it is entitled, in paying mobilization fees for work not mobilized, for additional professional fees, increased construction costs, extreme project delays, a per diem credit of $500 for each day after the deadline for project completion, increased carrying costs associated with the project, damages associated with the clouding of title and the adverse impact on the ability to market and sell the Subject Property, lost profits, attorney's fees and costs according to contract, expert fees and costs, mediation fees and costs, and other damages and losses all in an amount in excess of $800,000, or in an amount according to proof.

65.     Lum's, Chan's, Adept's, Modern's and Roes 1 through 100's negligence is a substantial factor in causing Cross-Complainant's harm.

WHEREFORE, Cross-Complainant prays for judgment against Lum, Chan, Adept, Modern and Roes 1 through 100 as set forth below.

### SIXTH CAUSE OF ACTION

**(Breach of Contract as to Lum, Chan, Adept, Modern and Roes 1 - 100, inclusive)**

66.     Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

67.     Cross-Complainant entered into the Lum Contract, the Chan Contract and the Adept/Modern Contracts wherein Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, agreed, among other things, to competently provide architectural services, structural engineering services, civil engineering services, geotechnical engineering services, shoring engineering services, temporary shoring and drainage services, soils testing, architectural plans and specifications, structural plans and specifications, drainage and waterproofing plans and specifications, geotechnical plans and specifications, shoring plans and specifications, construction observation services and permitting services for the Subject Property and to act as Engineer of Record, all in conformance with applicable laws, statutes, building codes, regulations and in conformance with applicable standards of care.

19

68.     Without peril to Cross-Complainant's ability to deny same and the allegations contained in Arcon's FAC, and to assert liability on the part of Arcon for any and all damages sustained by Cross-Complainant, Cross-Complainant hereby alleges that Lum, Chan, Adept and/or Modern breached their respective contracts and are liable to Cross-Complainant for damages to Cross-Complainant caused, in whole or in part, to the extent that their architectural and/or engineering services and/or the architectural, structural and shoring plans and specifications contain inaccuracies and inconsistencies, conflict and are not integrated so as to provide a buildable product, that plans and specifications were not in conformance with San Francisco Planning Department regulations and ordinances and other requirements, that errors and omissions in the Contract Documents, including the plans and specifications, caused increased construction costs and/or that Lum, Chan, Adept and Modern were negligent, breached their contracts and/or performed services falling below applicable standards of care, as Lum, Chan, Adept and/or Modern were required to comply with applicable laws, statutes, regulations, building codes and standards of care and were required to review, coordinate and integrate their plans and specifications with all other plans and specifications prepared for the construction of the Subject Property.

69.     In addition, Adept/Modern and Roes 1 through 100, and each of them, agreed in their respective contracts to name Cross-Complainant as an additional insured on their liability policies of insurance to cover Cross-Complainant's liability for work performed at the Subject Property and breached their contracts in failing to do so.

70.     Cross-Complainant performed all material obligations required of it pursuant to the Lum Contract, Chan Contract and Adept/Modern Contracts.

71.     Cross-Complainant has been damaged and sustained harm and losses as a result of Arcon's conduct complained of herein, and to the extent such damage is caused in whole or in part by Lum, Chan, Adept and/or Modern, the damage includes, but is not limited to, the overpayment for work performed, partially performed or not performed, in not receiving equitable adjustments to which it is entitled, in paying mobilization fees for work not mobilized, for additional professional fees, increased construction costs, extreme project delays, for not receiving a per diem credit of $500 for each day after the deadline for project completion, increased carrying costs associated with the project,

Case: 24-30679   Doc# 259   Filed: 01/15/26   Entered: 01/15/26 23:34:27   Page 22 of 888

damages associated with the clouding of title and the adverse impact in the ability to market and sell the Subject Property, lost profits, attorney's fees and costs according to contract, expert fees and costs, mediation fees and costs, and other damages and losses all in an amount in excess of $800,000, or in an amount according to proof.

72. As a result of Lum's, Chan's, Adept's, Modern's and Roes 1 through 100's breaches of contract, Cross-Complainant has suffered, among others, increased construction costs, project delays, lost profits and attorney's fees and costs in an amount in excess of $800,000, or in an amount according to proof.

73. Lum's, Chan's, Adept's, Modern's and Roes 1 through 100's breaches of contract are a substantial factor in causing Cross-Complainant's harm.

WHEREFORE, Cross-Complainant prays for judgment against Lum, Chan, Adept, Modern and Roes 1 through 100 as set forth below.

## SEVENTH CAUSE OF ACTION

**(Breach of Oral Contract as to Lum, Chan, Adept, Modern and Roes 1 - 100, inclusive)**

74. Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

75. On various dates during the relevant subject matter of this action, Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, entered into certain oral contracts with Cross-Complainant. Each oral contract entered into provided in material part that Lum, Chan, Adept, Modern and Roes 1 through 100 would defend, indemnify and hold Cross-Complainant harmless from any and all liability incurred by Cross-Complainant arising from the actions, inactions, negligence, misfeasance and/or nonfeasance of Lum, Chan, Adept, Modern and Roes 1 through 100. Each oral contract entered into also provided in material part that Lum, Chan, Adept, Modern and Roes 1 through 100 would obtain insurance naming Cross- Complainant as an additional insured for any and all liability or damages incurred by Cross-Complainant and arising from the actions, inactions, negligence, misfeasance and/or nonfeasance of that Cross-Defendant. Each oral contract entered into further provided in material part that Lum, Chan, Adept, Modern and Roes 1 through 100 were obligated to defend Cross-Complainant against any claim resulting directly or indirectly from work

21

performed by or relating to work performed by Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, at or relating to the Subject Property.

76.     Cross-Complainant has performed all or substantially all of the things that the oral contracts required it to do, including paying Lum, Chan, Adept, Modern and Roes 1 through 100 for work that was authorized under their respective contracts.

77.     Without peril to Cross-Complainant's ability to deny the allegations of Arcon's FAC, and notwithstanding Arcon's negligence, breaches, misrepresentations and failure to perform under the express terms of the Arcon Contract to the extreme detriment of Cross-Complainant, Cross-Complainant alleges that Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, have an express duty and are obligated to indemnify and hold Cross-Complainant harmless in an amount equal to the sum of any judgment, settlement and/or costs of defense incurred relating to the Subject Property pursuant to the oral contracts as a result of the claims alleged in Arcon's FAC. To date, Cross-Complainant is informed and believes and based thereon alleges that Lum, Chan, Adept, Modern and Roes 1 through 100 have failed and refused to indemnify and hold Cross-Complainant harmless pursuant to the terms of the oral contracts and have thereby breached the oral contracts.

78.     Without peril to Cross-Complainant's ability to deny the allegations of Arcon's FAC, and notwithstanding Arcon's negligence, breaches, misrepresentations and failure to perform under the express terms of the Arcon Contract to the extreme detriment of Cross-Complainant, Cross-Complainant alleges that Lum, Chan, Adept, Modern, Roes 1 through 100, and each of them, have an express duty and were obligated pursuant to their oral contracts to obtain insurance in Cross-Complainant's name for the damages and liability alleged in Arcon's FAC. Cross-Complainant is informed and believes and based thereon alleges that Lum, Chan, Adept, Modern and Roes 1 through 100 have failed to obtain the required insurance in Cross-Complainant's name for the damages and liability alleged in Arcon's FAC and have thereby breached the oral contracts.

79.     Cross-Complainant has been damaged and sustained harm and losses as a result of Arcon's conduct complained of herein and as a result of the allegations asserted in Arcon's FAC, and to the extent caused in whole or in part by Lum, Chan, Adept and/or Modern, such damage includes, but is not limited to, the overpayment for work performed, partially performed or not performed, in

Case: 24-30693 Doc# 259 Filed: 01/15/26 Entered: 01/15/26 23:34:27 Page 247 of 888
132

not receiving equitable adjustments to which it is entitled, in paying mobilization fees for work not mobilized, for additional professional fees, increased construction costs, extreme project delays, a per diem credit of $500 for each day after the deadline for project completion, increased carrying costs associated with the project, damages associated with the clouding of title and the adverse impact on the ability to market and sell the Subject Property, lost profits, attorney's fees and costs according to contract, expert fees and costs, mediation fees and costs, and other damages and losses all in an amount in excess of $800,000, or in an amount according to proof.

80. As a result of Lum's, Chan's, Adept's, Modern's and Roes 1 through 100's breaches of oral contract, Cross-Complainant has suffered and will suffer, among others, damages and attorney's fees and costs in an amount in excess of $800,000, or in an amount according to proof.

81. Lum's, Chan's, Adept's, Modern's and Roes 1 through 100's breaches of contract are a substantial factor in causing Cross-Complainant's harm.

WHEREFORE, Cross-Complainant prays for judgment against Lum, Chan, Adept, Modern and Roes 1 through 100 as set forth below.

## EIGHTH CAUSE OF ACTION

**(Equitable Indemnity as to Lum, Chan, Adept, Modern and Roes 1 - 100, inclusive)**

82. Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

83. Cross-Complainant expressly denies the allegations of Arcon's FAC and any claim that Cross-Complainant is liable for breach of contract, negligence, negligent or intentional misrepresentation, entitlement to quantum meruit or foreclosure of mechanic's lien, or other liability or wrongdoing whatsoever on its part. Should Cross-Complainant nevertheless be found to have breached any contract or to be liable for any other wrongdoing or in any way with respect to the allegations of Arcon's FAC, the actions or omissions of Cross-Complainant were passive and secondary, while those of Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, were active, primary and/or superseding. Thus, as a direct, proximate and foreseeable result of any wrongdoing of Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, Cross-Complainant is entitled to total equitable indemnity from any and all liability adjudged against it as to

23

the allegations contained in and relief sought by Arcon's FAC.

84.     As a direct, proximate and foreseeable result of Arcon's FAC, Cross-Complainant has been compelled to incur attorney's fees and costs, court costs, expert costs, mediation costs, the expenses of this action as well as other claims and actions, and may in the future be compelled to incur additional liability, expenses and fees by reason of settlement, judgment and/or defense. Cross-Complainant is entitled in equity and pursuant to California Code of Civil Procedure Section 1021.6 and California law to be held harmless and to be indemnified by Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, for its attorney's fees and costs and expenses according to proof.

WHEREFORE, Cross-Complainant prays for judgment against Lum, Chan, Adept, Modern and Roes 1 through 100 as set forth below.

## NINTH CAUSE OF ACTION

**(Contribution/Repayment as to Lum, Chan, Adept, Modern and Roes 1 - 100, inclusive)**

85.     Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

86.     Cross-Complainant expressly denies the material allegations of Arcon's FAC. Nevertheless, if Cross-Complainant is found to be liable to Arcon to any extent for its claimed damages, including in the form of an offset to Cross-Complainant's recovery of affirmative damages sustained in this matter, then Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, are jointly liable and obligated to contribute toward the payment or repayment of said damages according to their respective proportions.

87.     As a direct, proximate and foreseeable result of Arcon's Counter-Claims in arbitration and Arcon's claims as set forth in its FAC, Cross-Complainant has been compelled to incur attorney's fees and costs, court costs, expert costs, mediation costs and expenses of this action as well as other claims and actions, and may in the future be compelled to incur additional liability, expenses and fees by reason of settlement, judgment and/or defense. Cross-Complainant is entitled to contributions or repayments from Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, for its attorney's fees and costs and expenses according to proof.

WHEREFORE, Cross-Complainant prays for judgment against Lum, Chan, Adept, Modern

24

and Roes 1 through 100-as set forth below.

**TENTH CAUSE OF ACTION**

**(Declaratory Relief as to Arcon, Lum, Chan, Adept, Modern and Roes 1 - 100, inclusive)**

88.　Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

89.　A dispute and actual controversy has arisen and now exists between Cross-Complainant, on the one hand, and Arcon, Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, on the other, as to whether Arcon, Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, have certain duties related to their contracts with Cross-Complainant.

90.　Specifically, that pursuant to the Arcon Contract, Arcon had a duty to: (a) perform the scope of work set forth in the Arcon Contract for the guaranteed lump sum fixed price of $1,984,141.46; (b) review Contract Documents, including the plans and specifications, before bidding the work and/or commencing it; (c) pay its subcontractors; (d) fully perform work required under the Arcon Contract; (e) accurately invoice the work as complete with no payment to be received in advance thereof; (f) obtain preapproved change orders from Cross-Complainant before doing work and adhere to and follow the express directives of Cross-Complainant; (g) give required equitable credits and adjust the contract price downwards for excavation, shoring or other geotechnical work not performed by Arcon; (h) prosecute the work without interruption and avoid causing the project to sit idle for weeks on end; (i) avoid any activities that might create dangerous conditions to Cross-Complainant and adjoining homeowners; (j) construct the Subject Property in accordance with all Contract Documents, applicable laws, statutes, building codes and regulations and appropriate standards of care, having ascertained same prior to bidding the project; (k) review and rule out any errors, deficiencies or discrepancies in the Contract Documents, including the plans and specifications, and confirm that the work could and would be done for the amount of the guaranteed lump sum fixed price bid in the amount of $1,984,141.46 and without delay; (l) visit the project site and be familiar with all site relevant site conditions; (m) return mobilization fees for work not mobilized; and (n) perform the work it had agreed to perform by the agreed-upon date of completion.

91.　Specifically, that pursuant to all contracts, Arcon, Lum, Chan, Adept and Modern had a

25

duty to: (a) construct the Subject Property and/or perform their scopes of work in accordance with all applicable laws, statutes, building codes and regulations and appropriate standards of care, having ascertained same prior to commencing work on the project; (b) review and rule out any errors, deficiencies or discrepancies in the Contract Documents, including the plans and specifications, such that the plans were permittable and could be used to bid the project and construct same; (c) visit the project site and be familiar with all site relevant site conditions; (d) name Cross-Complainant as an additional insured under applicable policies of insurance; (e) obtain insurance on behalf of Cross-Complainant; (f) defend and indemnify Cross-Complainant of and from any third party claims, including those of Arcon; and (g) determine the amount and degree of fault of the parties, and the proportionate share owed to Cross-Complainant by Arcon, Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, in connection with Cross-Complainant's losses and damages, any settlement amounts paid, damages awarded, costs of defense and/or Cross-Complainant's costs, expenses and attorney's fees.

92.  Such declarations are necessary and appropriate so that Cross-Complainant may ascertain its rights and duties pursuant to the Arcon Contract, the Lum Contract, the Chan Contract, the Adept/Modern Contracts and the rights and duties of Cross-Defendants, and each of them, with respect to the claims asserted by Cross-Complainant in this First Amended Cross-Complaint and, to the extent applicable, by Arcon in its FAC.

## ELEVENTH CAUSE OF ACTION

**(Intentional Interference With Contractual Relations against Arcon and Roes 1 – 100 Inclusive)**

93.  Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

94.  In early 2021, Cross-Complainant retained the services of Sotheby's International Realty – a licensed California real estate broker – to sell the Subject Property. The listing agent from Sotheby's International Realty was an individual named Greg Fulford.

95.  On or about April 3, 2021, Cross-Complainant entered into a contract for sale of the Subject Property by American Liberty Investments LP in the amount of $6,250,000.00 (six-million fifteen thousand).

26

96.     On April 12, 2021, Arcon's representative Vera Aleksandrova emailed Greg Fulford in connection with the sale of the Subject Property. Vera Aleksandrova made several misrepresentations in her email to Cross-Complainant's listing agent. Aleksandrova stated that Arcon stopped work on this project "Due to the major difference between means and method of the construction with the project owner." This statement is not true. Arcon was fired from the project. Aleksandrova's email also claims that Arcon is owed $100K for their work and "There is a lien on the property for this particular reason." This statement is not true. The mechanic's lien Arcon recorded is for $72,000. Aleksandrova's email states that an "arbitration hearing was concluded in favor of Arcon." This statement is not true. The parties initially agreed to arbitrate their dispute and had selected an arbitrator. However, the arbitration idea was abandoned before any hearing took place.

97.     Cross-Complainant further alleges on information and belief that Arcon also contacted the prospective buyer and/or the prospective buyer's broker and made similar misrepresentations to them. Cross-Complainant also alleges on information and belief that Arcon also made misrepresentations to prospective buyers and/or their broker that the height of the Subject Property exceeded what was allowed by the San Francisco Planning Department. In response to an email from Cross-Complainant's attorney Jan Gruen that referenced interference with the sale of the subject property, Arcon attorney George Wolff stated that: "the building is taller than allowed by the planning department and this fact needs to be disclosed to potential buyers."

98.     Cross-Complainant alleges on information and belief that Arcon knew about the listing of the property and about the contract for sale with prospective buyer American Liberty Investments LP. Arcon intentionally took action to disrupt and sabotage the sale of the Subject Property. Arcon's actions caused the sale to be cancelled. On or about April 13, 2021, the prospective buyer cancelled the contract.

99.     As a direct and proximate result of Arcon's actions in connection with the sale of the subject property, Cross-Complainant has suffered damages in an amount to be determined according to proof.

## TWELFTH CAUSE OF ACTION

**(Violation of Business and Professions Code 7160 Against Arcon, Adept, Modern and Roes 1 - 100, inclusive)**

100.    Cross-Complainant realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth in this cause of action.

101.    Pursuant to the contract between Arcon and Cross-Complainant, Arcon was to act as general contractor on the Subject Property for a fixed guaranteed lump sum of $1,984,141.46.  Arcon had all relevant and necessary information, including the plans, specifications, site reports necessary to make an accurate determination of the necessary scope of work and the contract price.  Arcon falsely represented that the contract price was to be a guaranteed fixed price with the intention of inducing Cross-Complainant to enter into the contract with Arcon.  Arcon further intended to produce fraudulent invoices, revisions and change orders to be paid additional money from Cross-Complainant that was beyond the guaranteed fixed price.

102.    Arcon's actions were a violation of California Business and Professions Code 7160.  As a direct and proximate result of these actions, Cross-Complainant has suffered damages in an amount to be determined according to proof.  Cross-Complainant is also entitled to recover attorney's fees pursuant to this code section.

103.    As to Cross-Defendant Adept/Modern, Cross-Complainant entered into contracts with Adept/Modern wherein Adept/Modern would and did provide civil engineering services, geotechnical engineering services and shoring engineering services.  Before Cross-Complainant signed written contracts with Adept/Modern on October 30, 2017, Igor Kleyner, the principal owner and operator of Adept/Modern, represented to Cross- Complainant's representative, Ravi Sadarangani, that Adept/Modern would provide geotechnical engineering and shoring services to serve and protect Cross-Complainant's interests in constructing the project and that there were no conflicts of interest. Additionally, Kleyner represented to Ravi Sadarangani that Cross- Complainant would be named as an additional insured on Adept's insurance and that Adept and Modern were the same company.  Kleyner actually provided a false Certificate of Insurance to Sadarangani purporting to demonstrate that Adept's insurance would cover the project owner as an additional insured.  Kleyner also represented to

Ravi Sadarangani that Adept/Modern would not make changes to the work plan without first obtaining approval from the owner. The aforementioned representations by Kleyner were made first over the telephone on a call with Ravi Sadarangani in the days before the first contract was signed on or about October 30, 2017, and reiterated during an in-person meeting at Kleyner's offices in the Bayshore District. Cross-Complainant alleges, on information and belief, that the representations made by Kleyner, on behalf of Adept/Modern, were known to be false at the time they were made and that the false representations induced Cross-Complainant to enter into said contract. Cross-complainant further alleges on information and belief that Adept/Modern was in fact acting in concert with Arcon to push the scope of work, the revisions and the change orders beyond the guaranteed fixed price that was in the contract between Arcon and Cross-Complainant. As a result of these false representations, Cross-Complainant was induced to enter into the afore-mentioned home improvement contracts with Adept/Modern and that Cross-Complainant suffered damages by overpaying for drilling and excavation services.

104.   On or about November 14, 2018, Adept/Modern representative Igor "Gary" Kleyner contacted the City at Arcon's behest and without obtaining the owner's approval, to have the scope of the excavation and drilling called for in the approved plans decreased. Despite the reduced scope of drilling and excavation, Arcon refused to credit the owner for work bid that would no longer be required due to the City's approval of the geotechnical engineer's recommendations.

105.   The actions of Adept/Modern were a violation of California Business and Professions Code 7160. As such, Cross-Complainant is entitled to recover attorney's fees pursuant to this code section.

WHEREFORE, Cross-Complainant prays for judgment against Arcon, Lum, Chan, Adept, Modern and Roes 1 through 100 – as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Cross-Complainant prays for judgment against Cross-Defendants, as follows:

**AS TO ALL CAUSES OF ACTION:**

1.   General compensatory damages, according to proof;

2.   Pre-judgment and post-judgment interest;

3. Costs of suit, herein, including attorney's fees and costs; and

4. Such other and further relief as the Court may deem just and proper.

**AS TO THE FOURTH CAUSE OF ACTION:**

5. Punitive damages according to proof.

**AS TO THE EIGHTH CAUSE OF ACTION:**

6. Equitable indemnity, according to proof.

**AS TO THE NINTH CAUSE OF ACTION:**

7. Contribution and repayment, according to proof.

**AS TO THE TENTH CAUSE OF ACTION:**

8. Judicial declarations of the parties' rights, duties and obligations pursuant to contract and/or the law as follows:

    a. That pursuant to the Arcon Contract, Arcon had a duty to: (a) perform the scope of work set forth in the Arcon Contract for the guaranteed lump sum fixed price of $1,984,141.46; (b) review the Contract Documents, including the plans and specifications, before bidding the work and/or commencing it; (c) pay its subcontractors; (d) fully perform work required under the Arcon Contract; (e) accurately invoice the work as complete with no payment to be received in advance thereof; (f) obtain preapproved change orders from Cross-Complainant before doing work and adhere to and follow the express directives of Cross-Complainant; (g) give required equitable credits and adjust the contract price downwards for excavation, shoring and other geotechnical work not performed by Arcon; (h) prosecute the work without interruption and avoid causing the project to sit idle for weeks on end; (i) avoid any activities that might create dangerous conditions to Cross-Complainant and adjoining homeowners; (j) construct the Subject Property in accordance with all Contract Documents, applicable laws, statutes, building codes and regulations and appropriate standards of care, having ascertained same prior to bidding the project; (k) review and rule out any errors, deficiencies or discrepancies in the Contract Documents, including the plans and specifications, and confirm that the work could and would be done for the amount of the guaranteed lump sum fixed price bid in the amount of $1,984,141.46 and without delay; (l)

visit the project site and be familiar with all site relevant site conditions; (m) return mobilization fees for work not mobilized; and (n) perform the work it had agreed to perform by the agreed-upon date of completion.

b.      That pursuant to all contracts, Arcon, Lum, Chan, Adept and Modern had a duty to; (a) construct the Subject Property and/or perform their scopes of work in accordance with all applicable laws, statutes, building codes and regulations and appropriate standards of care, having ascertained same prior to commencing work on the project; (b) review and rule out any errors, deficiencies or discrepancies in the Contract Documents, including the plans and specifications, such that the plans were permittable and could be used to bid the project and construct same; (c) visit the project site and be familiar with all site relevant site conditions; (d) name Cross-Complainant as an additional insured under applicable policies of insurance; (e) obtain insurance on behalf of Cross-Complainant; (f) defend and indemnify Cross-Complainant of and from any third party claims, including those of Arcon; (g) determine the amount and degree of fault of the parties, and the proportionate share owed to Cross-Complainant by Arcon, Lum, Chan, Adept, Modern and Roes 1 through 100, and each of them, in connection with Cross-Complainant's losses and damages, any settlement amounts paid, damages awarded, costs of defense and/or Cross-Complainant's costs, expenses and attorney's fees.

**AS TO THE ELEVENTH CAUSE OF ACTION:**

9.      For damages according to proof;

**AS TO THE TWELFTH CAUSE OF ACTION;**

10.      For damages according to proof and for attorney's fees pursuant to Bus. And Prof. Code 7160.

Dated: May 20, 2022

LAW OFFICE OF BRIAN E. SORIANO

Brian E. Soriano
Vladie P. Viltman
Attorneys for Defendant and Cross-Complainant
653 28TH STREET, LLC

31

# EXHIBIT A

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B



Arcon Construction Corp.
650 Florida Street Unit C
San Francisco, CA 94110
Tel: 415.759.6228
Fax: 415.759.6215
www.Arcon-online.com

# Construction Proposal
Arcon Construction Corp

June 13, 2018
653 28th Street - Remodeling
653 28th Street
San Francisco, CA

Arcon Construction Corp
650 Florida Street
Unit C
San Francisco, California 94110
San Francisco
415-759-6228






Case: 24-30679   Doc# 259   Filed: 01/15/26   Entered: 01/15/26 23:34:27   Page 35 of 132

# Proposal

This Agreement, Made as of June 13, 2018

Between the Owner:      **653 28th St LLC**
                        **263 West Portal Ave, #763**
                        **San Francisco, California 94127**
                        **415-939-7284**

And the Contractor:     **Arcon Construction Corp**
                        **650 Florida Street**
                        **Unit C**
                        **San Francisco, California 94110**
                        **San Francisco**
                        **B774398**
                        **415-759-6228**

For the Project:        **653 28th Street – Remodeling**
                        **653 28th Street**
                        **San Francisco, CA**
Project Number:         **Arcon -1710-1413**

## Article 1.      CONTRACT DOCUMENTS

Article 1.1.      The contract documents consist of this agreement, allowances and construction draw schedule. These contract documents represent the entire agreement of both parties and supersede any prior oral or written agreement.

## Article 2.      SCOPE OF WORK

Article 2.1.      The Owner agrees to purchase and the Contractor agrees to build the above mentioned structure and fixtures attached thereto in **(San Francisco, CA)** according to the construction documents, allowances, finish schedules, all addenda, change orders, modifications and specifications set forth in the specification booklet.

Article 2.2.

## SCOPE OF WORK:
Estimate based on:
Arch plans dated 3-13-18
Structural dated 09-06-17
Shoring Plan dated 12-20-17
Asbestos Survey Report Dated: Jan 29, 2018
Geotechnical Soils Investigation Report dated Sept. 18, 2017

## SPECIAL CONDITIONS:

Exclusions: connection fees, special inspection fees, landscaping, appliances.

## PROJECT DIMENSIONS:

| | |
|---|---|
| Basement | 797.00 SQ FT |
| 1st Floor | 1293.00 SQ FT |
| 2nd Floor | 1339.00 SQ FT |
| 3rd Floor | 965.00 SQ FT |
| Total Gross SQFT | 4394.00 |

## TOTAL BASE PRICE: $1,984,141.46

### BASE PRICE INCLUDES:

Windows - Fleetwood sliding doors and windows or equal
Stucco - Smooth finish
Drywall - Level 5
Interior doors - according to the specs and allowances
Interior Paint - according to the specs and allowances
Baseboards - 1x3 MDF
Trims - trimless detail
Flooring- according to the specs and allowances.
Cabinetry - according to the specs and allowances
Tile - $12.00 allowance per sqft,
Door hardware - according to the specs and allowances
Bathroom hardware - according to the specs and allowances
Electrical fixtures - according to the specs and allowances
Plumbing fixtures - according to the allowances

### STANDARD ALLOWANCES (*INCLUDED IN BASE PRICE):

| | |
|---|---|
| 06 22 00 - Millwork - Materials | $4,375.00 |
| 08 14 00 - Interior Doors | $11,675.00 |
| 08 50 00 - Windows and Exterior doors | $77,695.00 |
| 08 71 00 - Door Hardware | $2,850.00 |
| 08 60 00 - Roof Windows and Skylights | $15,000.00 |
| 09 30 00 - Tiling Materials | $24,828.00 |
| 09 64 00 - Wood Flooring | $29,850.00 |
| 10 30 00 - Fireplaces and Stoves | $64,000.00 |
| 10 28 16 - Bath Accessories | $2,100.00 |
| 10 28 19 - Tub and Shower Doors | $10,050.00 |
| 12 30 00 - Casework | $75,250.00 |
| 12 36 00 - Countertops | $24,300.00 |
| 22 40 00 - Plumbing Fixtures | $16,525.00 |
| 26 50 00 - Lighting | $11,000.00 |

Case: 24-30679     Doc# 259     Filed: 01/15/26     Entered: 01/15/26 23:34:27     Page 37 of 132

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B

## Project Totals:

### 02 00 00 - EXT. CONDITIONS
| | |
|---|---:|
| 02 41 00 - Demolition | $21,854.00 |
| 02 81 00 - Transportation and Disposal | $9,834.30 |
| **SUBTOTAL 02 00 00 - EXT. CONDITIONS** | **$31,688.30** |

### 03 00 00 - CONCRETE
| | |
|---|---:|
| 03 00 00 - Concrete | $131,178.64 |
| **SUBTOTAL 03 00 00 - CONCRETE** | **$131,178.64** |

### 05 00 00 - METALS
| | |
|---|---:|
| 05 00 00 - Metals | $22,400.35 |
| 05 10 00 - Structural Metal Framing | $38,244.50 |
| 05 52 00 - Metal Railings | $26,896.81 |
| **SUBTOTAL 05 00 00 - METALS** | **$87,541.66** |

### 06 00 00 - WOOD, PLASTICS, COMP
| | |
|---|---:|
| 06 00 00 - Wood, Plastics, and Composites | $6,119.12 |
| 06 11 00 - Wood Framing | $170,813.05 |
| 06 20 00 - Finish Carpentry | $70,224.00 |
| *06 22 00 - Millwork - Materials | $4,375.00 |
| **SUBTOTAL 06 00 00 - WOOD, PLASTICS, COMP** | **$251,531.18** |

### 07 00 00 - THERMAL PROTECTION
| | |
|---|---:|
| 07 20 00 - Thermal Protection | $6,337.66 |
| 07 31 19 - Metal Roof | $7,375.73 |
| 07 46 00 - Siding | $4,589.34 |
| 07 50 00 - Membrane Roofing | $7,648.90 |
| 07 60 00 - Flashing and Sheet Metal | $3,850.00 |
| **SUBTOTAL 07 00 00 - THERMAL PROTECTION** | **$29,801.63** |

### 08 00 00 - OPENINGS
| | |
|---|---:|
| *08 14 00 - Interior Doors | $11,675.00 |
| 08 36 00 - Panel Doors | $5,682.04 |
| *08 50 00 - Windows and Exterior doors | $77,695.00 |
| *08 60 00 - Roof Windows and Skylights | $15,000.00 |
| 08 71 00 - Door Hardware | $2,850.00 |
| 08 80 00 - Glazing | $19,422.74 |
| 08 83 00 - Mirrors | $1,912.23 |
| **SUBTOTAL 08 00 00 - OPENINGS** | **$134,237.01** |

Case: 24-30679    Doc# 259    Filed: 01/15/26    Entered: 01/15/26 23:34:27    Page 38 of 132

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B

## 09 00 00 - FINISHES

| | |
|---|---:|
| 09 24 23 - Portland Cement Stucco | $34,966.40 |
| 09 29 00 - Gypsum Wallboard | $71,025.50 |
| 09 30 00 - Tiling | $36,172.74 |
| *09 30 00 - Tiling Materials | $24,828.00 |
| 09 64 00 - Wood Flooring | $11,473.35 |
| *09 64 00 - Wood Flooring - Materials | $29,850.00 |
| 09 91 13 - Exterior Painting | $5,791.31 |
| 09 91 23 - Interior Painting | $30,595.60 |
| **SUBTOTAL 09 00 00 - FINISHES** | **$244,702.90** |

## 10 00 00 - SPECIALTIES

| | |
|---|---:|
| *10 28 16 - Bath Accessories | $2,100.00 |
| *10 30 00 - Fireplaces and Stoves | $64,000.00 |
| *10 28 19 - Tub and Shower Doors | $10,050.00 |
| 10 55 00 - Postal Specialties | $495.00 |
| **SUBTOTAL 10 00 00 - SPECIALTIES** | **$76,645.00** |

## 11 00 00 - EQUIPMENT

| | |
|---|---:|
| 11 31 00 - Residential Appliances | $1,870.00 |
| **SUBTOTAL 11 00 00 - EQUIPMENT** | **$1,870.00** |

## 12 00 00 - FURNISHINGS

| | |
|---|---:|
| *12 30 00 - Casework | $75,250.00 |
| *12 36 00 - Countertops | $24,300.00 |
| **SUBTOTAL 12 00 00 - FURNISHINGS** | **$99,550.00** |

## 13 00 00 - SPECIAL CONST.

| | |
|---|---:|
| 13 00 00 - Special Construction | $3,850.00 |
| **SUBTOTAL 13 00 00 - SPECIAL CONST.** | **$3,850.00** |

## 21 00 00 - FIRE SUPPRESSION

| | |
|---|---:|
| 21 10 00 - Water-Based Fire-Suppression Systems | $30,800.00 |
| **SUBTOTAL 21 00 00 - FIRE SUPPRESSION** | **$30,800.00** |

## 22 00 00 - PLUMBING

| | |
|---|---:|
| 21 00 00 - Plumbing | $82,881.30 |
| *22 40 00 - Plumbing Fixtures | $16,525.00 |
| **SUBTOTAL 22 00 00 - PLUMBING** | **$99,406.30** |

## 23 00 00 - HVAC

Case: 24-30679    Doc# 259    Filed: 01/15/26    Entered: 01/15/26 23:34:27    Page 39 of 132

| | |
|---|---:|
| 23 00 00 - Heating, Ventilating, and Air Conditioning | $5,445.00 |
| 23 83 00 - Radiant Heating Units | $65,010.00 |
| **SUBTOTAL 23 00 00 - HVAC** | **$70,455.00** |

| | |
|---|---:|
| **26 00 00 - ELECTRICAL** | |
| 26 00 00 - Electrical | $52,449.60 |
| *26 50 00 - Lighting | $11,000.00 |
| **SUBTOTAL 26 00 00 - ELECTRICAL** | **$63,449.60** |

| | |
|---|---:|
| **27 00 00 COMMUNICATIONS** | |
| 27 15 00 Communications Horizontal Cabling | $1,300.31 |
| 27 40 00 Audio-Video Communications | $1,950.47 |
| **SUBTOTAL 27 00 00 COMMUNICATIONS** | **$3,250.78** |

| | |
|---|---:|
| **28 00 00 - SAFETY & SECURITY** | |
| 28 00 00 - Electronic Safety and Security | $4,950.00 |
| 28 30 00 - Detection and Alarm | $7,150.00 |
| **SUBTOTAL 28 00 00 - SAFETY & SECURITY** | **$12,100.00** |

| | |
|---|---:|
| **31 00 00 - EARTHWORK** | |
| 31 20 00 - Earth Moving | $45,073.88 |
| 31 40 00 - Shoring and Underpinning | $199,320.00 |
| **SUBTOTAL 31 00 00 - EARTHWORK** | **$244,393.88** |

| | |
|---|---:|
| **32 00 00 - EXT IMPROVEMENT** | |
| 32 16 00 - Curbs and Gutters, sidewalk | $8,460.89 |
| 32 31 00 - Fences and Gates | $11,550.00 |
| 32 32 00 - Retaining Walls | $24,750.00 |
| **SUBTOTAL 32 00 00 - EXT IMPROVEMENT** | **$44,760.89** |

| | |
|---|---:|
| **COMPANY OVERHEAD & MARGIN** | |
| Company Overhead | $193,757.22 |
| Company Margin | $129,171.48 |
| **SUBTOTAL COMPANY OVERHEAD & MARGIN** | **$322,928.69** |

## GRAND TOTAL $1,984,141.46

**Article 3.** **TIME OF COMPLETION**

Case: 24-30679    Doc# 259    Filed: 01/15/26    Entered: 01/15/26 23:34:27    Page 40 of 132

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B

The approximate commencement date of the project shall be **(6/19/2018)**. The approximate completion date of the project shall be **(6/26/2019)**, however any change orders and/or unusual weather might delay or otherwise affect the completion date.

## Article 4.     THE CONTRACT PRICE

Article 4.1.     The purchase price of the project shall be set at the sum of **$1,984,141.46.** Subject to additions and deductions pursuant to authorized change orders and allowances.

Article 4.2.     The Owner and the Contractor acknowledge that the Owner will pay a sum of **One Thousand Dollars, $1,000.00**, upon signing of this contract and before construction begins as a deposit and part of the purchase price of the project.

## Article 5.     PROGRESS PAYMENTS

Article 5.1.     The Owner will make payments to the contractor pursuant to the attached construction draw schedule as work required by said schedule is satisfactorily completed. Owner shall make draw payments to contractor within **15** days after request by contractor. Should the owner fail to make payment, contractor may charge a penalty of **5%** monthly upon the unpaid amount until paid.

Article 5.2.     If payment is not received by the Contractor within **5** days after delivery of payment demand for work satisfactorily completed, contractor shall have the right to stop work or terminate the contract at his option.  Termination by Contractor under the provisions of this paragraph shall not relieve the Owner of the obligations of payments to Contractor for that part of the work performed prior to such termination.  Termination by Owner under the provisions of this paragraph shall not relieve the Owner of the obligations of payments to Contractor for that part of the work performed prior to such termination.

Article 5.3.     See the attached "Construction Draw Schedule"

Article 5.4.     The period covered by each Application for Payment shall be two weeks or less. Every other Tuesday contractor will present invoice to the owner for work completed prior to payday according to cost breakdown.

Article 5.5.     Mobilization fee of **5%** of the contract price shall be paid on or before the commencement day.

Article 5.6.     Late payment may cause construction delay and/or remobilization fee.

## Article 6.     DUTIES OF THE CONTRACTOR

Article 6.1.     All work shall be in accordance to the provisions of the plans and specifications. All systems shall be in good working order.

Article 6.2.     All work shall be completed in a workman like manner, and shall comply with all applicable state and local building codes and laws.

Case: 24-30679     Doc# 259     Filed: 01/15/26  ·  Entered: 01/15/26 23:34:27     Page 41 of 132

Article 6.3.     All work shall be performed by licensed individuals to perform their said work, as outlined by law.

Article 6.4.     Contractor shall remove all construction debris and leave the project in a broom clean condition.

Article 6.5.     Upon satisfactory payment being made for any portion of the work performed, Contractor shall furnish a full and unconditional release from any claim or mechanics' lien for that portion of the work for which payment has been made.

## Article 7.     OWNER

Article 7.1.     The Owner shall communicate with subcontractors only through the Contractor.

Article 7.2.     The Owner will not assume any liability or responsibility, nor have control over or charge of construction means, methods, techniques, sequences, procedures, or for safety precautions and programs in connection with the project, since these are solely the Contractor's responsibility.

Article 7.3.     The Owner shall provide two full size copies of the approved building plans and copy in PDF format.

## Article 8.     CHANGE ORDERS AND FINISH SCHEDULES

Article 8.1.     A Change Order is any change to the original plans and/or specifications. All change orders need to be agreed upon in writing, including cost, additional time considerations, approximate dates when the work will begin and be completed, a legal description of the location where the work will be done and signed by both parties. 50% of the cost of each change order will be paid prior to the change, with the final 50% paid upon completion of the change order. A 20% fee shall be added to all change orders and overages in excess of initial allowances. Additional time needed to complete change orders shall be taken into consideration in the project completion date.

Article 8.2.     Any delays or changes in finish selection schedules will delay the projected completion date.

## Article 9.     INSURANCE

Article 9.1.     The Owner will purchase and maintain property insurance to the full and insurable value of the project, in case of a fire, vandalism, malicious mischief or other instances that may occur.

Article 9.2.     The Contractor shall purchase and maintain needed Workman's Compensation and Liability insurance coverage as required by law and deemed necessary for his own protection.

## Article 10.    GENERAL PROVISIONS

Case: 24-30679     Doc# 259     Filed: 01/15/26     Entered: 01/15/26 23:34:27     Page 42 of 132

Article 10.1.   If conditions are encountered at the construction site which are subsurface or otherwise concealed physical conditions or unknown physical conditions of an unusual nature, which differ naturally from those ordinarily found to exist and generally recognized as inherent in construction activities, the Owner will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, and/or time required for, performance of any part of the work, will negotiate with the Contractor an equitable adjustment in the contract sum, contract time or both.

## Article 11.   HAZARDOUS MATERIALS, WASTE AND ASBESTOS

Article 11.1.   Both parties agree that dealing with hazardous materials, waste or asbestos requires specialized training, processes, precautions and licenses. Therefore, unless the scope of this agreement includes the specific handling, disturbance, removal or transportation of hazardous materials, waste or asbestos, upon discovery of such hazardous materials the Contractor shall notify the Owner immediately and allow the Owner/Contractor to contract with a properly licensed and qualified hazardous material contractor. Any such work shall be treated as a Change Order resulting in additional costs and time considerations.

## Article 12.   ARBITRATION OF DISPUTES

Article 12.1.   Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

## Article 13.   WARRANTY

Article 13.1.   At the completion of this project, Contractor shall execute an instrument to Owner warranting the project for 1 year against defects in workmanship or materials utilized.

## Article 14.   TERMINATION OF THE CONTRACT

Article 14.1.   Should the Owner or Contractor fail to carry out this contract, with all of its provisions, the following options and stipulations shall apply:

Article 14.1.1. If the Owner or the Contractor shall default on the contract, the non-defaulting party may declare the contract is in default and proceed against the defaulting party for the recovery of all damages incurred as a result of said breach of contract, including a reasonable attorney's fee.   In the case of a defaulting Owner, the Earnest money herein mentioned shall be applied to the legally ascertained damages.

Article 14.1.2. In the event of a default by the Owner or Contractor, the non-defaulting party may state his intention to comply with the contract and proceed for specific performance.

Case: 24-30679     Doc# 259     Filed: 01/15/26     Entered: 01/15/26 23:34:27     Page 43 of 132

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B

Article 14.1.3. In the case of a defaulting Owner, the Contractor may accept, at his option the earnest money as shown herein as liquidated damages, should earnest money not cover the expenses to date, the Contractor may make claim to the Owner for all work executed and for proven loss with respect to equipment, materials, tools, construction equipment and machinery, including reasonable overhead, profit and damages applicable to the property less the earnest money.

## Article 15. ATTORNEY FEES

Article 15.1. In the event of any arbitration or litigation relating to the project, project performance or this contract, the prevailing party shall be entitled to reasonable attorney fees, costs and expenses.

## Article 16. ACCEPTANCE AND OCCUPANCY

Article 16.1. Upon completion, the project shall be inspected by the Owner and the Contractor, and any repairs necessary to comply with the contract documents shall be made by the Contractor.

Article 16.2. The Owner shall not occupy the property until final payment has been received by the Contractor.

Article 16.3. Occupancy of the project by the Owner in violation of Article 16.2, shall constitute unconditional acceptance of the project and a waiver of any defects or uncompleted work.

**ACCEPTANCE OF CONTRACT:**
The above prices, specifications, and conditions are satisfactory and are hereby accepted.

DocuSigned by:

*Andrey Libov*  6/13/2018 5:51:25 PM PDT      *653 28th Street LLC* 6/13/2018 5:40:31 PM PDT

Contractor Signature                    Owner Signature

Case: 24-30679     Doc# 259     Filed: 01/15/26     Entered: 01/15/26 23:34:27     Page 44 of 132

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B

<u>Rider to Construction Proposal</u>

Reference is made to that certain Construction Proposal ("Agreement") by and between 653 28th Street, LLC, and Arcon Construction Corp dated February 20, 2018. The Agreement is hereby is hereby modified as set forth below. In the event of any conflict between the terms and conditions of the Agreement and this Rider, the terms and conditions of this Rider shall prevail. All references to "Article" herein shall mean the corresponding Article of the Agreement.

1.      The contract documents as defined in Article 1 shall include all of the plans listed under Scope of Work in Article 2.2.    The Contractor hereby specifically acknowledges and declares that the contract documents are full and complete, are sufficient to have enabled the Contractor to determine the cost of the work outlined therein in order to enter into this Agreement and that the drawings and specifications therein are sufficient to enable it to construct the work outlined therein in accordance with all applicable laws, statutes, building codes and regulations and otherwise to fulfill all its obligations hereunder. The Contractor further acknowledges that it has visited the site and made appropriate field measurements, examined all conditions affecting the work to be performed, is fully familiar with all of the conditions thereon and affecting same, and has carefully examined all drawings, specifications and other documents, and that there are no discrepancies or omissions in the contact documents; provided, in no event, shall Contractor have any obligation to examine any site conditions below ground level and not visible.

2.      Contractor shall commence work on the Project promptly after Owner notifies Contractor in writing to begin ("Owner Begin Notice") (which is expected to occur once all necessary permits have been obtained by from the City of San Francisco and the period to file an appeal thereof has expired without any such appeal being filed, or, if any such appeals are filed, after the successful resolution of such appeals). .  If Owner has not provided the Owner Begin Notice", Owner may at any time terminate the Agreement without further obligation to Contractor.  Contractor shall complete all work on the Project (other than punch-list items) no later than June 26th, 2019, or within one (1) calendar year from commencement if commencement is after June 19, 2018, provided said date shall be equitably adjusted in the event of delays caused by change orders and unusual weather (said date, as so adjusted, the "Target Completion Date"). If completion of the work does not occur by the Target Completion Date, Owner may deduct from final payment $500 for each business day completion of the work is delayed beyond the Target Completion Date. Upon completion, the Project shall be inspected by the Owner and the Contractor, and any repairs necessary to comply with the contract documents shall be made by the Contractor at no additional cost to Owner. If completion of the work occurs prior to the Target Completion Date, Contractor shall be paid an additional $500 for each business day that completion of the work occurs prior to the Target Completion Date. Work shall not be deemed complete until a Certificate of Completion or Occupancy has been issued.

3.      The $1,000 deposit made by Owner pursuant to Article 4.1 shall be fully refundable to Owner if Owner terminates the Agreement as provided in Section 2 above.

4.      The words "a penalty of 5% monthly" in Article 5.2 are hereby deleted and replaced with "interest from the date payment is due at the rate of 5% per annum."

5.      For each progress payment made prior to substantial completion of the work by Contractor, Owner may withhold retainage in the amount of 10%. Upon satisfactory payment being made for any portion of the work performed, contractor shall furnish a full and unconditional release from any claim or mechanics lien for that portion of the work for which payment has been made.

6.      Final payment, constituting the entire unpaid balance of the contract price, shall be made by Owner to the Contractor when the Contractor has fully performed the Agreement, including all punch list item (except for the Contractor's responsibility to correct work as required in Section 11 below). Final payment shall not become due until the Contractor has delivered a complete release of all liens arising out of the Agreement including providing all certificate of completions and signed off job cards, permits closed off at DBI, and punch list completed

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B

7.     No materials or items covered by any allowances may be purchased by Contractor or any subcontractor without the prior written consent of Owner, it being understood that Owner may elect to purchase some or all of these items directly from the vendors. In no event shall Contractor mark-up or add profit margins or overhead to any items covered by allowances. If any items are purchased directly by Owner, the corresponding allowance item shall be deducted from the contract price. If the costs of any materials or items purchased by Contractor or any subcontractor and covered by any allowance item are less than the corresponding allowance allocated to such item in the Agreement, Owner may, at its election, utilize such savings to offset cost over-runs for other allowance items. In the event there is any net savings after the Project is completed, the contract price shall be reduced by the amount of such net savings.

8.     All contracts with subcontractors shall contain an indemnification and hold harmless provision to the benefit of Owner substantially similar to the provision set forth in Section 14 below. No subcontractor shall be permitted entry on the Project site unless Contractor shall have first obtained from such subcontractor and provided to Owner a certificate of insurance evidencing liability coverage required under the Agreement and naming the Owner and its manager as additional insureds

9.     Should any subcontractor, supplier or other person or the Contractor or any of them make, record or file, or maintain any action on or respecting a claim of mechanics' lien, stop-notice, equitable lien, payment or performance bond, or a lis pendens, relating to the Owner or the Project, the Contractor shall immediately and at its own expense, procure, furnish and record appropriate statutory release bonds which will extinguish or expunge said claim, stop-notice or lis pendens. If any claim of lien or stop-notice or any other demand for payment or security therefor, is made or filed with the Owner or the Project by any person claiming that the Contractor or any subcontractor or supplier or any other person claiming under any of them has failed to perform its contractual obligations or to make payment for any labor, services, trust fund contributions, materials, equipment, taxes or other item furnished or obligation incurred for, or in connection with, the Project, or if at any time there shall be evidence of such nonperformance or nonpayment of any claim or lien or stop-notice or other demand for which, if established, the Owner or the Project might become liable, then the Owner shall have the right to retain from any payment then due or thereafter to become due under the Agreement or to be reimbursed by the Contractor for an amount sufficient to (i) satisfy, discharge and defend against any such claim of lien or stop-notice or other demand, or any action or proceeding thereon which may be brought to judgment or award; (ii) make good any such nonpayment, nonperformance, damage, failure or default; and (iii) compensate the Owner for and indemnify it against any and all loss, liability, damage, cost and expense (including, without limitation, reasonable attorneys' fee, court costs and fees of experts) which may be sustained or incurred in connection therewith. This paragraph applies only to liens, stop notices, and all other remedies described in this paragraph which are made or claimed so long as Owner has made all current and timely payments required under the Agreement to Contractor on behalf of the claiming subcontractor or supplier.

10.     Contractor hereby warrants that it shall promptly remedy all defects in workmanship and/or materials utilized, at no extra cost to Owner (such warranty period to expire one year after the later of (a) the issuance of a Certificate of Completion and (b) Owner has obtained certificates of insurance from all subcontractors naming the Owner as an additional insured.   The Contractor also warrants that all materials and equipment furnished will be of good quality and new and that the work performed by the Contractor will conform to the requirements of the contract documents.

11.     The Contractor shall, at its sole cost and expense, promptly correct any work failing to conform to the requirements of this Agreement or the contract documents, whether discovered before or within one year after completion of the work. If Contractor fails to correct non-conforming work, Owner may do so and Contractor shall reimburse Owner for the reasonable costs incurred by Owner in connection therewith.

12.     The Contractor shall carry Workman's Compensation Insurance as required by applicable, liability insurance with a minimum coverage of $2 million per occurrence/$5 million aggregate. Each subcontractor shall carry Workman's Compensation Insurance as required by applicable and liability

2

insurance with a minimum coverage of $2 million per occurrence/$2 million aggregate, provided that the subcontractor providing pollution abatement services shall also be required to carry pollution liability coverage. All policies shall be purchased from companies lawfully authorized to do business in California and rated no less than A VII by A.M. Best. Each liability insurance policy shall apply as primary and shall provide for the severability of interests of the insureds. Prior to entry on the Project site, Contractor shall provide a certificate of insurance evidencing liability coverage and naming the Owner and its manager as additional insureds. Contractor will fully cooperate with Owner's insurance agent and fill out all necessary forms (including information on Contractor's loss ratios, 5 year loss history, etc.) to enable Owner to purchase, at Owner's expense, such insurance coverage, including, without limitation, developers insurance, as Owner shall elect.

The Owner and Contractor hereby waive all rights against each other and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance in effect at the time of loss. The Contractor shall require all subcontractors, sub-subcontractors, agents and employees of any of them to provide similar waivers in favor of Owner.

13.     Article 14 is hereby deleted and replaced with:

"Article 14.1. Termination by the Contractor. If the Owner fails to make a payment as required hereunder for a period of 30 days, the Contractor may, upon seven additional days' written notice to the Owner, terminate the Agreement and recover from the Owner for work performed under this Agreement through the date of termination plus Contractor's commercially reasonable standard percentage of OHP (overhead and profit) on the portion of the work not performed (provided Contractor shall not be entitled to any OHP on Allowance items).

"Article 14.2 Termination by the Owner. The Owner may, at any time, terminate the Agreement for the Owner's, with or without cause. Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall cease operations as directed by the Owner in the notice; take actions necessary, or that the Owner may direct, for the protection and preservation of the work; and, except for work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders. In case of such termination for the Owner's convenience or with or without cause, the Contractor shall be entitled to receive payment only for work executed through the date of termination as well as OHP (overhead and profit) on such executed work; provided that, if the termination is "for cause" (i.e. (a) Contractor refuses or fails to supply enough properly skilled workers or proper materials; (b) Contractor fails to make payment to subcontractors for materials or labor in accordance with the respective agreements between the Contractor and such subcontractors; (c) Contractor disregards applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of a public authority; or (d) Contractor otherwise is guilty of a material breach of a provision of the contract documents), then (i) the Contractor shall not be entitled to receive any further payment until the work is finished and (ii) such payment shall in no event exceed the unpaid balance of the Contract Sum less the costs of finishing the work and other damages incurred by the Owner; provided, if such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. If Owner terminates Contractor without cause or for the Owner's convenience, Contractor shall also be entitled to Contractor's commercially reasonable standard percentage of OHP (overhead and profit) on the portion of the work not performed.

14.     The Contractor hereby agrees to indemnify and hold Owner and its principals and affiliates harmless from and against any and all liabilities, claims, losses, damages, actions, causes of action, losses, fines, costs and expenses (including, without limitation, reasonable attorneys' fees, court costs and fees of experts) arising out of or resulting from the Contractor's (or its employees', agents', representatives' or subcontractors ' , or anyone directly or indirectly employed by them or anyone for whose acts they may be liable) (collectively, "Contractor Parties") performance of work in connection with the

3

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B

Project, breach of its obligations under this Agreement, active or passive negligent or willful acts, including, without limitation, injury to, illness or death of any person or persons or damage to any property, whether arising during the course of or after the completion of Contractor's work in ' with the Project. The foregoing indemnification shall expressly include any claims arising as a result of encroachment onto neighboring property to the Project by the Contractor or any Contractor Parties. It is contractor's responsibility to ensure that contractor and sub-contractors have adequate coverage including coverage for excavation operations -- earth movement and subsidence. Contractor to ensure any deductible is paid at the end of claim, not a SIR (paid before coverage is triggered.

15.     Contractor may not assign and of its rights or delegate any of its obligations under this Agreement without the prior written approval of Owner (which may be withheld in its sole discretion).

16.     Contractor will at all times keep sidewalks in front of the Project clear of all debris and free of any conditions that may result in injuries to members of the public. Contractor shall not permit and shall secure the Project as necessary to prevent third parties from accessing the job site.

17.     The following provisions are hereby deleted: Articles 4.2, (8.1 (fourth sentence only); 9.2; and 16. The reference to "Windows-Marvin sliding doors and windows or equal" in Article 2.2 is hereby deleted and replaced with "Windows-All weather/Fleetwood doors and windows or equal." The reference to "Stucco-Sand finish" in Article 2.2 is hereby deleted and replaced with "Stucco-Smooth finish." The reference to "Interior Doors" in Article 2.2 shall mean eight (8) foot tall doors. Article 5.2 is hereby deleted, it being understood that Contractor's right to terminate the Agreement is set forth in Section 13 above. It is agreed that the "mobilization fee" provided in Article 5.5 shall not increase the total contract price, shall be payable only upon Owner sending the Owner Begin Notice and shall in no event exceed $99,207.10 . It is agreed that the remobilization fee provided in Article 5.6 shall only be payable in the event that Contractor terminates the Agreement pursuant to Article 14.1 or Owner terminates the Agreement (without cause only) pursuant to Article 14.2 and the Agreement is thereafter reinstated and, in such event, shall be limited to a commercially reasonable remobilization fee (not to exceed $20,000).

18.     Waiver of performance or satisfaction of timely performance or satisfaction of any condition, covenant, requirement, obligation or warranty by one party shall not be deemed to be a waiver of the performance or satisfaction of any other condition, covenant, requirement, obligation or warranty unless specifically consented to in writing. The Agreement shall be governed by and construed in accordance with the laws of the State of California. The Agreement, as modified by this Rider, represents the complete and entire understanding and agreement between the parties hereto with regard to all matters involved in this transaction and supersedes any and all prior or contemporaneous agreements, whether written or oral. No agreements or provisions, unless incorporated herein, shall be binding on either party hereto. This Agreement may not be modified or amended, except in writing signed by both parties.

ARCON CONSTRUCTION CORP.

By: *Audrey Libov*

Name: A97BF3D5E23C... Audrey Libov                    Its:

COO

DATE  6/13/2018 5:51:25 PM PDT

653 28th STREET, LLC

By: RA Squared, LLC, its Manager

By: *653 28th Street LLC*

Name: Ravi Sadarangani

Its: Manager

DATE  6/13/2018 5:40:31 PM PDT

4

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B

Name / Address

653 28th Street, LLC
653 28th Street,
San Francisco, CA 94131

Lic: B774398

# COST BREAK-DOWN

Project: 653 28th Street - R...

Date: 6/11/2018

| Description | Total |
|---|---|
| Demolition | 21,854.00 |
| Construction Debris | 9,834.30 |
| Concrete | 131,178.64 |
| Metal Fabrications | 22,400.35 |
| Structural Metal Framing | 38,244.50 |
| Metal Railings | 26,896.81 |
| Wood, Plastics, Comp | 6,119.12 |
| Wood Framing | 170,813.05 |
| Finish Carpentry | 70,224.00 |
| Millwork | 4,375.00 |
| Insulation | 6,337.60 |
| Metal Roof | 7,375.73 |
| Siding | 4,589.34 |
| Membrane Roofing | 7,648.90 |
| Flashing and Sheet Metal | 3,850.00 |
| Interior Doors | 11,675.00 |
| Panel Doors | 5,682.04 |
| Windows | 77,695.00 |
| Door Hardware | 2,850.00 |
| Roof Windows and Skylights | 15,000.00 |
| Glazing | 19,422.74 |
| Mirrors | 1,912.23 |
| Portland Cement Stucco | 34,966.40 |
| Gypsum Wallboard | 71,025.50 |
| Tiling | 36,172.74 |
| Tiling Materials | 24,828.00 |
| Wood Flooring Material | 29,850.00 |
| Wood Flooring | 11,473.35 |
| Exterior Painting | 5,791.36 |
| Interior Painting | 30,595.60 |
| 10 30 00 - Fireplaces and Stoves | 64,000.00 |
| Bath Accessories | 2,100.00 |
| Tub and Shower Doors | 10,050.00 |
| Postal Specialties | 495.00 |
| Residential Appliances | 1,870.00 |
| Casework | 75,250.00 |
| Countertops | 24,300.00 |
| Special Const. | 3,850.00 |
| Fire Suppression | 30,800.00 |
| Plumbing | 82,881.30 |
| Plumbing Fixtures | 16,525.00 |
| Heating, Ventilating and AC | 5,445.00 |
| Radiant Heating Units | 65,010.00 |

TOTAL:

Authorized Signature_____

DocuSign Envelope ID: 97A0CFBF-479B-4B8B-864C-330EB234421B

Name / Address

653 28th Street, LLC
653 28th Street,
San Francisco, CA 94131

Lic: B774398

# COST BREAK-DOWN

Project: 653 28th Street – R...

Date: 6/11/2018

| Description | Total |
|---|---|
| Electrical | 52,449.60 |
| Lighting | 11,000.00 |
| Communication Horizontal Cabling | 1,300.31 |
| Audio-Video Communication | 1,950.47 |
| Safety & Security | 4,950.00 |
| Smoke Detection Sensors | 7,150.00 |
| Earth Moving | 45,073.88 |
| Shoring and Underpinning | 199,320.00 |
| Curbs and Gutters | 8,460.89 |
| Fence and Gates | 11,550.00 |
| Retaining walls | 24,750.00 |
| Company Overhead | 193,757.22 |
| Company Mergin | 129,171.48 |

| TOTAL: | $1,984,141.45 |
|---|---|

Authorized Signature _____

3554 Taraval st. San Francisco, CA 94116
Page 2
Phone: 415.759.8228 Fax: 415.759.6215 Email:info@arcon-online.com

Case: 24-30679    Doc# 259    Filed: 01/15/26    Entered: 01/15/26 23:34:27    Page 50 of
132

# EXHIBIT B

August 24, 2015

Ravi Sadarangani
Farallon Real Estate 4, LLC
152 Yerba Buena Avenue
San Francisco, CA 94127

Via e-mail: rsadarangani@hotmail.com

RE:      PROPOSAL FOR ARCHITECTURAL SERVICES

PROJECT:   Remodeling and expansion of 653 28th Street
San Francisco, CA 94131

Dear Ravi:

We are pleased that you have decided to retain John Lum Architecture (Architect) to provide architectural services for your house remodel/expansion (the Project). We appreciate your confidence and look forward to serving you. This letter sets out the contract terms and conditions under which we propose to provide you with architectural services. If these terms are acceptable, please sign at the conclusion of this letter.

The following defines the scope of the project and services that will be provided to you.

## 1.0      PROJECT DESCRIPTION

1.1  The existing site and building: Two-story, 1,200 SF single-family constructed in 1940. The house contains a garage and a guest bedroom and half-bath on the first floor; and an (exterior tunnel) entry, formal living room, dining room, kitchen, full bath, and two bedrooms on the second floor.

1.2  The scope of the Project is: Expand house to approximately 4,000-4,500 SF. House will have a new third floor, with a master bedroom suite with full bath, two additional bedrooms suites and a laundry room. On the main floor (second floor) will be a living room, dining room, and great room with open kitchen with powder, and viewing wine cellar. An outdoor kitchen is desired at this level or in the backyard (depending on layout). On the first floor will be a garage (one or two car depending on square footage), a media room (with wet bar), a guest suite with full bath, and, possibly a powder room. All floors will open to the rear yard with the usage of folding doors/ sliding doors to maximize outdoor living. The house will be designed to capture expansive views of the East Bay/ Bay Bridge, and the new third floor may be angled to emphasize this feature. The ceilings will be minimally 9'-0" tall, with the third floor having taller ceilings or a shaped form.

The design will be modern. The goal will be to create a high-quality, architecturally strong design that distinguishes the project from a standard development project, with a well-detailed front façade for curb appeal. Finishes and materials will be high-end.

## 2.0      SCOPE OF ARCHITECT'S BASIC SERVICES

The scope of the Architect's Basic Services encompassed in this Proposal includes four phases: the Schematic Design Phase, the Design Development/Construction Documents Phase, Permitting/Bidding Phase and Construction Phase. The following is a general description of scope of work for each of these phases for this Project:

Case: 24-30679    Doc# 259    Filed: 01/15/26    Entered: 01/15/26 23:34:27    Page 52 of 132

## 2.1 Schematic Design Phase

At the beginning of this Phase, the Client must provide to the Architect, all information necessary for services to begin, including but not limited to, any existing plans and/or as-built drawings of the Project, surveys, photographs, or other information that will assist us in providing services. In addition, you must provide us with a written or oral description of your goals and functional requirements for the Project (the Client's Program). You may also provide magazine clippings, product data sheets, or other information about ideas or products that you desire for the Project.

Utilizing any existing plans or as-built drawings, we will take additional field measurements and photographs as required to prepare a set of computer aided design ("CAD") drawings of the pertinent existing conditions. We will conduct general research into Planning and Building Code issues that may affect your project. We will consider environmentally responsible and sustainable design such as material choices, building systems, and building configuration in developing our design.

Based upon our initial discussions and the Client's Program, we will prepare design concept options for the Project. This phase will include preliminary discussions about structural issues, lighting, plumbing, mechanical systems at a conceptual level, as well as details, fixtures and materials, as required for the Project.

Your timely feedback is critical in helping us set the design direction for completion of the Schematic Design Drawings. Based upon the directions received from you, we will complete the Final Schematic Design Drawings, which may include layouts, sections, elevations, and perspectives of the work to be completed.

In this Phase, we will identify Consultants that are required for the project, including but not limited to structural engineer, mechanical engineer, and/or other consultants. The Architect and the Client shall discuss whether either the Architect will retain each or any of the Consultants required or the Client will contract with any Consultant directly. Any Consultants retained by the Architect for the project will be billed as a Reimbursable Expense.

The Architect will discuss with the Client whether a Pre-Application Meeting is recommended with the Planning or Building Department during this Phase.

Preliminary Pricing: Should cost of the construction of the Project be a critical issue, we encourage you to retain a general contractor or construction costs estimator to provide Preliminary Pricing of the construction work based on the Schematic Design Drawings. We will provide Schematic Design Drawings so that you can provide them to your contractor or estimator to obtain Preliminary Pricing. We will answer the Contractor questions and assist you in reviewing the pricing provided by the Contractor to further define the scope of the project to be developed in subsequent phases.

## 2.2 Design Development and Construction Documents Phase

Based upon the Client's approved Schematic Design, we will develop the design in more detail and prepare more precise CAD drawings for the Project, Design Development. We will review with you elements of the Project such as final layout, materials and finishes, lighting and plumbing fixtures, building systems, hardware, and/or cabinetry, as required for this project. It is critical that major design decisions be finalized and agreed in the Design Development phase prior to commencing with the working drawings, details and specifications (Construction Drawings). We recommend that the Client request that their contractor provide updated preliminary pricing. We will provide a copy of progress drawings and outline specifications, answer any questions from your contractor, and assist you in reviewing any pricing from your contractor.

Submittals for neighborhood review/notification will occur during this Phase, including Planning Department submittal, representation before the Planning Commission, Neighborhood Design Review and

Case: 24-30679    Doc# 259    Filed: 01/15/26    Entered: 01/15/26 23:34:27    Page 53 of
132

Discretionary Review. Please note that we cannot predict the extent of time required for the Planning process/approval or for neighborhood meetings and approvals.

Once all major decisions have been finalized, we shall prepare the final Construction Documents as required to construct the architectural portions of the project. The Consultants shall prepare all drawings and specifications required to construct their portions of the work (e.g., structural, mechanical). We will incorporate all drawings and other information into one set, the Construction Documents, to be submitted to the applicable Building Department and your general contractor. The Client acknowledges that the Architect by combining the Consultants drawings and specifications into one set of Construction Documents will be reviewing the Consultant's documents for general compliance with the design concepts, but that each of the Consultants is responsible for coordination with the Architects drawings and for the accuracy of their own drawings and specifications.

## 2.3     Permitting & Final Pricing Phase

Upon your approval, we shall submit the required stamped and signed final Construction Documents to the Building Department for their review, comments, and approval in order to obtain the Building Permit. Please note that we cannot predict the exact time it will take to obtain comments from the applicable Building Department and obtain the Permit for construction.

Contractor final pricing on a negotiated contract or competitive bidding will occur during this Phase. If the Client has previously retained a contractor for preliminary pricing of the construction work, we will assist you in obtaining the final pricing from that Contractor. If the Project is to be competitively bid, we will assist you in preparing the bid documents to obtain bids for the construction work. We will answer questions from the Contractor during the pricing process, assist you in the selection of a Contractor and assist you in the preparation of the Construction Contract between the Owner and the Contractor.

## 2.4     Construction Administration Phase

The duration of construction is to be determined by the Client's Contactor. We will attend a pre-construction meeting with the Contractor to respond to preliminary questions and establish ground rules and procedures for communication during construction of the Project. During this Phase, we shall continue with the design process by responding to properly prepared, timely requests for information from the contractor to clarify the intent of the design in the Construction Documents.

During this Phase, we will work with the Contractor on interpretation of the Contract Documents and continue with the final design process for the Project. The Contractor is typically responsible for preparation of meeting notes. In the event that we are requested to provide such meeting documentation, this will be considered an additional service.

We will represent you during the Construction of the Project to observe if the Project is being built in general accordance with the Construction Documents. This will include visits to the site and meetings at appropriate intervals and telephone conversations with you and Contractor to observe the progress and quality of the Contractor's work. As requested, the Architect will be available to review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concepts expressed in the Construction Documents. Review of the Submittals is not conducted for determining the accuracy or completeness of other details such as dimensions and quantities, or for substantiating instructions for the installation or performance of equipment or systems designed by the Contractor, all of which remain the responsibility of the Contractor. You acknowledge that we are not responsible for continuous reviews of the construction, or to inspect or supervise any construction, or to determine the Contractor's means, methods, or sequencing of construction, or job site safety, as these are the sole responsibility of the Contractor. As such, we shall not be responsible for the acts or omissions of the Contractor or any subcontractor or for delay caused by others or for any delay beyond the control of the Architect.

Case: 24-30679     Doc# 259     Filed: 01/15/26     Entered: 01/15/26 23:34:27     Page 54 of 132

**3.0    FEES, REIMBURSABLE EXPENSES, STATEMENTS FOR SERVICES**

**3.1    Fees for Architectural Services**

Our fee for providing architectural services pursuant to this Agreement will be as follows:

Hourly pursuant to the following hourly amounts

Our Standard Hourly Rates for services are as follows:

| | |
|---|---|
| Principal Architect | $225.00 |
| Licensed Architect | $175.00 |
| Project Manager1/Production | $150.00 |
| Project Manager2/Production | $125.00 |
| Drafter/Administrative | $115.00 |
| Intern | $95.00 |

Our hourly fees are periodically reviewed and may be increased after notice to you.

<u>Additional Services:</u>  Any services not described in Sections 1 and 2 above are not included in the scope of our Basic Services and shall be considered Additional Services.  Our fee described above is based upon an estimated number of hours to design and document the Project.  Additional services includes services necessitated by a material change in the Project, including, but not limited to, changes to the program, scope, size, quality, complexity, building systems, budget, schedule, procurement or delivery method, additional bid or permit packages, or construction phase duration.  Additional Services also include revisions to previously prepared Instruments of Service necessitated by revisions to codes, regulations or official government interpretations, or by changes in instructions given by the Client to the Architect or the Client's failure to make timely decisions that result in additional time to perform services.  We will advise you in writing of the necessity of the Additional Services required for your project and bill such time pursuant to our Standard Hourly fees stated above.

**3.2    Reimbursable Expenses**

Any out-of-pocket expenses incurred by us in providing services for the Project, are considered Reimbursable Expenses and will be billed at actual cost plus a ten percent (10%) handling and administration charge.  These expenses include, but are not limited to, the cost of reproduction, plotting, postage, delivery, film, & processing, long distance telephone communications, mileage/toll expenses for travel outside of San Francisco, and permit fees paid by the Architect.  These expenses will be added to each Statement of Services as they are incurred by us.

With respect to any Consultant required for the Project, including, but not limited to a structural engineer, mechanical engineer, Title 24 consultant, etc, we will discuss if you want the Architect to retain that Consultant or if the Client wants to retain that Consultant directly.  If the Architect retains any Consultant for the Project, the Client will be billed as a Reimbursable Expense of the cost of retaining that Consultant plus an administrative charge of ten percent (10%) of the Consultant's invoice.  The Client has the option to contract directly with any or all of the Consultants to avoid the ten percent administrative fee.

**3.3    Retainer/Statements for Services**

Prior to commencing work on this Project, you shall pay us a Retainer in the amount of $10,000 which will be applied to our final Statement for Services.  Our Statements for Services will be prepared monthly based upon the services performed and reimbursable expenses.  Your payment of the Statement for Services is due upon receipt.  Unpaid invoices shall be subject to a one and one half percent (1.5%) monthly interest

Case: 24-30679    Doc# 259    Filed: 01/15/26    Entered: 01/15/26 23:34:27    Page 55 of
132

charge commencing thirty (30) days from date of invoice. You will also be charged at our normal hourly rates for any additional time we may incur in collecting your account balance from you.

Should you have any questions about our Statement of Services, you must notify us within 5 days of receipt of our Statement of Services, otherwise the invoiced amount is deemed payable in full. Should you dispute any item in our Statement of Services, you shall pay the undisputed portion upon receipt with a written description of the item disputed and the basis for such dispute. Any dispute will be resolved according to the Dispute Resolution section of this Agreement. In the event that we are required to obtain the services of an attorney for any collection of any amount outstanding, all expenses and costs, including reasonable attorney's fees, relating to the collection of any amount outstanding shall be paid for by you.

4.0     EXCLUSIONS: NOT INCLUDED IN ARCHITECT'S SCOPE OF BASIC SERVICES

4.1     Consultant Services. The Basic Services of the Agreement do not include any services that may be provided by Consultants, such as structural engineers, mechanical engineers, surveyor, LEED consultant, lighting designer, waterproofing consultant, acoustical engineer, landscape architect, detailed specifications writer, etc. We will advise you of the Consultants that are required for the project and you shall have the option of retaining those Consultants directly. Should you request that the Architect contract directly with any Consultant for the Project, you will be billed in accordance with our policy for Reimbursable Expenses, as set forth above.

4.2     Furniture & Furnishings. Although some limited interior design services are included in Basic Services, as required for the Project, including materials, finishes, and built-in casework, please note that freestanding furnishings are not included in our scope of work. We can provide services for the design, specifications and or procurement of such items as an Additional Service upon your request.

4.3     Pricing, Construction Costs and Construction Schedule. Construction costs and schedules can vary from contractor to contractor and depend on the type of materials and methods selected, as well as market conditions. The Contractor is to provide all pricing, construction costs and scheduling, as is generally the role of the Contractor. The Architect will provide information and respond to requests for additional information from the Contractor. Since the Architect does not have control over construction costs or schedules, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Client's Project budget or from any estimate of Construction Cost, or from any construction schedule. We are not responsible for any impact to the schedule or delay caused by the Client, contractor, or other factors not in the Architect's control.

4.4     Hazardous Materials /Unknown Conditions. The Architect shall have no liability for investigation into unknown or hidden conditions that may increase the cost of construction. Any newly discovered condition during construction that requires additional architectural services shall be designated as Additional Services. The Architect shall have no responsibility for the discovery, presence, handling, or disposal of, or the exposure of persons to hazardous materials or toxic substances in any form at the Project site.

4.5.    Planning and Building Department Meetings and Plan Check. The Architect's Basic Services include general research into permit history of the Project, review of Planning and Building Code issues, and basic Building Permit submittal. It is assumed that the Project will be reviewed according to administrative level planning and building department procedures. Additional work not part of the normal review procedures (such as multiple permit applications, Variance Applications, Discretionary Review Hearings, neighborhood review meetings, or more than one trip to Planning Commission meetings) is not included in Basic Services and will be billed as Additional Services.

4.6     Existing Buildings and Existing Conditions. The Architect assumes that any as-built condition and any design drawings provided by the Client are in compliance with all laws, codes and ordinances. The scope of the Architect's services does not include verification of the accuracy and compliance of such drawings. The Client acknowledges that the Architect has not conducted investigation, including

destructive investigation of any existing buildings, other than conditions that are evident upon visual observation. The Client agrees that the Architect has no liability for the design and/or construction of existing buildings, including but not limited to, the structural integrity, waterproofing, compliance with laws, codes, and regulations, or the services of other design consultants, or the contractor's construction of the existing building.

4.7      Extensive Environmentally Responsible Design. The Architect will consider environmentally responsible design as part of the basic services. However, extensive extra services requested by the Client, such as energy modeling or LEED Certification are not included in Basic Services and, if requested, will be considered an Additional Service.

5.0      **GENERAL PROVISIONS**

5.1      Instruments of Service. All drawings, models, specifications and other documents prepared by the Architect for this Project are Instruments of our Services for use solely with respect to this project and shall remain the Architect's property. The Architect shall be deemed author of the Instruments of Service and shall retain all common law, statutory and other reserved rights, including the copyright. The Client is granted a license to use the Instruments of Service to construct the improvements for this project only. Our drawings, specifications, or other documents shall not be used by you or others on this project or other projects, for additions to this Project or for completion to this Project by others except by agreement in writing and with appropriate compensation to us. Should this Project be completed by others or without our full services on all phases of the design and construction of the Project, then you agree to waive all claims against us and to defend and indemnify us against all claims or demands from third parties. We shall have the right upon completion of the Project, to publish and exhibit drawings, models and other documents prepared by us as well as photographs of the Project and to include these items in our promotional and professional materials. You shall provide professional credit for us in any promotional materials for the Project.

5.2      <u>Suspension or Termination.</u> Should the Client not pay an invoice within 30 days of the date of the invoice, the Architect may suspend services until such amount outstanding is paid. Architect shall not be responsible for any delays to the Project in the event of suspension of services.

This Agreement may be terminated by either party upon not less than seven days written notice should the other party (a) fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination, and (b) fail to cure such failure of performance within the seven day notice period. This Agreement may be terminated by the Client upon not less than seven days written notice to us for your convenience and without cause. In the event of termination not the Architect's fault, the Architect shall be compensated for the services performed prior to termination, together with Reimbursable Expenses expended prior to the date of termination.

5.3      <u>Dispute Resolution.</u> Although we do not anticipate any disputes with you, in the event that a dispute does arise between us, we both agree to meet and try to resolve the dispute in a face-to-face meeting. In the event that the dispute cannot be resolved through direct negotiation, we agree that as to matters in question between us arising out of or relating to this Agreement or breach thereof, shall be subject first to mediation with an agreed upon neutral mediator, and if the dispute cannot be resolved, then the dispute shall be subject to and decided by binding arbitration in accordance with the rules of the American Arbitration Association or other agreed upon provider. The prevailing party shall be entitled to receive reasonable attorney's fees and costs in an amount to be determined by the arbitrator.

The mediation and arbitration provision of this agreement does not preclude the Architect from filing an action in small claims court to recover for any outstanding invoices or from recording and perfecting a Design Professional Mechanic's Lien. In consideration for our services, you agree to the fullest extent permitted by law to limit our liability for your damages to the fee paid for our services, regardless of the cause of action or legal theory pled or asserted.

### ARBITRATION OF DISPUTES

NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE BUSINESS AND PROFESSIONS CODE OR OTHER APPLICABLE LAWS. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY." "WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION.

Owner's Initials _RS_

5.4     Insurance and Limitation of Liability. The Architect maintains Workers' Compensation, Commercial General Liability, and Professional Liability Insurance. In recognition of the relative risks and benefits of the Project to both the Client and the Architect, the risks have been allocated such that the Client agrees, to the fullest extent permitted by law, to limit the total liability of the Architect and its employees and consultants for any damage, claim, or injury to the total fee paid by the Client for the Architect's services, regardless of the cause of action or legal theory pled or asserted. The Client and the Architect agree to waive consequential damages for claims, disputes or other matters in question arising out of this Agreement.

5.5     Final Agreement. This Proposal upon execution becomes the final written agreement between the Client and the Architect. It supersedes all prior or contemporaneous communications, representations, or agreements, whether oral or written, relating to the Project. Execution of this Agreement signifies that each party has read and understood the document thoroughly. Any amendments to this Agreement must be made in writing and signed by both the Client and Architect. The laws of the State of California will govern the validity of this Agreement, its interpretation and performance.

If this Proposal meets with your approval, please sign one copy and return it to our office with a check for the Retainer of $10,000, which will be held and applied to our final Statement of Services. We look forward to working with you on this Project.

Sincerely,                          Agreed,

John Lum, Architect                 Ravi Sadarangani, Managing Member/Partner    Date
CA. License 21837                   Farallon Real Estate 4, LLC
John Lum Architecture Inc.

8/27/15

Case: 24-30679     Doc# 259     Filed: 01/15/26     Entered: 01/15/26 23:34:27     Page 58 of 132

# EXHIBIT C

# Michael Chan Company

PO Box 591215 San Francisco, CA 94159-1215
P: 415.265.2266
michaelchancompany@gmail.com

To: Mr. Ravi Sadarangani
152 Yerba Buena Avenue
San Francisco, CA 94112

Date: November 11, 2016

Subject: New 3-Story & 1-Basement of Single Family Dwellings,
at 653 28th Street, San Francisco, California

## Proposal for Structural Engineering Design Services

### *SCOPE OF WORK*

**Structural Engineering:**
1. Prepare structural engineering addendum based on architectural drawings by John Lum Architecture Inc.

**Inclusions Items:**
1. No extra charges to incorporate architects' comments
2. No extra charges to update plan to incorporate comments/changes from SFDBI
3. No Extra Charges for first three site visits of 30 mins each. 7.3

**Exclusions Items:**
3. Geotechnical report
4. Underpinning/Shoring Design
5. Construction management/Site Visit during construction
6. Special Inspections – Structural

**Contract Amount:**
We propose to complete our building-structural addendum services for an amount of
***Twelve Thousand Seven Hundred Fifty Dollars ($12,750.)***

**Payment Schedule: ($12,750.)**
1. First payment $5,000, is to be paid at the acceptance of proposal of the project
2. Final payment $7,750 is to be paid at the completion of Structural Addendum

We will be able to proceed with our service once we have received the signed proposal and first payment. If you have any questions, please call me at 415-265-2266.

Submitted by:
*Michael Chan*
Michael Chan

## Acceptance

The above cost proposal is hereby accepted. Michael Chan Company is authorized to proceed with the scope of work mentioned above.

653 28th Street LLC

Client's Name (Print)

_(signature)_                                                    11/14/16

Client's Signature                                              Date

Managing Member

# EXHIBIT D



**CONSTRUCTION SOLUTIONS INC.**

1485 Bayshore
Blvd., Suite 133
San Francisco, CA
94124
T:
415-602-2290
T: 415-302-1712
info@adeptconstruction.solutions
Geotechnical Engineering License: GE 2873
Civil Engineering License: C 68621
Class A&B & C57 License: 1011699
*Integrated Engineering and Construction Services*

To:      Farallon Real Estate 4 LLC

Attn.:     Ravi Sadarangani


Project:     653 28th Street, San Francisco

Subject:    Engineering Services Proposal


Gentlemen:

Adept Construction Solutions Inc. are pleased to submit to you our Proposal for the engineering services to include the following:

**Scope of Work:**


    1. <u>Temporary Shoring Package:</u>

Provide Temporary Shoring engineering, calculations and drawings for

    a) Below Grade — design temporary soil shoring system to be constructed prior to or simultaneously with excavations and foundation construction;
    b) Value Engineering for means and methods and constructability for the temporary shoring system;
    c) Provide final set of drawings and calculations for submittal to DBI for separate permit approval process.

    2. <u>Civil Package:</u>

Civil drawings to include grading and excavation information, new and existing underground utilities, site work improvements, below grade waterproofing, drainage,

sewer and sump pump ejectors and catch basins, surface and roof drainage piping system diagram.

3. Permits Expediting Services:

Over the counter submittal and expedited services limited to Temporary Shoring Package.

**Exclusions and Limitations from this Proposal:**

- Site Survey;
- Geotechnical or Environmental Reports;
- Maher Ordinance Compliance;
- Pre Excavation Environmental Samples, Lab work or Report;
- MEP Engineering Systems Engineering;
- Course of Construction Inspections;
- Special Inspections;
- Review and Corrections of existing Structural Drawings;
- Permit Fees;
- Blueprint or Reprographics Services;

**Cost and Payment Schedule:**

**Fixed Cost Services Fees:**

| | |
|---|---|
| Temporary Shoring Package: | $7,800 |
| Civil Package: | $1,800 |
| Permit Expediting Services: | $1,600 |
| Total for Fixed Cost Engineering Services: | $11,200 |

50% deposit

**Time and Materials or Cost Plus Future Services:**

| | |
|---|---|
| Geotechnical or Structural Engineering | $165 / hour |
| Inspections: | $300 / Visit 3-hour minimum |
| OAE Meetings: | $350 / meeting |
| OAC Meetings: | $350 / meeting |
| RFIs or ACIs: | $165 / hour |
| Correction Notices: | $400 / visit |
| Compliance letters: $250 / letter | |
| Final Inspection Certification letter: | $500 / letter |

**Payments to be made as follows:**

**Retainer** for Engineering Services to be $5,000.00
Remaining Balance for engineering services to be paid upon completion of drawings.
Expediting Services fee to be paid upon permit approval.

**Service Charge.** Service Charge of 2.5% per month will be charged for any unpaid invoices.

**Additional Services.** Should you or your agent (architect, structural engineer, contractor, etc.) ask us to perform services excluded from our Scope of Work, and you approve such work, then any such work will be billed to you per our Fee Schedule below.

**Schedule of Additional Fees**

| | |
|---|---|
| Principal Lead Engineer | $165 / hour |
| Project Engineer | $145 / hour |
| Staff Engineer | $100 / hour |
| Drafting | $85 / hour |
| Administrative / Secretarial | $60 / hour |

**Cancellation or Termination.** If the project is canceled for any reason you will be charged for all services and reimbursable expenses performed up to the date of your notice of termination.

**Special Conditions:**
**Unanticipated Conditions.** If Engineer encounters an unanticipated condition, including one involving (a) the site, (b) existing structures where work is to be performed, (C) unknown or unforeseen geotechnical conditions, Engineer shall promptly notify Owner to determine how to addressing the unanticipated condition and whether an additional work Change Order is required.

**Engineer's Insurance Requirements.** Engineer shall procure and maintain, without interruption from the start of the Work until its completion, commercial general liability and Errors and Omissions Insurance as follows:
   a. **Minimum Limits.** The minimum limits must be no less than $1,000,000 combined single limit per occurrence and $2,000,000 aggregate.
   b. **Additional Insureds.** Contractor shall add Owner and its officers, officials, employees, and Lending Institution as additional insureds, and shall provide Owner proof that this has occurred.

**Entire Agreement.** This Agreement contains the entire agreement of the parties with respect to the matters it contains, and shall become valid and binding upon receipt of this signed document and deposit amount stated herein. No other agreement, statement, or promise made on or before the date of this Agreement shall be binding on the parties with respect to these matters. This Agreement may be amended or substituted only upon expressed written approval by both parties.

This Proposal / Agreement is valid until 12/1/2017

**IN WITNESS WHEREOF**, with receipt of Retainer Fee of $5,000.00 Client and Consultant agree to proceed by signing and dating this Agreement as set forth below.

Proposal submitted on  10/30/17  by: _____     Accepted on _____ by:

Gary Kleyner  C.E . G.E.,   Principal

Alex Volodarsky,  Lead Engineer, Managing Director



1485 Bayshore
Blvd., Suite 133
San Francisco, CA
94124
T:
415-602-2290
T: 415-302-1712
info@adeptconstruction.solutions
Geotechnical Engineering License: GE 2873
Civil Engineering License: C 68621
Class A&B & C57 License: 1011699
*Integrated Engineering and Construction Services*

To:        Farallon Real Estate, LLC

Attn.:      Ravi Sadarangani


Project:     653 28th Street, San Francisco

Subject:    Engineering Services Proposal


Gentlemen:

Adept Construction Solutions Inc. are pleased to submit to you our Proposal for the engineering services to include the following:

## Scope of Work:

    1.  <u>Temporary Shoring Package:</u>
Provide Temporary Shoring engineering, calculations and drawings for

    a) Below Grade -- design temporary soil retention shoring system to allow foundation replacement and retrofit prior to or simultaneously with excavations.
    b) Wood framing including cribbing and wood temporary shoring by others.
    c) Provide final set of drawings and calculations for submittal to DBI for separate permit approval process.


## Exclusions and Limitations from this Proposal:

- Site Survey;
- Geotechnical or Environmental Reports;
- Maher Ordinance Compliance;

- Pre Excavation Environmental Samples, Lab work or Report;
- MEP Engineering Systems Engineering;
- Wood Framing Temporary Shoring and Bracing;
- Course of Construction Inspections;
- Special Inspections;
- Review and Corrections of existing Structural Drawings;
- Permit Fees;
- Blueprint or Reprographics Services;

**Fixed Cost Services Fees:**

Temporary Soil Shoring Package:                    $6,300

**Time and Materials or Cost Plus Future Services:**

| | |
|---|---|
| Geotechnical or Structural Engineering | $165 / hour |
| Inspections: | $300 / Visit 3-hour minimum |
| OAE Meetings: | $350 / meeting |
| OAC Meetings: | $350 / meeting |
| RFIs or ACIs: | $165 / hour |
| Correction Notices: | $400 / visit |
| Compliance letters: $250 / letter | |
| Final Inspection Certification letter: | $500 / letter |

**Payments to be made as follows:**

**Retainer** for Engineering Services to be $3,500.00
Remaining Balance for engineering services to be paid upon completion of drawings.

**Service Charge**. Service Charge of 2.5% per month will be charged for any unpaid invoices.

**Additional Services.** Should you or your agent (architect, structural engineer, contractor, etc.) ask us to perform services excluded from our Scope of Work, and you approve such work, then any such work will be billed to you per our Fee Schedule below.

**Cancellation or Termination.** If the project is canceled for any reason you will be charged for all services and reimbursable expenses performed up to the date of your notice of termination.

**Special Conditions:**
**Unanticipated Conditions.** If Engineer encounters an unanticipated condition, including one involving (a) the site, (b) existing structures where work is to be performed, (C) unknown or unforeseen geotechnical conditions, Engineer shall promptly notify Owner to determine how to addressing the unanticipated condition and whether an additional work Change Order is required.

**Engineer's Insurance Requirements.** Engineer shall procure and maintain, without interruption from the start of the Work until its completion, commercial general liability and Errors and Omissions insurance as follows:
    a. **Minimum Limits.** The minimum limits must be no less than $1,000,000 combined single limit per occurrence and $2,000,000 aggregate.
    b. **Additional Insureds.** Contractor shall add Owner and its officers, officials, employees, and Lending Institution as additional insureds, and shall provide Owner proof that this has occurred.

**Entire Agreement.** This Agreement contains the entire agreement of the parties with respect to the matters it contains, and shall become valid and binding upon receipt of this signed document and deposit amount stated herein. No other agreement, statement, or promise made on or before the date of this Agreement shall be binding on the parties with respect to these matters. This Agreement may be amended or substituted only upon expressed written approval by both parties.

This Proposal / Agreement is valid until 12/4/2017

**IN WITNESS WHEREOF**, with receipt of Retainer Fee of $3,500.00 Client and Consultant agree to proceed by signing and dating this Agreement as set forth below.

Proposal submitted on 11/14/17 by:

*Kleyner*
_____
Gary Kleyner C.E. G.E., Principal

Accepted by: _____ Date:_____
Name: Many Menillo
Phone: 653 28th Street LLC
Email:



CONSTRUCTION SOLUTIONS INC.

Resource/

1485 BAYSHORE BLVD. SUITE 133
SAN FRANCISCO, CA 94124
415-602-2290
415-302-1712

## Modern Technology Solutions, Inc.

## Professional Service Agreement

This Agreement is made as of 12/11/2017 between the Client and the Consultant, collectively, "the parties" whereas Client retains Consultant to perform Professional Services, per terms and conditions set forth in this Agreement.

    Client: 653-28th Street, LLC

    C/o Mr. Ravi Sadarangani

Adept Construction Solutions Inc./Modern Technology Resources, Inc. Geotechnical Engineering Division

1485 Bayshore Blvd., Suite 225, Mail box 133

San Francisco, CA 94124

Civil Engineering License: C 68621

Geotechnical Engineering License: GE 2873

**Project: 653 28th Street, San Francisco, California**

### 1. Scope of Services:

Consultant to provide professional Geotechnical Services and assumes the duties and responsibilities of Engineer of Record for the project, to include the following:

**Field Observations, Inspections and Reporting;**
Compliance Documentation;

**Observation and Documentation Fees.** This fee covers the cost of actual professional time involved in Geotechnical Field Observations. Field Inspections and Observations to be charged per each visit as needed by Project Schedule.

---

Geotechnical Engineering #2873       Civil Engineering #68621       Class A & B Contractors # 1011699

**Course** of **Construction Schedule of Fees:**

Flat Rate Geotechnical Fee to assume responsibility and insurance:      $1,750

All other charges to be billed as follows:
Geotechnical Observations-      $320 / 2-hour minimum charge
Letters:
       Inspection Letters        $250 / per letter
       Final Inspection Certificate Letter      $350 /per letter

We anticipate that project will require inspections during pier drilling and an additional 3-4 inspections for excavation, backfill, drainage system.

All fees to be invoiced by Consultant and paid by the Client within Ten (10) days.
Final Special Inspection Release Letter required by DBI will not be issued until consultants are paid in full.

**Retainer.** Retainer amount shall be **$1750.00** payable upon acceptance of this agreement.

**Service Charge.** Service Charge of 2.5% per month will be charged for any unpaid invoices.

**Cancellation or Termination.** If any project is canceled for any reason you will be charged for all services and reimbursable expenses performed up to the date of your notice of termination.

**Entire Agreement.** This Agreement contains the entire agreement of the parties with respect to the matters it contains.

**IN WITNESS WHEREOF,** with receipt of Retainer Fee in the amount of $1,750 Client and Consultant agree to proceed by signing and dating this Agreement as set forth below.

Consultant:      Gary Kleyner
                Principal/ Geotechnical Engineer

**Client:**

Name:        653 28th St LLC.
Telephone:
Email:        415-939-7284

---

Geotechnical Engineering #2873      Civil Engineering #68621      Class A & B Contractors # 1011699

# EXHIBIT E

January 24, 2019

Via Email

Arcon Construction Corp.
650 Florida Street, Unit C
San Francisco, CA 94110
Attention: Mr. Andrey Libov

     **Re:**    **Notice of Breach of Contract**
              **Property Address: 653 28th Street, San Francisco, CA**

Dear Andrey:

This letter serves as a final attempt to address what seems to be a continuing pattern and practice of breaching the express terms of the contract entered into by and between 653 28th ST LLC ("Owner") and Arcon Construction Corp. ("Contractor") on June 13, 2018 (the "Agreement"). My goal is to avoid terminating your services for cause if possible. As you know, you were hired under the Agreement to construct a new home at 653 28th Street for a fixed price per approved architectural plans, structural plans, shoring plans, a geotechnical soils and investigation report and other project documents, all of which were provided to you in advance of the commencement of your work. Specifically, the governing Agreement and associated Rider signed by you provide as follows:

1. You will perform the stated scope of work in accord with the plans and specification provided to you in advance of project commencement for a fixed price of $1,984,141.46 (with allowances for certain items). The amount of the fixed contract included all work necessary to perform the Work including the excavation, shoring and the installation of specified piles to set depths. The nature of the soils and substrates were identified with specificity.

2. The Scope of Work, included in the Agreement was based on documents and plans outlined in our agreement, including architectural plans that clearly outline finished ceiling heights and provide a maximum elevation for the building peak height/elevation (i.e. ~ 0.5" below the upslope neighbor's peak roof). The Agreement was based on the set scope of work and project dimensions. The amount of excavation required was governed by these factors and clearly set forth in the plans provided to you for your review in advance of the job.

3. As set forth in the Rider, you specifically acknowledged and declared that the contract documents provided to you were full and complete and sufficient to enable you to determine the cost of the work set forth in the Agreement and you further acknowledged and declared that the drawings and specifications were and are sufficient to enable you to construct the work outlined in the Agreement in accord with all applicable laws, statutes, building codes and regulations and to otherwise fulfill all of your obligations under the Agreement. Article 6 of the Agreement states that "all work shall be in accordance to the provisions of the plans and specifications.....and shall comply with all applicable.....building codes and laws."

4. You specifically acknowledged that you had visited the site, made appropriate field measurements, examined all conditions affecting the work to be performed and were fully familiar with all of the conditions of the project including those that might affect the project and that you had carefully examined all drawings, specifications and other documents and that there were and are no discrepancies or omissions in the contract documents. As is abundantly clear, Arcon was required to review and be familiar with the plans and specifications before commencement of the work. It was Arcon's responsibility to bring the discrepancies to our attention and to the architect and various engineers BEFORE starting work.

5. Pursuant to Paragraph 8.1 of our contract all change orders need to be agreed upon in writing, including cost and additional time considerations, and must be signed by both parties in advance. On multiple occasions, you were advised that no modifications to approved plans would be supported or approved if it resulted in any additional expenses to be borne by Owner. Your actions in submitting the change orders and invoices at issue are a clear breach of the Agreement and another instance of your breach of your general good faith obligations under California law.

6. The governing contract states that you are required to pay your subcontractors and suppliers and take all steps necessary to bond around and file a release bond should any lien be recorded against the Property.

7. Article 15 of the Agreement provides that that in the event of arbitration or litigation relating to the project, project performance or contract performance, the prevailing parties is entitled to recover its reasonable attorney fees, costs and expenses.

Notwithstanding the terms of our contract, you have notified me that you intend to submit change orders not permitted by our contract and have since done so as discussed with more particularity below. As a basis for these change orders for unauthorized work, Arcon now claims there were discrepancies in the plans provided and that as a result Arcon needed to perform additional excavation work on the property and had to invoice for this work in the form of change orders. Your notifications violate the plain language of the Agreement: As a licensed GC, it was and is your duty to read and understand the approved plans and supporting documents and plan for construction techniques accordingly, including determining the amount of excavation required to achieve finished building height and the governing limitation of maximum peak building height allowed i.e.0.5" below upslope neighbor's peak roof.

It is simply outrageous to suggest that your negligence in understanding and performing your own responsibilities under the Agreement would entitle you to, in effect, renegotiate the fixed contract price you agreed to. Moreover, it is clearly a breach of your general good faith obligations under California law.



As a reminder to you: the Geotech and soils reports specifically listed "Excavation conditions and Rippability" and spelled out to expect "extreme difficulty" during drilling with "most conventional, heavy-duty equipment". Further, the boring logs in the Geotech report showed that bedrock was found at 3.5'-4'. In your own notice to your excavation and shoring sub-contractor, Ace Construction Corp, you agreed with these conditions and specifically cited "...we provided you with documentation consisting of plans, specifications, and a geotechnical report, which included borings and depicted bedrock throughout the site near the surface." You further stated in the same notice to Ace that "The bedrock is clearly not a "changed condition" or extra work which warrants a change order or any increase in price." You further stated in another email to Ace that "...we have consulted with geotechnical engineers, who have told us uniformly that the bedrock was made known to you in plans/specs and particularly the geological report was given to you prior to your bidding the project."

After Ace stopped work, we made it clear to you that a change order was NOT merited for any of these conditions and would not be approved by the project sponsor. You agreed and proceed to work on the excavation and shoring work per approved plans. Nevertheless, a few days after Ace resumed work on November 1st, in fact, you held a meeting on site with the Geotech, the sub-contractor, Ace, and with the project sponsor, on November 6th, requesting the Geotech engineer to revise the plans because it was taking your subcontractor longer time than you and Ace had planned to drill. You and your sub requested that the Geotech engineer, Dr. Igor "Gary" Kleyner come up with alternative solutions to reduce drilling depths for a "couple of piles by a couple of feet".

At our meeting AND the day after our meeting, I made it very clear to you verbally and via a written email on Nov 7th that any modifications to approved plans could be made ONLY if 5 conditions were met, including the following:

- The change NOT increase the risk profile. That it does not impact the integrity of the design and its impact on neighboring properties.

- That there be NO extension of time lines for construction time;

- The change does not result in change to approved structural plans

- That none of the proposed changes "result in any other additional expense to be borne by 653 28th St LLC, the project sponsor. Even if this means you may be required to install additional whalers and/ bracing/other materials required to accommodate any change to currently approved plans to offset the reduced depth."

- That any modifications meet with the approval of the Geotech of record;

- That any modifications be approved and permitted by the City; and

- That there be no need for peer review.

Despite my very clear instructions, you proceeded with the work and over two months later, you generated change order # 3 and #4 after modified shoring work was completed. In short, the change orders you have submitted are work within the scope of the original Agreement and/or for work ALREADY performed without the owner's prior approval in violation of the Agreement and my express conditions for any modification to plans. Accordingly, Owner declines to approve or pay change orders #3 in the amount of $33,840.02 for modified shoring work which was performed over two months ago without the owner's prior approval and #4 in the amount of $18,720 for excavation , trucking and disposal for work contemplated by the original Agreement.

Equally disturbing is the fact that certain items within the change orders submitted by you are for work it never performed which renders invoice # 774, which states that the excavation and shoring work was 100% complete, grossly inaccurate. The truth is that although approved by the Geotech of Record who confirms no compromise to the project, you did not complete the work per approved plans and eliminated a number of piles and reduced total excavation depths vs approved plans without informing me and getting my consent. Your modifications should have resulted in a completely different kind of "change order". namely, one in which the Owner is owed a refund for work not undertaken or completed per approved plans.

Your actions in submitting a fraudulent invoice are egregious and clearly in breach of the Agreement and your duties as a licensed contractor in the State of California.

At present you are:

- In breach of the Agreement having issued Change Orders 3 and 4 for work already performed without Owner approval;

- In breach of the Agreement for failing to perform work in accord with the Plans and Specifications of the Agreement without Owner approval and while charged Owner for the work not performed when in fact a credit is due;

- In breach of the Agreement for failing to remove debris from the site pursuant to Article 6 of the Agreement states that "all work shall be in accordance to the provisions of the plans and specifications…..and shall comply with all applicable…..building codes and laws." Further, it states that "contractor shall remove all construction debris…" The Geotech report (which, as you know, is one of the Contract Documents) states that "It is extremely important that strong measures be taken to control and conduct all surface and subsurface waters away from the structures on the site, and that **all drainage facilities be diligently maintained. This is extremely important during periods of prolonged and intense rainfall."**

- In breach of the Agreement having refused to return to the job site despite Owner's directions to do so.

You were notified by me, twice in the past few days to remove debris and to pump out rain water that has accumulated on site. The shoring engineer also informed you to remove water from the excavation site. Yet, despite the requirements laid out in the Geotech report and despite the requests made to you to remove debris and pump out drain water, you have ignored requests made, in direct violation to terms of our contract and requirements of the Geotech engineer. Instead you claim that a generator required to pump out water would be too loud and bothersome to the neighbors, despite the fact that you used generator/s during the excavation and shoring period. As a licensed GC in the City of San Francisco, you are aware that leaving stagnant water in place for days is grounds for NOV by the city. By ignoring the request to remove debris and water on timely basis, you have added to the timelines and to the risk profile of the project. Arcon's refusal to remove debris/water from the site on a timely basis impeded completion of the project and added to the completion timelines.

While you finally returned to the site briefly to pump out most of the rain water, at least 1' of water is still present in the sump pits. Unless and until the accumulated debris and water are completely removed, my engineer has advised that we will not be able to obtain accurate elevation point surveys. As you know, this information is needed to determine if additional excavation is required per the approved plans for the project. Per Section 1 above, any additional work/excavation needed to achieve building heights per plans will be done at the expense of Arcon and will not be paid for by the owner.

The above conduct will not be tolerated. That said, we wish to avoid your termination for cause for the forgoing material breaches of the Agreement by Arcon as permitted pursuant to Section 13 of the Rider to the Agreement. We also wish to avoid hiring another GC to complete the work you agreed to perform. Because at present the job is unfinished due solely to your improper actions, if we are forced to hire a new GC to perform the remaining portions of your original scope of work on a time and materials basis, you will, pursuant to Section 13 of the Rider, be liable for any increased costs incurred by Owner. Any such costs will be charged back to Arcon Construction upon completion of the project. Owner also reserves all rights to avail ourselves of all available legal remedies, which may include filing a complaint with the Contractor's License Board and/or making a claim against your contractors' license bond.

To avoid these consequences and resolve these issues without further delay, demand is hereby made as follows:

1. Provide all necessary lien releases from Ace and other subs who have worked on the site;

2. Provide approval for revision to shoring plans that you performed vs approved plans;

3. Cancel change orders 3 and 4;

4. Strike invoice 774;

5. Issue credit for work not done, including 107' cumulative depth of pile not installed at rate of $864/LF; and

6. Complete this project in accord with the plain terms of the agreement with no additional charges to complete excavation to BOE required to maintain building height restrictions due to Arcon's failure to reconcile discrepancies in plans and to reduce the excavation and shoring required per approved plans.

7. No addition to time lines agreed per contract. You have halted work for over three weeks; in addition, your sub-contractor Ace had halted work for over two weeks when Ace walked off the site due to dispute with Arcon; other days were lost due to vacation and sick days taken by your sub.

Please contact me to discuss the resolution of this matter without further delay. If you do not resume work on Monday, January 28th, 2019, we will be forced to terminate the Agreement for cause and will be compelled by your breaches to hire another GC and pursue all remedies.

Sincerely;

**653 28th Street, LLC**

Ravi Sadarangani
Managing Member
236 West Portal Ave, #763
San Francisco, CA 94127

# EXHIBIT F

| | |
|---|---|
| **From:** | Twenty Eighth Street <twentyeighthstllc@gmail.com> |
| **Sent:** | Friday, February 1, 2019 11:43 AM |
| **To:** | vlibov@arcon-online.com; Arcon Construction; Andrey Libov |
| **Cc:** | ddt@artisanlaw.com |
| **Subject:** | Notice of Termination for Cause |

<u>**Via Email and Overnight Mail**</u>

Mr. Andrey Libov
Arcon Construction Corp.
650 Florida Street, Unit C
San Francisco, CA 94110

     **Re:    Notice of Termination for Cause**
     **Property Address: 653 28<sup>th</sup>Street, San Francisco, CA (the "Project")**

Andrey:

     Arcon remains in breach of multiple provisions of the contract entered into by and between 653 28<sup>th</sup>ST LLC ("Owner") and Arcon Construction Corp. ("Contractor") on June 13, 2018 (the "Agreement") which required you to perform the stated scope of services for the set sum of $1,984,141.46 and in compliance with all other stated terms.  <u>This serves as formal notice that effective immediately, you are hereby terminated for cause.</u>

     I should note that Mr. Tong's after the fact attempt to "renegotiate" and "rewrite" clear and unambiguous contract terms already agreed upon by you, coupled with your conduct to date, is blatant evidence of your continuing bad faith.

     Pursuant to Paragraph 1 of the Rider to Construction Proposal (the "Rider"), you accepted all contract documents and confirmed (i) they were full and complete; (ii) were sufficient to enable you to determine the cost of the work; (iii) were sufficient to enable you to perform the work to completion in accord with all laws statutes, building codes, ordinances and standards in the industry; and (iv) were in fact sufficient to enable you to fulfill all of your obligations under the Agreement.  In addition, you expressly represented and warranted that you had visited the site, made appropriate field measurements, examined all conditions affecting the work, were fully familiar with all project conditions, having carefully examined both the site and the project documents, and based thereon, confirmed that no discrepancies or omissions of any kind existed that might impact your ability to do your job.  We relied on your representations, having no reason to believe they were fraudulently made by you.

     Moreover, once the Project commenced, you were required to complete it without interruption particularly where, as here, there has been no legitimate basis for the long term

1

cessation of the work. In contrast to your assertions, you are in possession of any and all construction documents necessary to perform your work including but not limited to revised geotechnical plans, revised architectural plans, surveys, and updated elevations. In addition to the construction documents, we have had verbal discussions with you to ensure you are fully aware of the current job site requirements and scope of revisions necessitated by your breaches of the Agreement. Any suggestion that you needed more information and/or revised documents is patently false.

Indeed, you have let the Project sit idle, and your unjustified absence from the jobsite throughout January has resulted in extreme and unwarranted Project delays, monetary losses to Owner and Owner exposure for jobsite abandonment. Per the Agreement, you are liable for any damages sustained by Owner as a result of your improper conduct, and we will look to you for all damages sustained as a result of your defaults as set forth herein.

This serves to remind you that the terms of the Agreement and the Rider to Construction Proposal ("Rider"), read and signed by you, provide as follows:

You must commence your work promptly upon notice by Owner to begin work which notice was provided. Rider, Paragraph 2;

You must complete all work on the Project (other than punch-list items) no later than June 26, 2019, (the "Target Completion Date"). Rider, Paragraph 2;

If completion of the work does not occur by the Target Completion Date, Owner is entitled to deduct $500 for each business day completion of the work was unjustifiably delayed. Rider, Paragraph 2. Owner intends to do so;

At your own expense, must procure furnish and record an appropriate statutory release bond in the event you or any of your subcontractors, suppliers or other persons make, record, file, or maintain a mechanics lien action or record a lis pendens against the Project. In addition, you are also required to compensate Owner for any and all losses, liabilities, damages, cost and/or expenses of any kind, including attorneys' fees and court costs, incurred in connection with and such proceedings and/or any failure by you to pay those working on the Project. Rider, Paragraph 9.

We are advised that you have not paid at least one of your contractors (Ace), and they decline to return to the jobsite until they receive payment. In addition, it has been brought to my attention that you are making false claims that you have not been paid by the owner for work completed. If anything, we are still waiting for you to issue credit for work not done, but wrongly charged. Not to mention we have paid you to date $367k. Demand is made that you immediately pay Ace and all other subcontractors and suppliers who have performed work at the Project and issue credit for 107 LF of piles not installed.

Pursuant to Paragraph 10.1 of the Agreement, in the event any construction conditions cause a material decrease in the Contractor's cost of and/or time required for performance of any part of

the work, Contractor is required to negotiate an equitable adjustment of the contract sum for the benefit of Owner.

Pursuant to Article 8, you may not issue change orders unless <u>preapproved by Owner in advance in writingincluding</u> information related to proposed cost, additional time considerations, approximate dates when the work will begin and be completed, and related information. You issued and rescinded Change Orders Nos. 3 and 4 for work done in violation of Article 8. We have just received Change Order No. 5 which is grossly inflated and is highly suspect and also violates all requirements of Paragraph 8.1. Based on the plain language of the Agreement, we will NOT approve Change Order No. 5, or any change orders that fail to comply with the provisions of Article 8. All past requests are denied. All future requests will be denied.

Paragraph 13 of the Rider governs our right to terminate your services for cause if you are guilty of a material breach of any provisions of the Agreement. Your conduct in, among other things, failing to pay your subcontractors, failing to honor the price of your contract, failing to give appropriate credits to Owner for the reduced number of piers and installation of same at reduced depths, submitting invoices for work not performed, issuing unapproved change orders, failing to perform your work without interruption or delay with no basis therefore, and refusing to return to the jobsite and recommence work, separately and collectively give rise to Owner's absolute right to terminate you for cause.

Based upon your formal termination, we hereby demand that you:

1. Immediately cease all work;
2. Immediately remove your equipment from the site;
3. Pay your subcontractors and suppliers in full for work performed to date;
4. Provide all necessary proof of payment and lien releases from Ace and all other subcontractors and suppliers who have worked on the site;
5. Take all steps necessary to ensure no liens or lis pendens are recorded against the Project;
6. Refund the amount of $99,207.10 which takes into account authorized work performed to date and any proper credits due and owing as between the parties. If you provide a refund of any other amount, demand is made that you provide a line item specific accounting of all sums not returned to Owner; and
7. Immediately deliver all contract documents, as-builts, project files, approvals obtained by you, permits and job cards to Owner.

Owner reserves all of its contract rights and will seek to recover all losses, damages and costs incurred as a result of your conduct, including but not limited to any increased costs to complete the project with an alternative contractor(s), any costs associated with the revision of shoring plans as performed by you vs approved plans, peer review costs, costs to secure the approval of excavation and shoring as revised, delay costs, attorneys' fees and costs and any other losses whatsoever. Obviously, your indemnity obligations remain in full force and effect.

Sincerely;

**653 28th Street, LLC**

3

Ravi Sadarangani
Managing Member

cc: Daron Tong via email (ddt@artisanlaw.com)

**PROOF OF SERVICE**

I, Carony Cheng, declare that:

I reside in the City and County of San Francisco; I am over the age of 18 years and not a party to this action; my business address is the Law Office of Brian E. Soriano, 1801 Bush Street, Suite 304, San Francisco, CA 94109.

On May 20, 2022, I served true and correct copies of the following documents:

**653 28TH STREET, LLC'S THIRD AMENDED CROSS-COMPLAINT FOR:
(1) BREACH OF WRITTEN CONTRACT; (2) NEGLIGENCE; (3) NEGLIGENT MISREPRESENTATION; (4) INTENTIONAL MISREPRESENTATION;
(5) PROFESSIONAL NEGLIGENCE; (6) BREACH OF CONTRACT; (7) BREACH OF ORAL CONTRACT; (8) EQUITABLE INDEMNITY; (9) CONTRIBUTION;
(10) DECLARATORY RELIEF; (11) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; and (12) VIOLATION OF BUSINESS AND PROFESSIONS CODE 7160**

together with an unsigned copy of this declaration, on the parties in this action by means set forth below, addressed as follows:

| | |
|---|---|
| *Attorneys for Plaintiff/Cross-Defendant* | *Attorneys for Defendants/Cross-Defendants* |
| *Arcon Construction Corporation* | *Adept Construction Solutions, Inc. and* |
| George William Wolff, Esq. | *Modern Technologies Resources, Inc.* |
| Law Office of George W. Wolff | James L. McCormick, Esq. |
| 580 California Street, Suite 1236 | Goodman Neuman Hamilton LLP |
| San Francisco CA 94104-1000 | 417 Montgomery Street, 10th Floor |
| george@wolfflaw.com | San Francisco, CA 94104 |
| | jmccormick@gnhllp.com |

| | |
|---|---|
| X | **BY ELECTRONIC MAIL:** Pursuant to SFSC L.R. 2.11(P)(1) and CRC, Rule 2.251(b)(1)(B) or based on a court order or an agreement of the parties to accept electronic service, I caused the documents to be served electronically through my electronic email address at mredwardsmithsr@gmail.com in portable document format ("PDF") Adobe Acrobat before 5:00 p.m. on the above-referenced date. |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 20th day of May 2022, at San Francisco, California.

_____
Carony Cheng

1
2
3
4
5
6
7
8                    Exhibit "B"
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REQUEST FOR JUDICIAL NOTICE 24-30679 - 3



(FILED stamp)

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| ARCON CONSTRUCTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>653 28TH STREET LLC; JOHN LUM ARCHITECTURE INC.; JOHN GIT HOONG LUM, AN INDIVIDUAL; ADEPT CONSTRUCTION SOLUTIONS, INC.; IGOR M. KLEYNER, AN INDIVIDUAL; MICHAEL YAN CHAN DBA MICHAEL CHAN COMPANY; AND Does 1-200, inclusive,<br><br>Defendants. | Case No. CGC-19-574888<br><br>**STATEMENT OF DECISION**<br><br>Complaint Filed: March 28, 2019<br>Trial Date: August 28, 2023 |
| 653 28TH STREET LLC,<br><br>Cross-Complainant,<br><br>v.<br><br>ARCON CONSTRUCTION CORPORATION; JOHN LUM ARCHITECTURE INC.; MICHAEL CHAN COMPANY; ADEPT CONSTRUCTION SOLUTIONS, INC., MODERN TECHNOLOGY RESOURCES, INC., AND Roes 1-100, inclusive,<br><br>Cross-Defendants. | |

## I. INTRODUCTION

This case involves disputes between a project owner and the contractors who initially worked on the construction of a residential property at 653 28th Street, San Francisco, California (the

1

*Arcon Construction Corporation v. 653 28th Street, LLC,* San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

Case: 24-30679    Doc# 259    Filed: 01/15/26    Entered: 01/15/26 23:34:27    Page 86 of 132

"Project"). The owner and general contractor spent several months having lawyers negotiate a construction contract (the "Contract") meant to avoid significant changes to the Project's fixed price and timeline for completion. After the parties entered the Contract, disputes about the job led to the Project owner's discharge of the general contractor before the foundation of the residential property was poured.

The general contractor filed a mechanic's lien against the subject property and filed this lawsuit to enforce the lien and for breach of contract. The lawsuit also named the design professionals involved in the Project. The owner countersued the general contractor for damages and cross-complained against the design professionals. The structural engineer and architect settled separately with the owner before trial. The general contractor sued its drilling subcontractor, but this court found that the claim was barred by the applicable statute of limitations. The general contractor withdrew its claims against the geotechnical engineer and shoring engineer and the matter proceeded to a court trial in this department.

## II.   THE PARTIES AND THEIR COUNSEL

The plaintiff and cross-defendant Arcon Construction Corporation ("Arcon") is the general contractor. George Wm. Wolff of the Wolff Law Office appeared at trial on behalf of Arcon. The defendant and cross-complainant 653 28th Street, LLC ("653") is the Project owner. Brian E. Soriano of Goldstein, Gellman, Melbostad, Harris & McSparran, LLP appeared at trial on behalf of 653. Cross-defendants Adept Construction Solutions, Inc. and Modern Technology Resources, Inc. served as the shoring contractor and geotechnical engineers of record (collectively "Adept/Modern"). James L. McCormick of Goodman Neuman Hamilton, LLP appeared on behalf of Adept/Modern.

Previous defendants Project architect John Lum Architecture, Inc., and John Git Hoong Lum, an individual (collectively "Lum"), and structural engineer Michael Chan dba Michael Chan Company

2

("Chan") separately settled with 653 before trial. Each settlement was determined to be in good faith within the meaning and effect of California Code of Civil Procedure § 877.6 by the law and motion department.[1]

The court received each party's proposed statement of decision on January 19, 2024, and the condensed 2,283-page trial transcript on January 22, 2024. In accordance with Cal. Code of Civ. Pro. § 632 and Cal. Rule of Court 3.1590(g), the parties submitted their objections to the proposed statement of decision by April 22, 2024. A hearing concerning Arcon's claim for indemnity, contribution, credit or offset(s) resulting from 653's good faith settlements with Lum and Chan was heard on June 7, 2024.

The court, having read and considered the oral and written evidence, the demeanor of all witnesses, the supporting and opposing memoranda of all parties, the arguments of counsel, the parties' objections to the proposed statement of decision, and good cause appearing therefore, makes the following findings and conclusions.

## III. STATEMENT OF FACTS

653 is managed by Ravi Sadarangani ("Sadarangani"). Sadarangani arranged to have Associated Terra Consultants, Inc. ("Terra") prepare a geotechnical soils investigation for the site to determine the suitability of new construction of a new residential home at the job site. Terra issued an eighteen-page written report of its findings on September 18, 2017 (the "Soil Report"). Ten days later, Sadarangani met to discuss the Project with Arcon, which is owned by father, Vladimir Libov, and son, Andrey Libov ("Libov").[2] Before meeting with the Libovs, 653 retained architectural services from Lum to provide design, project administration and coordination with the structural engineer's

---

[1] See Order Granting Chan's Motion for Determination of Good Faith Settlement with 653 28th Street filed December 6, 2021, ("Chan Order") and Order re Defendant's [Lum] Application for Determination of Good Faith Settlement filed December 9, 2021 ("Lum Order").
[2] All references herein to Libov are to Andrey Libov.

3

plans. 653 retained Igor "Gary" Kleyner, Ph.D. ("Kleyner") of Adept Construction Solutions, Inc., on Arcon's recommendation, as the geotechnical engineer to assist with the shoring plans for the required excavation.

## A. 653 Enters Contract with Adept for the Shoring Plan

Kleyner inspected the job site on October 27, 2017. After his visit, he informed Sadarangani the shoring plan would be a "rather simple one with piers on one side, not more than 13'-15' deep." Sadarangani relayed this message to Arcon via email on October 27, 2017, and again on November 13, 2017. On November 14, 2017, Adept submitted an engineering services proposal/agreement to 653 to provide temporary shoring engineering, calculations, and drawings for the Project. The next day, Sadarangani and Adept exchanged emails about the design cost. Kleyner described a simple shoring plan with piers on one side and suggested, "It is possible we can do without piers with some light bracing." Kleyner also noted that, "[o]n 28th bedrock is 3 to 8 feet depth. Drilling piers will be difficult in this conditions (sic)." Sadarangani executed Adept's proposed agreement.

Notwithstanding Kleyner's proposal, Adept submitted a more complex shoring plan to the San Francisco Department of Building Inspection (the "City"), which limited the use of bracing and proposed the use of 30 drilled piers from 10 to 15 feet deep on three sides, rather than one side. Two soldier piles were designed to be drilled to an embedment depth of 22 feet. When asked by Sadarangani about the expense of a simpler shoring plan, Kleyner emailed his answer on November 15, 2017: "More difficult to design, more responsibility and more geotechnical attention is required. Standard Drilling piers more easy (sic) to design, but it would be difficult to drill in bedrock. Topsoil and surcharge load from neighboring buildings should be considered." Kleyner explained that the price of his contract was higher than expected because a design without the use of drilled piers required more work.

4

At trial, Kleyner testified that a simpler system foregoing drilled piers and using spread footers and tiebacks was not possible because of an adjacent neighbor's refusal to cooperate. On cross-examination, he acknowledged receipt of another email from Sadarangani, informing him that the same neighbor had asked that he incorporate the simpler shoring system approach. Kleyner's shoring proposal to the City ultimately became a part of Arcon's proposal to 653, but Kleyner never completely explained to Sadarangani why a more complicated system was necessary.

**B.     653 Enters Contract with Modern Technology Resources, Inc. ("Modern")**

Kleyner told Sadarangani that if 653 wanted Kleyner to provide geotechnical services and serve as "Engineer of Record" for the Project, a new contract was necessary. Terra was the original geotechnical services consultant and Adept's first contract with 653 did not include geotechnical services. Kleyner presented 653 a professional geotechnical services contract on Adept letterhead with a different entity, Modern Resources, Inc. ("Modern"). When Sadarangani asked why there was a different company, Kleyner explained that they were the same company and that one was a subsidiary of the other. The Modern agreement is "made as of December 11, 2017." Despite misgivings about a more costly and complex shoring plan and who was serving as 653's engineer of record, Sadarangani signed a second contract.

653 eventually learned that Adept and Modern are two separately formed corporations. When Sadarangani insisted on being named as an additional insured under the insurance policies for both Adept and Modern (concerning general commercial liabilities policies and not errors and omissions policies), Kleyner and his insurance broker Alexander Shkolnikov ("Shkolnikov") assured him that 653 would be covered by insurance. Their promises were not kept. Modern never named 653 as an additional insured to its general commercial liability insurance policy.

**C.     653 Enters Contract With Arcon**

5

*Arcon Construction Corporation v. 653 28th Street, LLC*, San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

On June 13, 2018, after Adept and Modern provided the initial temporary shoring plan, but before its approval by the City, 653 entered the Contract with Arcon to construct a single-family residence at 653 28th Street in the fixed amount of $1,984,141.46. The Contract price was set by Arcon based upon estimates drawn from architectural plans dated March 13, 2018, structural plans dated September 6, 2017, a shoring plan dated December 20, 2017, an asbestos survey dated 01-29-18 and the Soil Report. The Contract identified pricing for specific line items to enable progress billing. The Contract's fixed price was reached by adding all line items and adding charges for overhead and profit, which totaled $322,928.69 or a 19% markup.[3] Under the Contract, Arcon acted as the General Contractor for the Project from commencement through completion. The Project's intended completion date was June 26, 2019.[4]

Within one day of signing the Contract, and before the commencement of the Project, 653 gave Arcon a "mobilization fee" of $99,207.10 or 5% of the Contract price.[5]

Arcon then retained Ace Drilling and Excavation, ("Ace") to perform the demolition, the shoring, and the excavation in the plans for the Project. The contract between Ace and Arcon was for $197,385 plus a 19% markup ($37,503) or $234,888.[6]

Under the Contract, the total cost of earth moving and shoring was $244,394 plus another 19% markup for overhead and profit in the amount of $46,435 or the sum of $290,829. The Contract charged 653 for demolition and disposal the sum of $37,709 ($31,688 plus the 19% markup for overhead and profit in the amount of $6,021). The lump sum for services to be provided by Ace is

---

[3] See footnote 7 as to the calculation of the Contract margin.
[4] Article 3 of the Contract.
[5] Article 5.5 of the Contract.
[6] The Contract margin of 19% equals the sum of 11.2% for Company Overhead and 7.8% for Company Margin. This markup is calculated from the sums set forth as the Company Overhead & Margin at page 6 of the Contract. In their papers and at trial, the parties submitted that Arcon used other markup sums such as 19.5% and 20%. The court follows the contract language to determine the Contract margin.

6

Case: 24-30679    Doc# 259    Filed: 01/15/26    Entered: 01/15/26 23:34:27    Page 91 of
132

$328,538.  Sadarangani also approved Change Order #1, which included $28,800 for additional piles required by a revised shoring plan.  Arcon charged 653 a total of $357,338 for Ace's scope of work.

**D.    Peer Review**

In July 2018, the City informed the parties that the submitted plans would be subject to peer review.[7]  The peer review process required changes to the structural plan and the shoring plan that were approved on August 29, 2018.  Arcon issued two written change orders, one for the structural plan, and another, requiring four additional piers with an embedment depth of 10 feet each to be added to the shoring plan.  653 approved both change orders in writing before the work was undertaken.[8]

**E.    Work Begins**

Temporary shoring work began at the job site in mid-September 2018 with an anticipated completion date by the end of the month.  The shoring work immediately stalled a few days after commencement because Ace's foreman traveled to Ireland for personal reasons. Ace brought conventional drilling equipment to the job site, but soon found the drilling of soldier piles to be difficult and time consuming.  Ace encountered refusal, *i.e.,* the inability to drill further into the bedrock, and stopped work.  Ace halted work on September 24, 2018, and demanded more compensation from Arcon to perform the job.  According to Ace, the difficult drilling conditions were "unforeseen circumstances" because they were not properly disclosed before it bid on the job.  Ace asked Arcon if there was a geotechnical report for the Project. Libov testified that he gave the Soil Report to Joe O'Brian of Ace to bid on the subcontract three months earlier, but Arcon offered no evidence to corroborate Libov's claim.  Nor is there evidence of any rebuke or reminder to Ace by

---

[7] Peer review examines the plans from a safety perspective and does not consider cost-effectiveness from an owner's perspective.
[8] 653 agreed to pay Arcon $28,800 for additional work by Ace (now totaling $358,718.21), but Arcon apparently, failed in turn, to pay Ace.

7

either Arcon or Libov about ignoring the Soil Report used to bid on the Project.

The Soil Report is significant because of its warning that extreme difficulty could be expected with any excavation and drilling at the Project due to the presence of bedrock at shallow depths. Paragraph 17 of the Soil Report states:

> We encountered refusal during the exploratory drilling process to a conventional Standard Penetration Test sampler in the rock in the borehole. The site soils and rock should be considered difficult to rip and grade with most conventional heavy-duty equipment. Rippability conditions may vary across the proposed development area. Extreme difficulty may be encountered in locations.

Even if the Soil Report was unavailable, a review of the Adept/Modern shoring plan would have revealed that special "heavy track mounted equipment" might be necessary for drilling bore holes and that there was a specific reference to the need for "coring," a process that requires a specialized barrel attachment for hard rock drilling.

Arcon yielded to Ace's compensation demand and its refusal to return to the job site for three weeks by submitting to 653 Change Order #3 on October 18, 2018. Arcon sought an additional $7,056, and potentially more, on a time and materials basis, because Ace claimed unforeseen conditions. Based on the Soil Report warnings and the Adept/Modern shoring plan warnings about bedrock at the job site, Sadarangani could not understand Arcon's reason for Change Order #3. He reviewed the documents and contacted the geotechnical engineer who authored the Soil Report, Rick Haltenhoff, to arrange a meeting with Kleyner to determine why Change Order #3 was appropriate.

## F.    Meeting About Site Conditions

Sadarangani, Kleyner and Haltenhoff met on October 23, 2018. Ace was now demanding a $30,000 change order from Arcon to return to the site and to resume work. Kleyner initially thought Change Order #3 was justified. After discussing Ace's reports of difficulty and reviewing the Soil Report and a 2015 report by Frank Lee & Associates, Kleyner agreed that the excavation conditions

8

encountered had been adequately described, that there were no new subsurface excavation conditions found at the site, and that Ace's complaints did not justify a change order.

The next day, Arcon told Sadarangani that it would tell Ace to return to the Project without a change order. Arcon emailed Ace that there were no unforeseen conditions because the Soil Report had referenced the bedrock at the job site. Arcon instructed Ace to return to work without delay. Ace did not do so. Ace returned a week later, but only after receiving a notice of termination letter from Arcon and reaching an agreement with Arcon for additional compensation.

## G. Meeting Regarding Changes to Shoring Plan

One week after Ace returned to its shoring work, Arcon asked Sadarangani to attend a meeting at the Project. On November 6, 2018, Arcon told representatives from 653 and Adept/Modern that Kleyner should approve a reduced scope of work and present alternative solutions because the drilling was taking too long. Arcon expected to reduce a "couple of soldier piles by about 2-6 feet." Arcon suggested that drilling fewer soldier piles than on the plans and in the Contract would save time. Sadarangani explained to those present at the meeting that any changes to the shoring system required his consent.

The following day, Sadarangani sent an email to *everyone* at the meeting that he would approve a reduction in the drilling only if the change in plan: (1) was approved by Kleyner; (2) does not reduce the safety of the shoring system and increase the risk profile; (3) does not add to the Project timelines; (4) does not cause another peer review; (5) does not cause any change to structural plans; and (5) does not result in increased costs to 653 even if Arcon and Ace were to install additional walers/and bracing/other materials required to accommodate any change to currently approved plans to offset the reduced depth.

Sadarangani made clear that 653 had to be informed of any material modification to the

9

Project. The proposed reductions to the shoring system appeared to benefit the contractor and its subcontractor, and not the owner. His message reiterated the need for Kleyner's approval and the City's consent "without requiring any other notifications that may result from any design changes to help accommodate the shoring and excavation time difference than planned." Thereafter, Sadarangani repeatedly asked Arcon and Adept/Modern about the progress of the shoring plan. Sadarangani's queries were ignored.[9]

## H. Communications Breakdown

In the wake of Arcon's silence about its work at the site, it continued to invoice 653 for progress payments. 653 continued to pay these invoices. Arcon sent invoice #755, which represented that the demolition work called for in the contract was 100% complete as of November 19, 2018. 653 paid invoice #755 in full. On December 7, 2018, Arcon issued invoice #765. 653 again paid invoice #765 in full.

Commensurate with these payments, Sadarangani continued to seek updates from Arcon and Adept/Modern regarding the shoring plan and pile schedule. On December 21, 2018, Alex Volodarsky of Adept/Modern ("Volodarsky") emailed 653 that changes to the shoring plan had been recalculated and completed, and that Kleyner would forward the revisions. Later that day, Volodarsky sent a revision sheet with a table showing the changes to the number and depth of the drilled soldier piles comparing the approved plan with the actual measurements as-built on site.

---

[9] On one occasion, Adept/Modern sent a letter dated November 14, 2018, to Ace and copied the City with a description of changes Kleyner had incorporated into the previously approved shoring plan. Kleyner's letter stated that Adept/Modern had "observed hard bedrock conditions which prevented design drill depth to be achieved" and described the plan to incorporate additional walers and bracing in certain areas and to decrease the minimum embedment depth to 6 feet in some areas and 8 feet in others. Kleyner's explanation omitted the Soil Report's identification of refusal conditions at the site. Under the Adept/Modern contract, Sadarangani should have been copied on the correspondence, but was not made aware of its existence until its disclosure during litigation. Adept/Modern did not handle its communications with Sadarangani or oversee its responsibilities regarding change orders consistent with its contractual duties or the standard of care, but as discussed *infra* at footnote 14, the court is not persuaded by the evidence that such failures warrant damages.

---

10

*Arcon Construction Corporation v. 653 28th Street, LLC*, San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

Upon reviewing the table of site conditions as measured by Adept/Modern, Sadarangani realized that the shoring plan changes were significantly more than the reduction of 2-6 feet on a few piles that were discussed on November 6, 2018. Although the approved plan called for 364 linear feet of drilling for pier embedment, the as-built measurements provided by Adept/Modern revealed that 120.5 linear feet of drilling in the approved shoring plans were never completed, and that another 81.5 linear feet of drilling embedment in the approved shoring plans were partially drilled and then abandoned, providing no benefit to the temporary shoring plans or to the owner. Kleyner confirmed that Arcon and Ace requested changes to the shoring plans. There was a reduction in the scope of shoring work which benefited Arcon and Ace, but Sadarangani had yet to understand how the invoices reflected the actual work performed.

## I.    Disputes Escalate

On December 26, 2018, Arcon submitted invoice #774 representing that demolition was 100% complete; that shoring and underpinning was 100% complete; that earth moving was 100% complete; and that debris removal was 90% complete. Two days after receiving invoice #774, Sadarangani learned that workers for Ace were presently working on the site and that portions of the previous structure's foundation had not been demolished. Physical conditions and work at the site were not as Arcon represented in its invoices. 653 presented these details to Arcon. A dispute between the parties quickly became an impasse.

Arcon walked off the job site after it claimed that certain parts of the job were 100% complete and required additional payments. Sadarangani sought to confirm the reduction in scope for the excavation and drilling, but Arcon never directly answered his questions.

As the Project sat idle and partially excavated, the winter rain arrived and filled the site with enough water to undermine shoring and threaten adjacent properties. The Soil Report anticipated the

11

need for pumps and generators on site to pump out rainwater and Adept/Modern's shoring plan included details for a dewatering system to handle surface water during construction. When Arcon walked away from the job, there was no dewatering equipment at the site. Arcon returned to pump out some water but abandoned the site with a depth of at least one foot of water in the excavation.

653 became concerned with Arcon's work and reviewed the Contract's line items and invoices more closely. Sadarangani's visits to the site made clear that invoice #774 had grossly exaggerated the percentages of completion for demolition, debris removal, earth moving and shoring and underpinning. When 653 withheld payments to investigate Arcon's representations, Arcon refused to proceed with the Project.

On or about January 9, 2019, Arcon told 653 that a discrepancy between the various plans concerning the base of excavation required resolution to avoid exceeding a finished building height requirement.[10] Arcon then emailed Sadarangani stating that it would not proceed with any additional work until the base of excavation discrepancy was addressed, that 653 should pay invoice #774, and that a change order was being prepared "for additional work that has been done and also additional work to excavate another 2' down." Sadarangani replied that he was owed a credit for piers not drilled and for those drilled to reduced depths; that he had asked for an explanation regarding the additional work contemplated by the proposed change order; and that he expected Arcon to return to the Project.

Arcon responded to Sadarangani's email claiming that it had drilled and installed more linear feet of soldier piles than set forth in the plans. Arcon explained that the change order resulted from the additional cost of drilling and the work of installing walers and bracing. Arcon remained indifferent to Sadarangani's early November directive that shoring changes could only been made if they added no expense. Thereafter, Arcon and 653 exchanged emails where Sadarangani insisted that Arcon provide

---

[10] The City required the Project to meet a finished building height below the upslope neighbor's peak roof.

12

*Arcon Construction Corporation v. 653 28th Street, LLC*, San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

a table showing its position on the shoring conditions on site. When Arcon directed 653 to obtain the most accurate information from Kleyner, Sadarangani told them that he had Kleyner's updated tables, which showed over 100 linear feet less and 4 soldier piles less than called for in the approved plans.

During January 2019, Sadarangani made more attempts to have Arcon dewater the excavation, but his messages were unanswered. Neighbors were now complaining. Kleyner warned Sadarangani of increasing safety concerns resulting from the accumulating rainwater and the immediate need to remove the water to accurately survey the base of the excavation. The unavailability of a survey impeded Kleyner's ability to make his engineering calculations. Kleyner asked Arcon to pump the site. Arcon ignored Kleyner's request. The urgency to Sadarangani and Kleyner was palpable.

Between January 15, 2019, and January 17, 2019, emails circulated among Sadarangani, his architects[11], Kleyner, and Arcon that show the design team finalizing preliminary draft elevations with the objective of securing a maximum elevation measurement for the building's peak height. Queries from Lum and Duong to Arcon about the elevations went unanswered. On January 17, 2019, Sadarangani emailed the elevations prepared by his architects to Libov and asked how Arcon would like to proceed.

Rather than responding to Sadarangani's inquiry, Arcon submitted to 653, a revised Change Order #3, dated January 18, 2019, for the changes to the shoring work, including the walers and bracing that Sadarangani said he would not agree to pay. No one talked to Sadarangani to seek authorization or the execution of a written change order before the work described in revised Change Order #3 was performed. Sadarangani found Arcon's charges for the walers and bracing, and for drilling 10 linear feet more than called for in the shoring plan to be unacceptable. Arcon's refusal to credit 653 for the reduced scope of work resulting from changes to the shoring plan compounded

---

[11] Lum and Khoan Duong ("Duong").

13

*Arcon Construction Corporation v. 653 28th Street, LLC*, San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

Sadarangani's frustration.

Arcon's failure to recognize that any change order under the Contract required approval by Sadarangani became more evident when Libov submitted Change Order #4, dated January 23, 2019. The latest change order was intended to address the height limitation concern at the job site. No one from Arcon ever discussed the proposal with 653, before, during or after it was issued. Email correspondence from the architects and Sadarangani regarding calculated building elevations appeared to have been spurned. Arcon's proposal was for 653 to pay $18,720 for additional excavation. Arcon remained off the site.

Sadarangani was exasperated with Arcon. On January 24, 2019, Sadarangani sent a lengthy and detailed Notice of Breach letter to Arcon encouraging its immediate return to the Project. He wanted Arcon to abide by the express terms of the Contract and to resolve 653's concerns with their recent change orders. Sadarangani wanted Arcon to address its failures: to obtain authorization for new work as discussed at the November 6, 2018 meeting; to provide lien releases from the subcontractor; to address misstatements and correct credits in invoice #774; and to return to remove water and debris completely from the excavation. The notice asked to cancel Change Orders #3 and #4, to strike invoice #774, and insisted on its return to work because five weeks have been lost to work stoppages. Arcon did not abide by 653's request.

On January 31, 2019, Ace submitted a change order to Arcon for $33,400 to perform additional excavation work and the installation of additional walers and bracing. In turn, Arcon submitted Change Order #5 to 653, explaining that it replaced Change Orders #3 & #4. Change Order #5 included a $74,071 charge for Ace's $33,400 request, which exceeded the 20% increase for change orders identified in the Contract. Change Order #5 finally included part of the requested credit for the reduced scope of work drilling piers for $25,520, but the discount was contingent on 653 accepting the

14

entire change order. Arcon stated invoice #774 was not voided and that Change Order #5 was an additional charge.

## J.     653 Terminates Arcon

On February 1, 2019, a City inspector visited the job site on an anonymous complaint about the Project. The excavation containing water and debris had become a City concern. The City inspector pressured Sadarangani to address the problem. Kleyner reiterated his concern for potential disaster. Sadarangani understood the implications of an excavation full of water. Arcon had not said whether it would return the job site.

Later that day, 653 sent Arcon a Notice of Termination letter, detailing several Contract breaches. Sadarangani hoped the termination letter would convince Arcon to return to work, but his efforts, and those through third parties, proved futile.

After Arcon's termination, 653 retained a surveyor to measure the excavation. 653's design team resolved the building height problem by incorporating less excavation than proposed by Arcon. 653 contracted with Ace to perform additional excavation based upon its job site knowledge and to avoid having Ace lien the Project because Arcon had not paid Ace $54,000 on the subcontract and had not secured lien releases. The City inspector reviewed the new plans and job site conditions with Kleyner, and approved them by closing his complaint investigation in March 2019.

653 hired another licensed general contractor, CHT Properties Development ("CHT"), to complete the Project. 653 also contracted with additional service providers to address the full scope of work Arcon had been obligated to perform under the Contract. The Project was completed in July 2021. Arcon filed a mechanic's lien against the property after its termination from the Project, and then filed suit to recover on the lien and damages for breach of contract. 653 responded with counterclaims against Arcon. The parties initially had their dispute filed as a binding arbitration, but

15

later agreed to abandon the arbitration and to have their claims heard in San Francisco Superior Court where the design professionals were added as defendants to Arcon's claims and as Cross-Defendants to 653's claims. The action proceeded to a court trial in this Department commencing on August 28, 2023.

## IV. DECISION

This Statement of Decision is issued pursuant to California Rule of Court 3.1590.

### A. ARCON'S CLAIMS

As detailed below, 653 justifiably terminated Arcon on February 1, 2019, for materially breaching the Contract. Arcon's claims to recover on its mechanic's lien and for damages stemming from breach of contract are denied.

Under California law, the amount of a mechanic's lien is limited to the lesser of the reasonable value of the services rendered or the amount due under the contract. Civil Code § 8430. A contractor cannot lien work not included in a direct contract or a modification of that contract. Civil Code § 8432. Moreover, the lien amount must deduct any amounts due to other claimants. Civil Code § 8434. Arcon was prohibited from including unapproved or unperformed work and was required to deduct the $54,000 withheld from subcontractor Ace. These mistakes cannot be corrected, and this claim therefore is denied.

The court finds that Arcon is entitled to an offset against the recovery awarded to 653, (outlined below) in the amount of $30,083.20. This amount represents the unpaid portions of Arcon's final invoice submitted before its termination from the Project adjusted to reflect more accurate percentages of completion and the proper percentage increases for overhead and profit margin/

16

*Arcon Construction Corporation v. 653 28th Street LLC*, San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

## B.    653'S CLAIMS

As discussed below, the court finds 653 provided substantial and credible evidence of numerous material breaches of contract by Arcon, which stem from a total and abject disregard of its responsibilities under the Contract.

An example of its unwillingness to abide by the Contract can be illustrated by Arcon's response to Sadarangani's demand in his Notice of Breach that Arcon address numerous breaches including its return to the job site to remove accumulating water and debris. Arcon was contractually required to incorporate a dewatering system described in the shoring plans but abdicated its contractual responsibility. A week after the Notice of Breach was sent, Arcon remained unyielding. A City inspector visited the job and expressed concerns about the open excavation and the apparent lack of work site activity. As supported by opinion testimony from general contracting expert witness Dave Brown, 653 justifiably terminated Arcon for failing to address the open excavation and to proceed with the Project. The accumulation of water not only prevented an accurate survey to assist in designing a solution to meet the City's height limitation, but other expert testimony offered that the presence of water at the site created a safety risk to people and a hazard to neighboring foundations. No credible evidence was presented to show why Arcon could not perform the job.

653 presented evidence that supports several material breaches of the Contract by Arcon, including the failure: to provide vibration monitoring as required by the plans; to obtain written change order approvals from 653; to show accurate work completion percentages in its invoices; and to account for credits and billing reconciliations owed to 653 for decreasing the scope of the shoring work. Arcon's material breaches of contract caused 653 damages on the following claims:

### 1.    Arcon Owes 653 Damages for 653's Increased Costs of Completing the Project.

17

Case: 24-30679   Doc# 259   Filed: 01/15/26   Entered: 01/15/26 23:34:27   Page 102
of 132

*Arcon Construction Corporation v. 653 28th Street LLC*, San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

Sadarangani provided testimony and documentary evidence proving that 653 been forced to incur costs and expenses that exceeded the Contract fee to complete the Project. 653 retained CHT to complete the Project for a fixed contract price of $1,180,000 as compared to the Contract's $1,984,141 fee. The testimony showed that after comparing the scope of work and line-item breakdown in each agreement, and considering the work and payments already made to Arcon, 653 spent an additional $132,818 beyond the fixed price agreed upon with Arcon to complete the Project with CHT.[12]

653 credibly proved that these damages were actually incurred. Exhibit 192 included checks paid to CHT and others in connection with the completion of the project at 653 28th Street in San Francisco. The amount paid to CHT in the checks from Exhibit 192 total $1,228,522. Most of the checks include a reference to the payment number corresponding to the Progress Payment Schedule that is Exhibit A to the contract between CHT and 653. While some numbered Progress Payments are not reflected on the checks, the amounts of the checks to CHT without a reference number are in amounts that suggest some of the payments were grouped into larger payments to CHT.

---

[12] Sadarangani prepared a demonstrative exhibit identified as Exhibit 357A to compare the cost of the Contract and the agreement with CHT. At trial, Sadarangani testified that Arcon had charged as 11.7% for company overhead expenses and 7.8% for company profit margin based upon a line item breakdown of how Arcon calculated its fixed price. Sadarangani explained that there were many standard allowances included in the fixed price for Arcon not included in the CHT contract. The allowances in the Contract provided 653 the opportunity to source and purchase these items and deduct them from the contract's fixed price. The standard allowance items are discussed in the rider at item 7 of the Contract.

The Contract's allowance items amounted to $369,498. After applying the increases Arcon used for overhead and profit, the total amount of the allowance items in the Arcon contract that are not included in CHT's fixed price contract make up $441,550 of the Arcon fixed price amount of $1,984,141. By subtracting those items, the price of the Contract with a scope similar to that CHT agreement is reduced to $1,542,591. The Contract price was increased by Arcon's change orders #1 and #2, ($28,800 and $23,100 respectively,) bringing the contract price for comparison purposes to $1,594,491. From that amount, the amount of $367,543 is subtracted to acknowledge the work Arcon claimed to have completed before its termination, resulting in an amount of $1,236,948 for the value of the work remaining under the Contract.

The fixed price of the CHT contract was $1,180,000. 653 presented evidence that showed there was an additional $189,767 in expenses for aspects of the Project covered by the Contract but were not covered by CHT's fixed price contract. These items and the amount Arcon priced for each was reflected in demonstrative exhibit 358A. Adding these amounts to the CHT base contract price provides the appropriate value to compare to the remaining costs to complete the Project under the Contract, or $1,369,767. Comparing this number to the value remaining under the Contract results in a damages award for the cost to complete the Project exceeding the Contract price by $132,818.

18

*Arcon Construction Corporation v. 653 28th Street, LLC,* San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

Exhibit 192 also included checks paid to subcontractors for items outside the Contract including garage door purchase and installation, stone fabrication and trenching for the utility lines. These payments total an additional $49,042. Arcon contends that the Contract did not include utility line connections. The court is not persuaded because the damage claim is for trenching work and not for the actual connection fees with the utility companies. 653 introduced evidence of invoices and statements from vendors such as Golden State Lumber and Magnolia that support the additional expenses claimed to complete the Project under the scope of services agreed upon in the Contract.

Sadarangani also testified that an additional $43,216 was paid to complete the demolition and debris removal that Arcon did not complete. Although Arcon challenges that sum on the grounds that there are no invoices for this work presented at trial, Sadarangani's testimony was sufficiently credible under the totality of the circumstances to persuade the court of the expenses incurred by 653. The testimony of a single witness is sufficient to prove a fact. Evidence Code §411; CACI 107.

Finally, evidence was presented by the Project's structural engineer, Chan, who testified that Arcon's fixed price contract included $38,245 for Structural Metal Framing, but that there was no metal framing called for in the plans. Because these amounts were not included in 653's comparison of the two fixed price contracts this additional $130,503 should also be awarded to 653.

As a result, the court finds damages for breach of contract and additional expenditures by 653 outside of the scope of the replacement general contractor's agreement should be awarded against Arcon and in favor of 653 in the amount of $263,321 representing 653's expenses to complete the Project beyond the Contract price.

**2.      Arcon's "Mobilization Fee" was an Illegal Advance Deposit in Violation of Business and Professions Code § 7159(d)(8).**

19

*Arcon Construction Corporation v. 653 28th Street, LLC*, San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

Before construction, 653 paid a $1,000.00 deposit under Article 4.2 of the Contract. Under Article 5.5, the Contract also required an advance payment entitled "Mobilization Fee" in the amount of $99,207.10, which represented 5% of the total contract price to be provided before any work commenced. The parties signed the Contract on June 13, 2018, and 653 gave Arcon a check for the mobilization fee that was deposited on June 19, 2018, before any work at the Project. 653 seeks a full refund of $99,207.20 plus prejudgment interest from June 14, 2018, to the date judgment is entered.

653 reasons that the mobilization fee was not an additional charge, but a percentage of the Contract's fixed price that was applied across every aspect of the construction, even when certain Project phases had not yet begun. A breakdown of the proposed Project costs shows that the mobilization fee additionally applied to Arcon's profit margin of $129,171.48, which was part of the total Contract price. According to Arcon, the "mobilization fee" is a common provision understood to cover a contractor's up-front costs in bringing equipment to a construction site. The evidence shows that each side had its own understanding of the term and that Arcon failed to offer any evidence to support its interpretation. The record shows that Arcon did not submit evidence of any construction expenses, which includes the movement of equipment, supplies or incidentals to the site, that justify a mobilization fee, and that it did not return, after its termination, any part of the mobilization fee despite having completed a small portion of the Contract. Arcon placed a lien on the Project in an amount less than the mobilization fee deposit.

653 further contends that the mobilization fee violates Business & Professions Code § 7159 *et seq.*, which sets out requirements for home improvement contracts between a contractor and an owner. Under the Business & Professions Code, the contractor's contract must acknowledge and inform the owner of specific limitations on advance deposits. Bus. & Prof. Code § 7159, subd. (d)(8) (C). The

20

*Arcon Construction Corporation v. 653 28th Street LLC,* San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

same law requires a home improvement contract to include standard language that specifies that the downpayment may not exceed $1,000.00 or 10 percent of the contract price. *Id.*

Arcon offers in response that the payment is included in the $1,948,141.46 price of a fixed price contract as a non-refundable 5% mobilization fee for project start-up costs, which were due and payable only after the start of construction work and that the referenced statutory requirements for a home improvement contract do not apply because the Project involved the complete teardown of an unoccupied existing home and the construction of an entirely new building.

Article 5.5 of the Contract states: "Mobilization fee of 5% of the contract shall be paid on or before the commencement day." The Contract is silent as to the definition and purpose of the mobilization fee. Payment was made before work commencement day. There is no reference in the Contract to Project start-up costs. Nor is there any language as to whether it is refundable or how to handle or treat the mobilization fee in the event of early termination, discharge, or recission.[13]

Arcon's assertion that the Project falls outside the statutory framework governing contractors and home improvement projects is understood. Remodeling a kitchen, rebuilding a stairway, or adding a deck are typically subject to home improvement contracts. Contractors engaged by the public to complete such projects are governed by a statutory framework known as "The Contractors' State License Law." Arcon's interpretation of the statutory framework is too narrow. The courts have long found that, "[S]tatutory provisions regulating contractors are to be broadly construed." *Moore v. Teed* (2020) 48 Cal.App.5th 280, 296.

Business & Professions Code § 7151 defines "Home Improvement" to include, "the repairing, remodeling, altering, converting, or modernizing of, or adding to, residential property, as well as the

---

[13] Paragraph 17 of the executed Rider to the Contract addresses how a remobilization fee under Article 5.6 of the Contract ("[l]ate payment may cause construction delay and/or remobilization fee.") might occur if the Owner terminates the Agreement without cause, but there is no definition of remobilization fee either.

21

reconstruction, restoration or rebuilding of a residential property that is damaged or destroyed by a natural disaster…".  In the context of contractor licensing, the courts have determined that the Contractors' State License Law is to be given a 'reasonable and practical construction' to support the Legislature's intent and purpose behind the statutory scheme – to protect consumers and the public from dishonest or incompetent contractors.  *Moore v. Teed, supra*, 48 Cal. App.5th at 296, citing *ACCO Engineered Systems, Inc. v. Contractors' State License Bd.* (2018) 39 Cal. App.5th 80. 88.).  See also, *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 938 ["California's strict contractor licensing law reflects a strong public policy in favoring of protecting the public against unscrupulous and and/or incompetent contracting work."].  In the context of the Contractors' State License Law, these safeguards extend to contractors who build new homes. The definition provided for a home improvement contract by the Legislature is broad and does not exclude a complete demolition and/or new build.   Under the Business & Professions Code, there is no difference between a home improvement project and the demolition of one residence to build another.

Arcon also argues that 653's principal was not an unsophisticated consumer and agreed to the non-refundable fee. Sadarangani had familiarity with the business of developing real property and Arcon and 653 apparently used lawyers who spent several months negotiating the Contract. Therefore, Arcon contends that the deposit need not be returned. Even if the policy safeguards behind the Contractors' State License do not apply, Arcon's sophisticated consumer and arms-length negotiations argument is not persuasive. The unexplained and undefined mobilization fee is objectively unreasonable. 653 bore all the risk of the mobilization fee.  If 653 terminated Arcon for good cause the day after the mobilization fee was received, there would be no recourse to recover its money under Arcon's interpretation of Article 5.5.

22

*Arcon Construction Corporation v. 653 28th Street, LLC*, San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

Arcon has not persuaded the court with its explanation in its objection to the proposed

statement of decision as to how a mobilization fee, as described in Public Contract Code section

10104[14], applies to this private construction project. Even if section 10104 applied, Arcon failed to

offer persuasive evidence of any expense to support its mobilization claim. Arcon's non-refundable

fee is patently one-sided and inequitable. Arcon has been unjustly enriched at the expense of 653 - the

law abhors unjust enrichment.

The court has reviewed the mobilization fee language and considered its purpose and effect.

Article 5.5's language undermines the public policy objective of protecting consumers under the

Contractors' State License Law. The mobilization fee is unenforceable as a matter of law. Arcon shall

return $99,207.20 plus prejudgment interest from June 14, 2018, to the date judgment is entered.

**3.      Delays in the Project Caused Damage to 653.**

**a.      Arcon did not account for difficult soil conditions.**

There is no question that Arcon had the Soil Report. The Contract price, as described above, is

based on, among other things, the Soil Report. 653 seeks delay damages because Arcon and Ace, its

drilling and excavation subcontractor, failed to bring proper drilling equipment to the Project even

though the Soil Report described conditions for which extreme difficulty could be expected during

excavation and drilling. If that was not a warning, Arcon had Adept/Modern's shoring plan, whose

*first page* provides under the "Soldier Pile and Lagging Notes" heading:

THE SOLDIER PILES FOR THE TEMPORARY SHORING CAN PROBABLY BE
DRILLED WITH LARGE TRACK MOUNTED EQUIPMENT. HARD ROCK DRILLING
AND/OR CORING SHOULD BE ANTICIPATED.

---

[14] It states: "As used in this chapter, "mobilization" includes preparatory work and operations, including, but not limited
to, those necessary for the movement of personnel, equipment, supplies and incidentals to the project site, for the
establishment of all offices, buildings and other facilities necessary for work on the project, and for all other work and
operations which must be performed or costs incurred prior to beginning work on the various items of the project site."

23

*Arcon Construction Corporation v. 653 28th Street, LLC*, San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

Arcon failed its contractual responsibility to oversee and manage the Project. Under the Contract, "[a]ll work shall be in accordance to the provisions of the plans and specification...."[15] Arcon failed to provide credible evidence that Ace ever knew about the Soil Report or the shoring plan. The difficult conditions at the job site and the failure to have proper drilling equipment caused Ace to spend significantly more time than expected on the job, and to walk off the job site. Ace eventually returned to the Project, but the delays resulting from the work stoppage resulted from Arcon's indifference and inattention to geotechnical detail.

### b. 653 is Not Entitled to Delay Damages

653 claims delay damages for an eight-month period. The Contract committed to a completion date of June 26, 2019. Upon Arcon's termination on January 31, 2019, 653 immediately searched for a replacement general contractor to complete the Project. 653 contracted with CHT on February 27, 2019, but the earliest date the new contractor could have the Project completed was February 29, 2020. The certificate of completion was not obtained until July 19, 2021, but 653 is not claiming delay damages beyond the date CHT contracted to complete the Project so that Arcon is not penalized for delays resulting from Covid-19 or the replacement general contractor.

Paragraph 2 of the Rider to the Contract provides in pertinent part:

> Contract shall commence work on the Project promptly after Owner notifies Contractor in writing to begin ("Owner Begin Notice") (which is expected to occur once all necessary permits have been obtained by from the City of San Francisco.... If Owner has not provided the ["]Owner Begin Notice", Owner may at any time terminate the Agreement further obligation to Contractor. Contractor shall complete all work on the Project . . . no later than June 26th, 2019, or within one (1) calendar year from commencement if commencement is after June 19, 2018, provided said date shall be equitably adjusted in the event of days caused by change orders and unusual weather (said date, as so adjusted, the "Target Completion Date"). If completion of the work does not occur by the Target Completion Date, Owner may deduct from the final payment $500 for each business day completion of the work is delayed beyond the Target Completion Date.

---

[15] Article 6.2 of the Contract.

24

Generally, a provision in a contract liquidating the damages for breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable. Civ. Code, section 1671(b). There is a presumption of validity of a liquidated damages provision. *Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 654. Owners that seek liquidated damages under the provisions of a construction contract, must show that they have strictly complied with all requisites to the enforcement of that contractual provision, and an owner whose acts have contributed substantially to the delayed performance of such a contract may not recover liquidated damages on the basis of such delay. *General Insurance Co. v. Commerce Hyatt House* (1970) 5 Cal.App.3d 460, 462.

Under the Rider, the "Target Completion Date" of the Project shall be no later than June 26, 2019, or within one year from commencement if commencement is after June 19, 2018, upon the issuance of the Owner Begin Notice. 653 contends that it was Arcon's burden to raise at trial the claim that the latter was never served the Owner Begin Notice. Arcon had no such burden at trial. 653 submits that the Owner Begin Notice was issued on June 14, 2018, but there is no evidence in the record that 653 ever served the Owner Begin Notice on Arcon in conformity with the Rider. When an owner seeks delay or liquidated damages for delays on a contract, he or she must show strict compliance with the contract.

The Rider provides that if the Owner Begin Notice is not issued, Owner may at any time terminate the Agreement without further obligation to Contractor. The record is clear that 653 fired Arcon for cause. 653 submits that the Rider language provides for delay or liquidated damages in the sum of $500 for each business day that the completion of the Project extends beyond the Target Completion Date. The court disagrees with 653's analysis. The Rider does not provide for delay or liquidated damages in the event of termination in advance of the Target Completion Date. These sums

25

assume Arcon has not been terminated. There is a $500 deduction for each day of work past the deadline or an additional $500 for each business day that completion of the work occurs prior to the deadline. These sums are viewed objectively as incentives to Arcon to finish the job on schedule. Nothing in either the Contract or the Rider allows 653 to recover liquidated or delay damages after its cause termination of Arcon.

### 4.    Arcon Owes 653 Money as Reconciliation for the Reduced Scope of Shoring Plan that was Implemented Without the Owner's Authorization and by Withholding Information From the Owner.

Arcon held a meeting on November 6, 2018, to persuade Sadarangani to have Kleyner change the approved shoring plan. Kleyner and Arcon described the possibility of reducing the depth of a couple of soldier piles by 2-6 feet. As described *supra*, Sadarangani told Arcon and Adept/Modern that they needed his approval to implement any changes to the shoring plan. The evidence shows that Arcon and Adept/Modern proceeded to implement significant changes to the approved shoring design that resulted not only in the reduction of a couple of piles by 2-6 feet, but a completely different shoring system that abandoned some designed support piers and reduced the embedment depth of those remaining by over 120 linear feet.

Before Arcon knew that Adept/Modern had provided 653 with the as-built site measurements, it told 653 that an additional ten linear feet of additional drilling for soldier piles had been drilled beyond what was required in the approved plan. Change Order #3 included charges for the additional linear feet of drilling and the expense of installing walers and braces without crediting 653 for substantial reductions in other parts of the shoring plan.

When Adept/Modern provided 653 with information including measurements taken at the job site of the embedment depth achieved for each pier, Sadarangani realized that the additional 10.5 linear feet of drilling required fewer piers. Arcon had avoided drilling 128.5 linear feet of drilling

*Arcon Construction Corporation v. 653 28th Street LLC,* San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

called for elsewhere in the approved plan and abandoned another 81.5 linear feet of drilling so that previously drilled holes provided neither support to the shoring system nor benefit to 653. 653 was then billed and Sadarangani paid for a shoring plan based upon the extensive drilling work under the original plan. Arcon ignored his emails about the discrepancy. Instead, Arcon continued to request approval for change orders containing increased billing for work on the shoring plan.

On January 31, 2019, Arcon issued Change Order #5, granting 653 a partial credit for the reduced scope of the shore plan in the amount of $25,520. The credit was contingent on accepting other increased expenses related to Ace's work on the project. 653 never approved Change Order #5 and has not received any reduction in cost for the reduced shoring plan. 653 is entitled to damages in the form of a credit for the reduced scope of work for which Arcon has not reconciled.

Arcon argues that the changes to the shoring system were made organically by having the geotechnical engineer observe drilling and, upon observing refusal of the bedrock to allow for deeper drilling, the geotechnical engineer had the authority to authorize minor deviations from the plans based upon observed site conditions. Arcon contends that change orders were not possible or necessary since these changes were made hole by hole based upon observation.

These arguments do not explain Arcon's refusal to credit 653 for the reduced scope of work. Any additional charges for the altered shoring plan requested by Arcon ignored Sadarangani's November 7, 2018, email directive that any changes may not increase the cost beyond what was previously planned.

The value for billing for linear feet of drilling was identified in Arcon's proposed change order #3, line item 31 40 00 as $864.00 per linear foot of drilling. After crediting Arcon for the 10.5 linear feet of additional drilling, the reconciliation for the drilling work Arcon avoided under the revised shoring plan consists of 118 linear feet at the rate of $864 per linear foot for a subtotal of $101,952.

27

The sum of $70,416 must also be returned to 653 for 81.5 linear feet of partially drilled and abandoned holes multiplied by the same rate of $864 per linear foot. The total reconciliation for the decreased scope of the shoring system is $172,368. 653, having paid a 19% markup for Arcon's overhead and margin, is entitled to recover that increase in the amount of $32,750. 653's recovery of the damages totals $205,118.

### 5. Arcon owes 653 for overcharging Ace's fee.

The contract between Arcon and Ace, signed on June 13, 2018, was for $197,385. Arcon's overhead and profit markup under the Contract is $37,503 or 19% of Ace's charge. Applying these values to the terms of the Contract, Arcon *should have charged 653 the sum of $234,888 for Ace's work.*. The Contract instead charged $328,538 for Ace's work.[16] This amounts to an unexplained markup of $93,650. Arcon further charged 653 $28,800 for Ace's scope of work in Change Order #1. There is no clear corresponding charge in the record from Ace to Arcon. Under the Contract, 653 is entitled to reimbursement in the amount of $122,450 as additional damages.

### 6. 653 may recover as prevailing party, costs under Code of Civil Procedure section 1032 *et seq.*, and/or seek under the Contract, Reasonable Attorney's Fees, Costs, and Expenses

Article 15 of the Contract provides that the prevailing party in litigation "shall be entitled to reasonable attorney fees, costs and expenses." 653 is the prevailing party against Arcon and is entitled to bring a motion to recover its costs under Code of Civil Procedure section 1032 *et seq.,* and/or to seek, under the Contract, reasonable attorney's fees, costs, and expenses in an amount to be determined by a subsequent noticed motion.

---

[16] Arcon tallied $244,394 for "Earthwork" and $31,688 for "Demolition" and "Transportation and Disposal" plus a 19% markup ($52,456) for a total sum of $328,538.

28

*Arcon Construction Corporation v. 653 28th Street, LLC,* San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

### 7. Adept/Modern Owes 653 Additional Damages for Professional Negligence.

The court finds that Adept/Modern breached the duty of care owed to 653 as a contracted shoring designer and geotechnical engineer. While the contract with Adept is limited to designing the shoring plan, Adept/Modern were identified on the shoring plan as the geotechnical engineers of record. Expert testimony established that Adept's initial shoring design was more conservative than necessary and was not cost effective for the owner. Adept was aware of the presence of bedrock at shallow depths, but designed the shoring plan using soil parameters rather than those for bedrock.

Adept designed a complex plan using deeply drilled piers on three sides of the site after having informed Sadarangani that using deep piers, while easier to design, was not appropriate due to the bedrock conditions. Adept's ability to redesign the shoring plan in a manner that reduced the need for deep pier drilling by almost 50% supports the characterization of the initial design as overly conservative.

The failure of Adept's shoring plan to account for details involving the installation of plumbing pipes under the concrete foundation slab and the base of excavation fell below the standard of care expected of a licensed shoring designer. Adept failed to use the skill and care that a reasonably careful shoring engineer would have used in similar circumstances. A similar geotechnical engineer should have known about the City's height limitations and engineered those concerns into the shoring plans. This omission caused further delay and served as one of the excuses for Arcon to stop work on the Project.

Adept's lack of skill, prudence and diligence caused 653 to spend more money to reengage its architects, engineers, and a surveyor to find a solution that would satisfy the City's Department of Building Inspection. 653 presented evidence that it paid an additional $18,157.00 to professionals to find and document the solution to the bottom of excavation discrepancy. These payments do not

29

Case: 24-30679   Doc# 259   Filed: 01/15/26   Entered: 01/15/26 23:34:27   Page 114
of 132

include additional money paid to the architect with whom 653 settled before trial. The evidence demonstrated that 653 paid the drilling and excavation subcontractor, Ace, $20,000 directly to perform the additional excavation work required after Arcon was terminated. The court awards these claims to 653 for Adept's and Modern's breach of the standard of care expected for such design professionals and geotechnical engineers of record.[17]

### 8. Adept/Modern Do Not Owe 653 Attorney's Fees for Inducing It to Sign Home Improvement Contracts Based Upon False Representations Pursuant to Business and Professions Code section 7160.

653 seeks to recover penalties and attorney fees from Adept/Modern for inducing it to sign its contracts for engineering services based upon false representations. California's Business and Professions Code section 7160 provides:

> Any person who is induced to contract for a work of improvement, including but not limited to a home improvement, in reliance on false or fraudulent representations or false statements knowingly made, may sue and recover from such contractor or solicitor a penalty of five hundred dollars ($500), plus reasonable attorney's fees, in addition to any damages sustained by him by reason of such statements or representations made by the contractor or solicitor.

According to 653, Adept/Modern induced it to contract for works of improvement by not following its original shoring plan and implementing another more expensive one; by inaccurately stating 653's additional insured status; and by failing to abide by its contractual promise to provide

---

[17] 653 claims Adept/Modern's breach of the standard of care for other reasons such as the interchangeable nature of each company's name on invoices, payments, and insurance policies. Nothing in the record explains why these companies were separately formed. There is evidence to show that the interchangeability of these companies was troublesome, but nothing to demonstrate that their nearly synonymous use or failure to add the owner as an additional insured on a Modern comprehensive general liability insurance policy caused harm to 653.

As described in footnote 8, *supra*, 653 contends that Adept/Modern breached the standard of care by failing to keep the owner informed on a regular basis (*i.e.*, the November 14, 2018, letter to Arcon and copy only to the City), and to secure the approval of any change order. The court is not persuaded that 653 has credibly proven that the perceived omission(s) caused it any further harm than what has been discussed in Section IV.B.4.

30

Case: 24-30679   Doc# 259   Filed: 01/15/26   Entered: 01/15/26 23:34:27   Page 115
of 132

geotechnical services to its client. 653 acknowledges that Adept/Modern's representations may not have been made with fraudulent intent, but alleges that they were knowing and/or reckless.

The court is not persuaded that Adept/Modern's statements fraudulently induced 653 to contract for their engineering services. There is insufficient evidence to suggest that Adept/Modern had no reasonable grounds to believe that their statements to Sadarangani were not true when they made them. The court finds, after considering Kleyner's testimony and credibility that he would not make representations for Adept/Kleyner's economic gain. He clearly expressed interest in finding appropriate engineering solutions when Arcon refused to come to the site. Adept/Modern's efforts during January 2018 run counter to any suggested collusion with Arcon. The court is unwilling to award penalties or attorney fees under circumstances where 653 chose to continue with Adept/Modern's services after experiencing what it considers to be deceitful conduct.

The court does not find section 7160 applicable in this case because Adept/Modern functions under a civil engineering license along with a geotechnical engineering license where both are granted and subject to discipline by the Board for Professional Engineers, Land Surveyors, and Geologists. Thus, the court finds that the Adept/Modern and 653 contract was not a "contract for a work of improvement," but rather, a professional services contract not covered by the statute.

**9.      653 May Recover Statutory Costs Against Adept/Moder under Code of Civil Procedure section 1032 *et seq*.**

653 is the prevailing party against Adept/Modern and is entitled to bring a motion to recover its costs in an amount to be determined under Code of Civil Procedure section 1032 *et seq.*

**10.     Arcon is Not Entitled to an Offset under Code of Civil Procedure sections 877 and 877.6.**

On June 7, 2024, the Court held a hearing on Arcon's contention that it is entitled to an offset under Code of Civil Procedure section 877.6 because of the Court's prior determination of good faith

31

settlements between 653 and architect Lum ($99,999) and structural engineer Chan ($25,000). Under the Lum Order and the Chan Order, claims for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault, including Arcon's First Amended Complaint, were dismissed with prejudice, and forever barred. The Court finds that there is no relationship between the claims released in the prior good faith settlements and the breach of contract damages awarded in this decision. Arcon is not entitled to an offset for 653's prior settlements with Lum and Chan.

## V.      CONCLUSION

Judgment shall be entered in favor of Defendant 653 on all Arcon's claims.

Judgment shall be entered in favor of Cross-Complainant 653 and against Cross-Defendant Arcon with damages awarded as follows:

> Cost of Completion damages of $263,321;
>
> Return of the advance mobilization fee of $99,207.16 plus prejudgment interest from June 19, 2018, until the date judgment is entered;
>
> Reconciliation for reduced shoring plan of $205,118; and
>
> Overcharges for Ace's subcontract of $122,450.

The above damages against Cross-Defendant Arcon shall be reduced by $30,083.20, the amount of the final unpaid invoice to 653.

Judgment shall be entered in favor of Cross-Complainant 653 and against Cross-Defendants Adept and Modern for professional negligence with damages awarded of $38,157.

653 is the prevailing party against Arcon and is entitled to recover its costs under Code of Civil Procedure section 1032 *et seq.*, and/or under the Contract, reasonable attorney's fees, costs, and expenses in an amount to be determined by a post-trial motion.

653 is the prevailing party against Adept/Modern and entitled to recover its costs under Code

32

*Arcon Construction Corporation v. 653 28th Street, LLC,* San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

of Civil Procedure section 1032 *et seq.*

653's counsel shall prepare a judgment consistent with the Court's Order.

**IT IS SO ORDERED.**

Date: June 21, 2024

_____
The Honorable Garrett L. Wong
Judge of the Superior Court

*Arcon Construction Corporation v. 653 28th Street LLC,* San Francisco Superior Court Case No. CGC-19-574888
Statement of Decision

## CERTIFICATE OF SERVICE BY MAIL
### (Code of Civil Procedure § 1013a (4))

I, Kimberly Septien, deputy clerk of the Superior Court of California, County of San

Francisco, certify that I am not a party to this action.

On **June 24, 2024**, I served the attached **STATEMENT OF DECISION (CGC-19-574888)**

by placing a copy thereof in a sealed envelope addressed to each of the following:

George W. Wolff
Wolff Law Office
P.O. Box 26749
San Francisco, CA 94126-6749

Brian E. Soriano, Esq.
Goldstein, Gellman, Melbostad, Harris
& McSparran, LLP
1388 Sutter Street, Suite 1000
San Francisco CA 94109-5494

James L. McCormick
Goodman Neuman Hamilton LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

and I then placed the sealed envelope(s) in the outgoing mail at 400 McAllister Street, San

Francisco, CA 94102, on the date indicated above for collection with the postage thereon fully

prepaid and mailed on that date following standard court practices.

DATE: June 24, 2024

CLERK OF THE COURT

KIMBERLY SEPTIEN, Deputy Clerk

1

2

3

4

5

6                                    Exhibit "C"

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE 24-30679 - 4

F I L E D
Superior Court of California
County of San Francisco

SEP 10 2024

CLERK OF THE COURT
BY: _____
KIMBERLY SEPTIEN   Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| ARCON CONSTRUCTION CORPORATION, | Case No. CGC-19-574888 |
| Plaintiff, | Assigned for All Purposes to Department 504, Judge Garrett L. Wong, presiding |
| v. | |
| 653 28TH STREET LLC; JOHN LUM ARCHITECTURE INC.; JOHN GIT HOONG LUM, AN INDIVIDUAL; ADEPT CONSTRUCTION SOLUTIONS, INC.; IGOR M. KLEYNER, AN INDIVIDUAL; MICHAEL YAN CHAN DBA MICHAEL CHAN COMPANY; AND Does 1-200, inclusive, | [PROPOSED] JUDGMENT AFTER COURT TRIAL |
| Defendants. | Complaint Filed: March 28, 2019 |
| | Trial Date: August 28, 2023 |
| 653 28TH STREET LLC, | |
| Cross-Complainant, | |
| v. | |
| ARCON CONSTRUCTION CORPORATION; JOHN LUM ARCHITECTURE INC.; MICHAEL CHAN COMPANY; ADEPT CONSTRUCTION SOLUTIONS, INC., MODERN TECHNOLOGY RESOURCES, INC., AND Roes 1-100, inclusive, | |
| Cross-Defendants. | |

The following is a judgment after court trial. The jury was waived. The Court considered the evidence. The trial began on August 23, 2023 at 9:00 a.m. before Judge Garrett L. Wong and the submission of evidence was completed on September 21, 2023.

Appearances are as follows:

1.

Case: 24-30679    Doc# 289-1  Filed: 04/15/26  Entered: 04/15/26 20:34:22  Page 121 of 132

Plaintiff/Cross-Defendant ARCON CONSTRUCTION CORPORATION (hereinafter "ARCON"), and its counsel of record, George William Wolff, Esq.,

Defendant/Cross-Complainant 653 28TH STREET, LLC (hereinafter "653"), and its counsel of record, Brian E. Soriano, Esq.,

Defendants/Cross-Defendants ADEPT CONSTRUCTION SOLUTIONS, INC., and MODERN TECHNOLOGY RESOURCES, INC. (hereinafter collectively as "ADEPT/MODERN"), and their counsel of record, James L. McCormick, Esq.

A Statement of Decision was requested. The Court signed a Statement of Decision of June 21, 2024.

**JUDGMENT IS ENTERED AS FOLLOWS BY THE COURT:**

**On Plaintiff ARCON CONSTRUCTION CORPORATION's Complaint,**

Judgment shall be entered in favor of Defendant 653 28TH STREET, LLC, on all of Plaintiff ARCON CONSTRUCTION CORPORATION's claims.

Plaintiff ARCON CONSTRUCTION CORPORATION to receive nothing from Defendant 653 28TH STREET, LLC on the Complaint.

Defendant 653 28TH STREET, LLC is the prevailing party against Plaintiff ARCON CONSTRUCTION CORPORATION and is entitled to recover its costs under Code of Civil Procedure section 1032 *et seq.*, and/or under the Contract, reasonable attorney's fees, costs, and expenses in an amount to be determined by a post-trial motion.

**On Cross-Complainant 653 28TH STREET, LLC's Cross-Complaint,**

Judgment shall be entered in favor of Cross-Complainant 653 28TH STREET, LLC, and against Cross-Defendant ARCON CONSTRUCTION CORPORATION with damages in the amount of $722,017.46 (this amount includes prejudgment interest on the mobilization fee from June 19, 2018, to September 19, 2024).

Judgment shall also be entered in favor of Cross-Complainant 653 28TH STREET, LLC, and against Cross-Defendants ADEPT CONSTRUCTION SOLUTIONS, INC., and MODERN TECHNOLOGY RESOURCES, INC. for professional negligence with damages awarded of $38,157.

Cross-Complainant 653 28TH STREET, LLC is the prevailing party against Cross-Defendants

2

[PROPOSED] JUDGMENT AFTER COURT TRIAL - CASE NO. CGC-19-574888

ADEPT CONSTRUCTION SOLUTIONS, INC., and MODERN TECHNOLOGY RESOURCES, INC. and is entitled to recover its costs under Code of Civil Procedure section 1032 *et seq.*

Cross-Complainant 653 28TH STREET, LLC is the prevailing party against Cross-Defendant ARCON CONSTRUCTION CORPORATION and is entitled to recover its costs under Code of Civil Procedure section 1032 *et seq.*, and/or under the Contract, reasonable attorney's fees, costs, and expenses in an amount to be determined by a post-trial motion.

**IT IS SO ORDERED.**

Date: _September 9_, 2024

_____
The Honorable Garrett L. Wong
JUDGE OF THE SUPERIOR COURT

3

[PROPOSED] JUDGMENT AFTER COURT TRIAL – CASE NO. CGC-19-574888

1
2
3
4
5
Exhibit "D"
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REQUEST FOR JUDICIAL NOTICE 24-30679 - 5



1  Brian E. Soriano, SBN 183865
   Nyoki T. Sacramento, SBN 239046
2  GOLDSTEIN, GELLMAN, MELBOSTAD,
   HARRIS & McSPARRAN, LLP
3  1388 Sutter Street, Suite 1000
   San Francisco, CA 94109-5454
4  TEL: 415/673-5600
   FAX:415/673-5606
5  EMAIL: bsoriano@g3mh.com
   EMAIL: nsacramento@g3mh.com
6
   Attorneys for Creditor
7  653 28th Street, LLC

**CHANGES MADE BY COURT**

**Signed and Filed: December 9, 2024**

_(signature)_

_____

**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

8               **UNITED STATES BANKRUPTCY COURT**

9               **NORTHERN DISTRICT OF CALIFORNIA**

10                   **SAN FRANCISCO DIVISION**

11  In re:                                    Case No. 24-30679 DM 11

12  ARCON CONSTRUCTION CORPORATION,            Chapter 11

13              Debtor.                        **ORDER GRANTING 653 28TH STREET,**
                                               **LLC'S MOTION FOR RELIEF FROM**
14                                             **AUTOMATIC STAY**

15                                             Judge: Hon. Dennis Montali
                                               Date: November 21, 2024
16                                             Time: 9:30 a.m.
                                               Ctrm: 17 (Via Tele/Videoconference)

17

18          Upon consideration of Creditor 653 28th Street, LLC's MOTION FOR RELIEF FROM STAY

19  filed with the Court on October 24, 2024, and after hearing held on November 21, 2024, good cause

20  appearing therefor;

21          **IT IS ORDERED THAT** the automatic stay imposed by 11 U.S.C. Sec. 362 is hereby

22  modified as follows:

23          1.      The State Court action may proceed and address any and all issues required to finalize

24  the judgment in S.F. Superior Court Case No. CGC-19-574888 as between the moving party 653 28th

25  Street LLC and Debtor Arcon Construction Corporation, including but not limited to, 653 28th Street,

26  LLC's motion for recovery of attorney's fees against debtor Arcon Construction Corporation.

27

28

                                            1.

2.       The stay preventing enforcement of the judgment against Debtor Arcon Construction Corporation shall remain in place unless and until permission to do so is granted by the Bankruptcy Court.

3.       The Court finds that no stay applies as to all other defendants.

**APPROVED.**

2

## COURT SERVICE LIST

Arcon Construction Corporation
333 Gellert Bld, Suite 160
Daly City, CA 94015

1
2
3
4
5
6
7
8                                    Exhibit "E"
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REQUEST FOR JUDICIAL NOTICE 24-30679 - 6

Compose

| | |
|---|---|
| Inbox | 430 |
| Starred | |
| Snoozed | |
| Important | |
| Sent | |
| Drafts | 68 |
| Purchases | 4 |
| Social | 38 |
| Updates | 681 |
| Forums | 1 |
| Promotions | 273 |
| More | |

Labels

| | |
|---|---|
| [Imap]/Drafts | |
| [Imap]/Trash | |
| O9-32894 | |
| 9th circuit | 5 |
| 19-30470 genardini | 7 |
| 24-30679 arcon | 45 |
| A.Allen | 10 |
| aini - salazar | |
| akins-gainer -aac | 291 |
| ALRP | 2 |
| amanda house | 1 |

✉

## eService Notice for Arcon Construction Corp vs 653 28th Street LLC et al; CGC-

**donotreply@info.rapidlegal.com**
to me

**eService Delivery Notification**

This electronic message is to notify you on behalf of **Alves Radcliffe LLP**

The following document(s) are being served:

     **Ex Parte Application (w/o hearing)**
     **Proof of Electronic Service**

To retrieve documents, please click this link: **eService Notification.**

Should you have any questions, please contact Customer Support at 1-800-366-5445, email operations@rapidlegal.com or for more info

Thank you for using Rapid Legal.

Order(s): **13327380-02**

Billing Code: **1449**

This automated message is being sent by Rapid Legal, Inc. It is intended exclusively for the individuals and/or entities to which it is addressed. This communication including any you are not authorized to read, print, retain, copy or disseminate any part of this message, or any part of any links or attachments thereto. If you have received this message in er

© 2025 Rapid Legal Inc, All Rights Reserved,
15345 Fairfield Ranch Road, Suite 200, Chino Hills, CA 91709
Contact Us  Privacy Policy  Terms of Service

↩ Reply    → Forward    🙂

**Sheila Gropper-Nelson** <shedoeslaw@gmail.com>

to Suzanne, Brent 

Attached please find the order granting relief from stay for a limited purpose.

That you've contacted the state court can be viewed as a violation of the stay.

All further conduct by 653 in pursuit of any further action in state court, together with the conduct already identified, will be treated as a continuing violation of the automatic stay.


## Arcon Construction Corporation v. 653-28th Street LLC et al., San Francisco County Superior Court Case No. CGC 19-574888- MEET AND CONFER RE HEARING DATE

**Suzanne Alves** <salves@alvesradcliffe.com>                Thu, Nov 6, 2025 at 7:03 PM
To: Sheila Gropper-Nelson <shedoeslaw@gmail.com>
Cc: Brent Meyer <brent@meyerllp.com>

Ms. Gropper-Nelson:

Thank you for providing a copy of the Court's Order. However, contrary to your claim of a "limited purpose," the wording of the Court's order is actually quite broad, to wit: "**any and all** issues required to finalize the judgment in S.F. Superior Court Case No. CGC-19-574888 as between the moving party 653 28th Street LLC and Debtor Arcon Construction Corporation, including **but not limited to**, 653 28th Street, LLC's motion for recovery of attorney's fees against debtor Arcon Construction Corporation." [Emphasis added.] Thus, I disagree wholeheartedly that I, on behalf of my client, have violated any stay order by contacting the Court to obtain a hearing date for a motion to finalize the judgment by amending the same to add the true judgment debtors, the corporate alter egos.

Further, the trial court is presumably aware of the stay order and, by instructing the parties to meet and confer regarding a hearing date, clearly considers the proposed motion to fall within the above-referenced language.

Thus, please advise what date within the range provided (December 10 through 31, excluding December 25) you are available for hearing in this matter.

[Quoted text hidden]


# Arcon Construction Corporation v. 653-28th Street LLC et al., San Francisco County Superior Court Case No. CGC 19-574888- MEET AND CONFER RE HEARING DATE

6 messages

---

**Suzanne Alves** <salves@alvesradcliffe.com>                    Thu, Nov 6, 2025 at 11:55 AM
To: Sheila Gropper-Nelson <shedoeslaw@gmail.com>
Cc: Brent Meyer <brent@meyerllp.com>

Ms. Gropper-Nelson:

Per the Court's instruction, I am writing to meet and confer regarding a hearing date for 653-28th Street LLC's Motion to Amend Judgment to add alter ego debtors. The Court is available to hear this matter any date in December (other than the 25th) at 9:00 a.m. from December 10 until the end of the year. I will make myself available on any date of your choosing during that timeframe. Please let me know by close of business tomorrow what date works best for you and your client.

I look forward to hearing from you.

Your courtesy and cooperation in this matter are greatly appreciated.

Sincerely,

Suzanne M. Alves

 ALVES RADCLIFFE

2377 Gold Meadow Way, Ste. 100

Gold River, California 95670

Tel: 916-333-3375

Email: salves@alvesradcliffe.com